<table>
<tr><td></td><td>IN THE CIRCUIT COURT OF THE<br>ELEVENTH JUDICIAL CIRCUIT<br>IN AND FOR MIAMI-DADE COUNTY</td></tr>
</table>

**IN THE CIRCUIT COURT OF THE**
**ELEVENTH JUDICIAL CIRCUIT**
**IN AND FOR MIAMI-DADE COUNTY**

**COMPLEX BUSINESS**
**LITIGATION DIVISION**

**IN RE: CHAMPLAIN TOWERS SOUTH**
**COLLAPSE LITIGATION.**

**CLASS REPRESENTATION**

CASE NO. 2021-015089-CA-01

_____/

### <u>CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT</u>

Plaintiffs Raquel Azevedo de Oliveira, as personal representative of the Estates of Alfredo Leone and Lorenzo de Oliveira Leone; Kevin Spiegel, as personal representative of the Estate of Judith Spiegel; Kevin Fang, as personal representative of the Estate of Stacie Fang; Raysa Rodriguez; and Steve Rosenthal bring their consolidated second amended class action complaint against Defendants 8701 Collins Development, LLC; Terra Group, LLC; Terra World Investments, LLC; John Moriarty & Associates of Florida, Inc.; NV5, Inc.; DeSimone Consulting Engineers, LLC; Champlain Towers South Condominium Association, Inc.; Morabito Consultants, Inc.; and Becker & Poliakoff, P.A (collectively, "Defendants"). Plaintiffs, individually and on behalf of the class and subclasses defined herein, make the following allegations:



EXHIBIT
**A**

**INTRODUCTION**

1.　　On June 24, 2021, at approximately 1:38 a.m., the Champlain Towers South ("CTS") condominium building in Surfside, Florida suffered a catastrophic failure and partial collapse, killing 98 people and destroying 55 units. The remaining structure was demolished ten days later, after being deemed dangerously unstable.



2.　　Though the collapse was sudden, the structural damage to CTS that caused the collapse had been worsening for years and was caused by the negligence of the Defendants named herein.　Because of them, the residents and occupants lost their lives, homes, and belongings.

3.　　CTS was an older building in need of routine repairs and maintenance, but it was not until excavation and construction began on the luxury high-rise condominium project next door, known as "Eighty-Seven Park," that CTS became so badly damaged and destabilized as to

be unsafe.  First, the developers of Eighty-Seven Park improperly obtained the right to build higher and larger than originally entitled, including by buying a public street just a few feet from CTS's foundation.  Then they undertook destructive excavation and site work dangerously close to CTS, sloped their project so that water poured into CTS and corroded its structural supports, and drove sheet piles 40 feet into the ground, causing tremors and vibrations at such high levels that they cracked tiles and walls at CTS and shook the structure.

4.     When residents, like the Radulescu Family, wrote to the Eighty-Seven Park developers and complained that they feared their "lives will be in danger" on account of the "daily TREMORS" associated with the construction, they were dismissed outright by the next-door developer eager to be sure his luxury project was not delayed. Rather than take steps to remediate the damage, the Eighty-Seven Park developers embarked on a campaign to quiet the residents, sending their lawyers to offer them a cash pay-off, conditioned on confidentiality.

5.     Meanwhile, when it came time for CTS to undergo repairs in connection with its building recertification, the Champlain Towers South Condominium Association, Inc. (the "Association") failed to fulfill its responsibility to timely levy the necessary assessment and carry out the needed repairs.  The engineer hired by the Association to investigate the structure, failed to report adequately on the dire situation.  And, the experienced law firm hired to represent the Association, on whom the Board of Directors relied for advice and counsel, ignored red flags, indifferent to the obvious danger facing residents.  The collapse was entirely preventable. The negligence and gross negligence of the Defendants caused this devastating tragedy, and they must be held liable.

## PARTIES

6.     Plaintiffs and the putative class and subclasses they seek to represent were unit owners, residents, occupants, and guests at CTS at the time of the collapse. Together, these victims suffered hundreds of millions of dollars in damages. They lost their loved ones, their homes, and nearly all their personal belongings.

7.     The following named Plaintiffs are representative of the members of the putative Liability Class, Personal Injury and Wrongful Death Subclass, Non-Owner Personal Injury and Wrongful Death Subclass, and Economic Loss and Property Damage Subclass alleged below (collectively, the "Classes").

*Plaintiffs*

8.     Plaintiff Raquel Azevedo de Oliveira is a resident of the State of Florida.  She brings claims on behalf of the Estates of Alfredo Leone and Lorenzo de Oliveira Leone, of which Raquel has been duly appointed Personal Representative. Raquel and her husband Alfredo Leone rented Unit 512 in CTS, and they lived there with their five-year-old son, Lorenzo. On June 24, 2021, Raquel was away visiting family in Colorado. Alfredo and Lorenzo were in Unit 512 at the time of the collapse and died as a result. Raquel will ask the Court to appoint her as a representative of the Liability Class and the Personal Injury and Wrongful Death Subclass.

9.     Plaintiff Kevin Spiegel is a citizen and resident of the State of Florida. Kevin owns and, until the time of the collapse, resided at Unit 603 in CTS. Kevin has been or will be the duly appointed Personal Representative of the Estate of Judith Spiegel. Kevin purchased Unit 603 in 2016 for himself and his wife, Judith. Their grandchildren lived nearby. On June 24, 2021, Kevin was traveling for work. Judith was home in Unit 603 and died in the collapse, leaving behind Kevin and their three adult children, Rachel Spiegel, Josh Spiegel, and Michael Spiegel. Kevin will ask

the Court to appoint him as a representative of the Liability Class and the Personal Injury and Wrongful Death Subclass.

10.     Plaintiff Kevin Fang brings claims on behalf of the Estate of Stacie Fang, of which Kevin has been or will be the duly appointed Personal Representative. Stacie Fang lived in Unit 1002 with her 15-year-old son, Jonah Handler. On June 24, 2021, Stacie died in the collapse. Her son, Jonah, survived and is the sole beneficiary of his mother's estate. Kevin will ask the Court to appoint him as a representative of the Liability Class and the Non-Owner Personal Injury and Wrongful Death Subclass.

11.     Plaintiff Raysa Rodriguez is a citizen and resident of the State of Florida. Raysa owns and, until the time of the collapse, resided at Unit 907 in CTS. Raysa retired from work and moved to CTS in 2003. On the night of the collapse, she was asleep in Unit 907. She awoke and discovered the adjacent tower had collapsed, leaving a wall of dust. Raysa escaped through the stairwell of her building and helped many of her neighbors escape as well. As a result of the collapse, Raysa lost her home and all her possessions. Raysa will ask the Court to appoint her as a representative of the Liability Class and the Economic Loss and Property Damage Subclass.

12.     Plaintiff Steve Rosenthal is a citizen and resident of the State of Florida. Steve owns and, until the time of the collapse, resided at Unit 705 in CTS. Steve was awakened by the collapse and was rescued from his balcony by first responders. As a result of the collapse, Steve lost his home and all his possessions. Steve will ask the Court to appoint him as a representative of the Liability Class and the Economic Loss and Property Damage Subclass.

*Defendants*

13.     Defendant 8701 Collins Development, LLC, was and is a Delaware limited liability company with its principal place of business at 3310 Mary Street, Suite 302, Coconut Grove,

Florida and was and is doing business in Florida. Defendant 8701 Collins Development, LLC, by and through its agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos, owned, operated, constructed, managed, supervised, and/or developed a construction project known as "Eighty-Seven Park," located at 8701 Collins Avenue, Miami Beach, Florida.

14.     Defendant Terra Group, LLC, was and is a Florida limited liability company with its principal place of business at 3310 Mary Street, Suite 302, Coconut Grove, Florida and was and is doing business in Florida. Defendant Terra Group, LLC, by and through its agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos owned, operated, constructed, managed, supervised, and/or developed a construction project known as "Eighty-Seven Park," located at 8701 Collins Avenue, Miami Beach, Florida.

15.     Defendant Terra World Investments, LLC, was and is a Florida limited liability company with its principal place of business at 3310 Mary Street, Suite 302, Coconut Grove, Florida and was and is doing business in Florida. Defendant Terra Group, LLC, by and through its agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos owned, operated, constructed, managed, supervised, and/or developed a construction project known as "Eighty-Seven Park," located at 8701 Collins Avenue, Miami Beach, Florida. Together, Defendants 8701 Collins Development, LLC; Terra Group, LLC; and Terra World Investments, LLC, are collectively referred to herein as the "Terra Defendants."

16.     Defendant 8701 Collins Development, LLC was a shell company established by Defendants Terra Group, LLC, and/or Terra World Investments, LLC through which Terra Group, LLC, and/or Terra World Investments, LLC carried out its development of Eighty-Seven Park. However, the conduct, actions, and inactions giving rise to this action and Defendants' liability

were committed by agents, servants, employees, ostensible agents, and/or alter egos of Terra Group, LLC and/or Terra World Investments, LLC.

17.     Defendant John Moriarity & Associates of Florida, Inc. (hereinafter referred to as "JMA"), was and is a Massachusetts corporation with its principal place of business located at 3 Church Street, Winchester, Massachusetts and was licensed to and doing business in Florida. JMA, by and through its agents, servants, workmen, employees, ostensible agents, and/or alter egos, was hired, retained, or otherwise acting as the general contractor on the construction project known as "Eighty-Seven Park," located at 8701 Collins Avenue, Miami Beach, Florida.

18.     Defendant NV5, Inc. (hereinafter referred to as "NV5"), was and is a Delaware corporation with its principal place of business at 200 South Park Road, Suite 350, Hollywood, Florida and was and is doing business in Florida. NV5, by and through its agents, servants, workmen, employees, ostensible agents, and/or alter egos, was hired, retained, or otherwise acting as the geotechnical engineer and inspector on the construction project known as "Eighty-Seven Park," located at 8701 Collins Avenue, Miami Beach, Florida.

19.     Defendant DeSimone Consulting Engineers, LLC (hereinafter referred to as "DeSimone"), was and is a Delaware limited liability company with its principal place of business at 140 Broadway, 25th Floor, New York, New York and was and is doing business in Florida. DeSimone, by and through its agents, servants, workmen, employees, ostensible agents, and/or alter egos, was hired, retained, or otherwise acting as the structural engineer on the construction project known as "Eighty-Seven Park," located at 8701 Collins Avenue, Miami Beach, Florida.

20.     Defendant Champlain Towers South Condominium Association, Inc. (hereinafter referred to as "the Association"), was and is a not-for-profit Florida corporation with its principal

place of business in Miami-Dade County, Florida, located at 8777 Collins Avenue, Surfside, Florida.

21.      Defendant Morabito Consultants, Inc. (hereinafter referred to as "Morabito"), was and is authorized to do and/or doing business in Florida, duly organized, created and existing under and by virtue of the laws of the State of Maryland with its principal place of business located at 952 Ridgebrook Road, Suite 1700, Sparks, Maryland. Morabito by and through its agents, servants, workmen, employees, ostensible agents, and/or alter egos, was hired, retained, and/or otherwise acting as a professional engineer responsible for inspecting the CTS building and certifying its structural integrity.

22.      Defendant Becker & Poliakoff, P.A. (hereinafter referred to as "Becker"), was and is a Florida professional association with a principal place of business at 1 East Broward Boulevard, Suite 1800, Fort Lauderdale, Florida and was and is doing business in Florida. Becker, by and through its agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos provided continuous legal services and counsel to the Association since at least February 25, 1993, until after the CTS collapse.

**JURISDICTION AND VENUE**

23.      This putative class action arises from the Defendants' conduct and seeks damages exceeding $30,000, exclusive of interest, costs, and attorneys' fees. Accordingly, this action falls within this Court's exclusive jurisdiction under section 26.012, Florida Statutes (2021).

24.      Jurisdiction properly lies in this Court. Defendants have their principal places of business in Miami-Dade County, Florida, conducted substantial business in Miami-Dade County, committed the tortious acts complained of within Florida, and/or otherwise have sufficient minimum contacts with Florida.

25.     Venue is proper in Miami-Dade County, Florida, pursuant to sections 47.011 and 47.051, Florida Statutes (2021), as this is the place where the acts and omissions complained of herein took place, where the causes of action accrued, and the place where the affected properties, which are the subject of this action, are situated.

## **GENERAL ALLEGATIONS**

26.     CTS was a twelve-story condominium building situated at the southernmost border of the Town of Surfside, at 87th and Collins Avenue.  Completed in 1981, CTS had 136 units.



27.     On June 24, 2021, at approximately 1:38 a.m., a portion of CTS suffered a catastrophic failure and partial collapse, killing 98 residents. The remaining terrified residents in the still-standing structure frantically escaped or were evacuated by first responders.

28.     Rescue and recovery crews then spent weeks digging through rubble to recover the victims' remains. In many cases, only partial remains were identified.

29.     CTS made tragic history as the third deadliest structural failure in the United States.

### *The Mechanics of the CTS Catastrophe*

30.     The mechanics of the structural collapse confirm that the Defendants—specifically including those involved in the development and construction of Eighty-Seven Park—caused and contributed to this unfathomable loss of life, safety, and property.

31.     Only one known recording of the CTS collapse exists, taken by an Eighty-Seven Park surveillance camera located at the following location:



32.     This camera captured CTS moments before it collapsed:



33.     Prior to the collapse of the tower, at least one critical support column and sections of the pool deck had already collapsed. Lacking these key support members, the tower proceeded to collapse in a progressive fashion, which took only a matter of seconds:



34.     Residents' reports from within CTS that night and the below image confirm that

the pool deck caved in and fell into the garage prior to the tower collapse.



35.     The CTS pool deck adjoined the building's south foundation wall, which abutted a

beach access walkway that the Terra Defendants, JMA, NV5, and DeSimone built during the

Eighty-Seven Park construction and maintained.

36.     Immediately beneath CTS and its pool deck, dozens of concrete structural support columns filled the 120-space parking garage. These structural support columns provided vertical support for the pool deck and the condominium tower:



37.     Each structural support column was assigned a specific identifier according to a grid in the original architectural plans for the parking garage:



38.    Garage columns M-8 (14), M-9.1 (27), M-11.1 (27/28) and M-13.1 (28) were built in the same row:



39.    These columns were designed, configured, and built so that not only would each column resist its own allocation of forces exerted by and against the CTS structure, but each would also work in tandem with the overall structural system surrounding it that combined to resist forces exerted by and against the CTS structure. Tragically, construction at Eighty-Seven Park irreversibly damaged key structural elements, including the pool deck and support columns. Once these elements failed, the tower was incapable of standing.

40.    Video footage of the CTS parking garage from the building immediately north of CTS captured collapsed concrete in the parking garage minutes before the rest of the building collapsed:



41.     An enhanced still image of the parking garage entrance footage shows in more detail the collapsed concrete supports, as well as collapsed pool decking:



42.     The video of CTS's garage revealed that, just minutes before the collapse, columns M-8 (14) and M-9.1 (27) stood, but column M-11.1 (27/28) collapsed onto the concrete slab garage:



43.     In the aftermath, column M-13.1 (28) also remained standing:



44.     Once the pool deck and at least one structural column in the garage (M-11.1)

collapsed, the CTS tower and concrete columns supporting it lost lateral support, resulting in

tremendous stress on the columns supporting the center portion of the tower: columns I-9.1 (80/81), K-9.1 (78/79), L-9.1 (77), M-9.1 (27), and N-9.1 (25/26):





45.     The failure of the foundational structure in the parking garage helped trigger the collapse sequence.

46.     The building collapse sequence is illustrated below, beginning with section 1 (in red), followed by section 2 (in green), then section 3 (in blue), and finally section 4 (in yellow), which collapsed only seconds after first section of condominiums fell:



***The Terra Defendants' Dangerous Expansion of the 8701 Collins Avenue Property***

47.     "Keep moving the job forward . . . Do not let any neighbor delay us" was the theme of the construction project now known as Eighty-Seven Park.

48.     David Martin, chief executive officer of Defendant Terra Group, LLC, succinctly articulated this safety-be-damned philosophy:

> **From:** David Martin <david@terragroup.com>
> **Sent:** Friday, March 22, 2019 8:32 AM
> **To:** Jason Gilg <jgilg@terragroup.com>
> **Cc:** Robert Nordling <rnordling@jmaf.net>; John Leete <JLeete@jmaf.net>; Fernando Vilela <FVilela@jmaf.net>; Michael Patrizio <mpatrizio@terragroup.com>; Michael Piazza <mpiazza@terragroup.com>; Andres Moncada <amoncada@terragroup.com>; Ryan Mahoney <RMahoney@jmaf.net>
> **Subject:** Re: Champlain Tower | Neighbor Complaint + Call to City for Work After Hours
>
> Keep moving the job forward. If there are any issues with city call my cell. The city will help us they want to us to finish. Do not let any neighbor delay us let just be nice!
>
> Sent from my iPhone

49.     Located at 8701 Collins Avenue in Miami Beach is a sprawling, 18-story luxury condominium building known as Eighty-Seven Park, which was developed and constructed between 2015 and 2020.

50.     The lavish Eighty-Seven Park loomed over CTS, with only a narrow beach access walkway separating the properties.  The two condominium properties border the municipal dividing line: Eighty-Seven Park is situated in the City of Miami Beach ("the City"), while CTS was in the Town of Surfside.

51.     On or about August 19, 2013, Terra World Investments, LLC ("Terra"), entered into an agreement with Dezer Properties LLC to purchase the Howard Johnson Dezerland Beach Hotel ("Dezerland Hotel") located at 8701 Collins Avenue, Miami Beach, Florida (hereinafter, the "8701 Collins Property"), for a reported $65 million. The purchase agreement was later assigned to 8701 Collins Development, LLC.

52.     Shortly after purchasing the 8701 Collins Property, the Terra Defendants started a public relations campaign indicating they intended both to renovate the existing Dezerland Hotel and add a condominium tower to the 8701 Collins Property.

53.     When the Terra Defendants purchased the 8701 Collins Property, the applicable zoning requirements limited building height to 60 feet. But this was unacceptable to the Terra Defendants, who, notwithstanding their public campaign touting renovation and preservation, began lobbying the City to lift this height limitation and upzone the property to increase value.

54.     The Terra Defendants needed the zoning change to effectuate their true plan: to raze the Dezerland Hotel and redevelop the property into a brand-new luxury condominium.

55.     These lobbying efforts were successful.  On April 30, 2014, the City Commission for the City of Miami Beach passed Ordinance 2014-3857, which amended section 142-217 of the Code of the City of Miami Beach. That amendment adopted a 200-foot maximum building height and a 21-story maximum but only for all lots fronting the Atlantic Ocean with a property line within 250 feet of the North Shore Open Space Park.

56.     The 8701 Collins Property was—and is—the only property that the zoning change impacted.

57.     Internal emails among senior Terra Defendant executives and members of their architectural firm show the Terra Defendants made a concerted effort to hide their actual building plans from the public all along. In fact, months before obtaining the zoning changes and design approval, the Terra Defendants' then-chief operating officer, David Martin, instructed his colleagues and members of architectural firm Shulman + Associates that "[w]e do not want anyone thinking we are building something here."

58.     On May 6, 2014, the Terra Defendants won approval from the City's Design Review Board to partially demolish the Dezerland Hotel and to begin construction of a 20-story residential condominium building with an urban plaza to replace a surface parking lot.

59.     The Terra Defendants' plan also featured a secret negotiation to illegally purchase 87th Terrace, a 50-foot-wide public right-of-way, with a sidewalk and parking, from the City. At the time, 87th Terrace sat immediately between CTS and the Dezerland Hotel. 87th Terrace provided beach access, light, air, and parking to CTS residents, visitors, and the general public.



*Former 87th Terrace Separating CTS From the 8701 Collins Avenue Property*

60.     By acquiring 87th Terrace, the Terra Defendants could add almost a half-acre to the footprint of the 8701 Collins Avenue Property, increase the density, build additional units and square feet, and maximize their profits.

61.     Florida law, however, does not permit the purchase of a public right-of-way. To avoid this legal impediment, the Terra Defendants retained attorneys to devise a creative solution.

62.     Terra Defendants' lawyers crafted a plan: the City would enter into a development agreement (hereinafter, the "Development Agreement") with the Terra Defendants, whereby the City would "vacate" 87th Terrace in exchange for a "voluntary contribution" of $10.5 million. As a result of this exchange, the entire width of 87th Terrace would, as a matter of Florida law, become part of the land at the 8701 Collins Property. Having taken ownership of 87th Terrace, the Terra Defendants would, following payment of the "voluntary contribution," then provide the City with a perpetual pedestrian access easement across a small sidewalk where 87th Terrace used to exist.

63.     Of course, there was nothing "voluntary" about the Terra Defendants' payment to the City. 87th Terrace would not be "abandoned" until the Terra Defendants paid the money—all $10.5 million—to the City, which the City ensured by appointing an official to oversee the transaction.

64.     In the fall of 2014, the City Commission adopted resolutions approving the vacation of the 87th Terrace right-of-way, subject to the City's approval of the Development Agreement, the parties' execution of that agreement, and the receipt of the entire $10.5 million "voluntary contribution" from the Terra Defendants.

65.     CTS received nothing from the City's "sale" of 87th Terrace to the Terra Defendants, notwithstanding that it abutted the street and held an interest up to the centerline.

66.     Ultimately, the Terra Defendants overtook 87th Terrace, expanding the 8701 Collins Property's footprint as much as possible, right up against the southern property foundation wall of CTS.  They undertook a destructive and intensive street demolition, tearing out the existing roadway and sidewalks and building in its place a small footpath, approximately eight to ten feet wide, which served as the only space between Eighty-Seven Park and CTS:



**8-10 ft. wide footpath**

67.     The Terra Defendants' decision to expand the 8701 Collins Property into 87th Terrace and to conduct demolition and construction as close to CTS as possible, should have heightened the Terra Defendants' awareness of and concern about the destructive and dangerous impact that demolition of the roadway and construction of its massive structure could have on CTS.

68.     Indeed, had the Terra Defendants not "purchased" 87th Terrace from the City, the construction would have occurred approximately 60 to 70 feet away from CTS.  As it happened, however, the Terra Defendants undertook excavation and construction a mere ten feet from the exterior foundational wall and support columns of CTS, where they used large tractor cranes to drive 40-foot sheet piles into the ground.

*__Defendants Ignored Warnings About the Risk of Construction to CTS__*

69.   Before beginning construction of Eighty-Seven Park, the applicable building codes required the Terra Defendants to conduct a geotechnical investigation.

70.   Section 1803.1 of the Florida Building Code mandates that "Geotechnical investigations shall be conducted in accordance with Section 1803.2 and reported in accordance with Section 1803.6."

71.   Florida Building Code Section 1803.6 provides, in relevant part:

**1803.6 Reporting.**

Where geotechnical investigations are required, a written report of the investigations shall be submitted to the *building official* by the permit applicant at the time of permit application. This geotechnical report shall include, but need not be limited to, the following information:

1. A plot showing the location of the soil investigations.

2. A complete record of the soil boring and penetration test logs and soil samples.

3. A record of the soil profile.

4. Elevation of the water table, if encouraged.

5. ***Recommendations for foundation type and design criteria***, including but not limited to: bearing capacity of natural or compacted soil; provisions to mitigate the effects of expansive soils; mitigation of the effects of liquefaction, differential settlement and varying soil strength; and the effects of adjacent loads.

6. Expected total and differential settlement.

7. ***Deep foundation information in accordance with Section 1803.5.5***.

8. ***Special design and construction provisions for foundations of structures founded on expansive soils, as necessary***.

9. Compacted fill material properties and testing in accordance with Section 1803.5.8.

10. Controlled low-strength material properties and testing in accordance with Section 1803.5.9.

(Emphasis added.)

72.     In 2015, the Terra Defendants retained NV5 to perform a geotechnical study and render the report that section 1803 of the Florida Building Code required (the "NV5 Report").

73.     The purpose of the April 17, 2015, NV5 Report was "to explore the subsurface conditions in order to provide recommendations for foundation design and construction."

74.     The NV5 Report contained critical findings and recommendations regarding potentially destructive effects that the development of Eighty-Seven Park would have on the adjacent CTS and NV5 provided it to the Terra Defendants, JMA, and DeSimone.

75.     Specifically, the NV5 Report warned the Terra Defendants that vibrations caused during site preparation and foundation work and dewatering activities would damage CTS's foundation and property if precautions were not taken.

76.     Given that the NV5 Report made numerous references to the dangers that vibrations associated with the construction of Eighty-Seven Park would pose to adjacent structures like CTS,

there is no doubt that the Terra Defendants knew long before construction began that uncontrolled or unmonitored vibrations and ground disturbances would negatively impact CTS.

77.    In particular, the NV5 Report emphasized the potentially disastrous impact that site preparation and compaction procedures would have on adjacent existing structures, including CTS if that work was not safely accomplished. NV5 also instructed that ***"[t]he vibrations produced by the operation of the compactor should be monitored for potential adverse effect on adjacent existing structures, pavements, and utilities."***

> *The vibrations produced by the operation of the compactor should be monitored for potential adverse effect on adjacent existing structures, pavements, and utilities.*   If nearby structures will be affected by the vibration of the compactor, the compaction procedure may require modification as approved by NV5.

78.    The NV5 Report similarly cautioned that Eighty-Seven Park's foundation and basement garage construction required proper excavation, shoring, adequate lateral support, and preservation of subjacent support. NV5 warned, "[p]articular attention should be paid to any deep excavations such as for the basement and elevator shafts and the potential impacts these could have on adjacent structures, ***especially where such excavations are close to project property lines.***"

2.    Particular attention should be paid to any deep excavations such as for the basement and for elevator shafts, and the potential impacts these could have on adjacent structures, especially where such excavations are close to project property lines.

79.    The NV5 Report cautioned the Terra Defendants, JMA, and DeSimone, that "all excavations should comply with Occupational Safety and Health Administration [("OSHA")] design and safety requirements."

80.    Title 29, section 1926.651(i), of the Code of Federal Regulations (2014), titled *Stability of adjacent structures*, provides ***"[w]here the stability of adjoining buildings, walls, or other structures is endangered by excavation operations, support systems such as shoring,***

***bracing, or underpinning shall be provided to ensure the stability of such structures[.]"*** (Emphasis added.)

81.     Title 29 CFR, section 1926.650(b) of the Code of Federal Regulations (2014), mandates "Protective Systems" that must be used during excavation procedures, including those that protect against "the collapse of adjacent structures."

82.     Further, 29 C.F.R, § 1926.651(k)(1) required the Terra Defendants, JMA, NV5, and DeSimone, to conduct "[d]aily inspections of excavations, ***the adjacent areas***, and protective systems . . . for evidence of a situation that could result in possible cave-ins, indications of failure of protection systems, hazardous atmospheres, or other hazardous conditions." (Emphasis added.)

83.     Code Section 1803.5.7 of the Florida Building states that "[w]here excavation will reduce support from any foundation, a registered design professional shall prepare an assessment of the structure as determined from examination of the structure, the review of available design documents and, if necessary, excavation test pits." The registered design professional must "determine the requirements for underpinning and protection and prepare site-specific plans, details and sequence of work for submission. Such support shall be provided by underpinning, sheeting and bracing, or by other means acceptable to the building official."

84.     Florida Building Code Section 1804.1 further states that "[e]xcavation for any purpose shall not reduce lateral support from any foundation or adjacent foundation without first underpinning or protecting the foundation against detrimental lateral or verdict movement, or both."

85.     The Terra Defendants, JMA, NV5, and DeSimone knew or should have known that they were responsible for ensuring Eighty-Seven Park site preparation work—including but not limited to excavation, shoring, compaction, and dewatering—would preserve, rather than

25

undermine, CTS's structural integrity. The Terra Defendants, JMA, NV5, and DeSimone also knew or should have known that failing to meet these responsibilities would necessarily expose CTS owners and occupants to unreasonable risks of catastrophic injuries, death, and loss of property.

86.     Despite their knowledge of their responsibilities and the devasting toll of not meeting them, the Terra Defendants, JMA, NV5, and DeSimone ignored NV5's warnings and instructions, ignored OSHA's requirements, ignored the Florida Building Code, ignored CTS resident warnings and complaints, and ignored what they could see happening during construction at the CTS property line. For the sake of greed, speed, or, most likely, both, the Terra Defendants, JMA, NV5, and DeSimone time and again defaulted to the least expensive, but most disruptive and most dangerous, practices for its Eighty-Seven Park site-preparation work. As is set forth in more detail below, the Terra Defendants, JMA, NV5, and DeSimone knew or should have known what their negligent practices would do to CTS.

### *Ultrahazardous Sheet Pile Driving at Eighty-Seven Park Damaged CTS*

**Defendants Ignored NV5 Warnings and Used Sheet Pile Driving**

87.     Pile driving was and is an ultrahazardous and abnormally dangerous construction activity. Great care and caution must be taken to ensure that pile driving does not cause damage to adjacent structures.

88.     The NV5 Report made recommendations regarding the different types of basement excavation support systems and methods that could be utilized and outlined the following methods for basement excavation support: Sheet Piles, Tangent and Secant Pile Walls, Deep Soil Mix ("DSM") Wall, and Slurry Wall.

89.     The NV5 Report noted that "conventional sheet pile walls are typically installed using ***vibratory hammer to vibrate the piles into place.***" (Emphasis added.)

90.     Among the advantages NV5 identified associated with utilizing driven sheet piles were that "most local contractors are familiar with the installation procedures for sheet pile systems," it is "relatively quick," and the sheets "can be pulled and re-used if needed." Notably, the major disadvantage associated with driven sheet piles, to which NV5 explicitly alerted the Terra Defendants, JMA, and DeSimone, was the inherent risk that ***"[s]heets installed by vibratory driving can cause damaging vibrations to adjacent properties and structures."***

---

Disadvantages of the sheet pile system include:

- Sheets installed by vibratory driving can cause damaging vibrations to adjacent properties and structures
- Instances of medium hard limestone could create difficulties for sheet installation
- Sheets have the potential for leakage and soil washout between sheets in areas of high groundwater
- The depth of sheet section has to be considered in planning excavation to minimize sheets protruding into excavation

---

91.     Unlike driven sheet piles, the other methods of basement excavation support identified in the NV5 Report—including tangent and secant pile walls, DSM wall, and slurry wall—were all identified to be "[p]ractically vibration free" but "costly compared to other methods."

92.     NV5 informed the Terra Defendants, JMA, and DeSimone that tangent and secant pile walls were "[p]ractically vibration free," among other benefits, but took longer to install and incorporated a waiting period of at least one to two weeks to allow the grout in the piles to gain strength:

**6.3.1.2  Tangent and Secant Pile Walls**

This system consists of ACIP piles drilled tangent or secant to each other to form a continuous wall.  Advantages of the ACIP pile wall system include:

- Practically vibration free
- Large heavily reinforced sections (pile diameters up to 30 inches) can be installed if needed
- Can be installed at the same time as regular pile foundations using the same drilling rig
- Wall piles can be incorporated into the foundation support system if so designed.

The following disadvantages are identified for the ACIP pile wall system:

- Sometimes water-tightness can be an issue
- Pile diameter has to be considered in planning excavation to minimize piles protruding into excavation
- Although the installation of individual piles could be achieved fairly quickly, the schedule for the installation of the wall system as a whole would be impacted by the restricted sequence of installation of the piles.  Adjacent piles cannot be installed in sequence.  Consequently the operation would call for moving of the crane more frequently than would be the case for a sheet pile wall.
- Unlike sheet pile walls where the wall face can be excavated immediately upon installing the sheets, excavation in front of ACIP piles would require a minimum waiting period of at least one to two weeks to allow the grout in the piles to gain strength.

93.    Similarly, NV5 informed the Terra Defendants, JMA, and DeSimone that the DSM wall method of basement excavation support was "[p]ractically vibration-free" and "[w]ell-suited for site subsurface conditions" but required a specialty contractor and was more expensive than other methods:

Advantages of this method include:

- Practically vibration-free
- Well-suited for site subsurface conditions where the soils to be mixed are sands/limestone
- Presents no intrusion into the excavation area
- Relatively water-tight

Disadvantages are:

- Requires specialty contractor
- Costly compared to other methods

28

94.     The final method of basement excavation support NV5 identified was a slurry wall, which, like the DSM wall and the tangent and secant pile wall, was "[p]ractically vibration-free" but was costlier than more conventional methods:

Advantages of this method include:

- Practically vibration-free in sands
- Suited for site subsurface conditions where the soils to be excavated are sands/silts

Disadvantages are:

- Requires specialty contractor
- Costly compared to other more conventional methods
- Walls can leak
- Excavation of panels does remove material and so there is the potential for subsidence and offsite impacts during the mix installation if care is not taken to stabilize the column being treated with the bentonite slurry.

95.     NV5 specifically told the Terra Defendants, JMA, and DeSimone that all viable methods of basement excavation support systems were "practically vibration free," except for the sheet pile system.

96.     Despite knowing that viable methods of basement excavation support that eliminated or substantially reduced the risk of damaging CTS were available and could be used on the project, the Terra Defendants, JMA, NV5, and DeSimone made a purely profit-driven decision to use driven sheet piles to develop Eighty-Seven Park.

97.     The Terra Defendants, JMA, NV5, and DeSimone thus knew or should have known that they exposed the owners, residents, and guests of CTS to a dangerous construction activity that they knew could negatively impact and damage CTS's foundational structure, including the concrete structural support columns and structural connections to the pool deck.

98.     The installation of sheet piles on the Eighty-Seven Park project occurred in early 2016 and was accomplished by using a large vibratory hammer, specifically a PVE 23, Model No. 23VM, pile hammer attached to a JCB 0174583 tractor crane, to drive the 35- to 41-foot-long

metal sheet piles into the ground. Throughout the entire installation process for every sheet pile, the large vibratory hammer and attached sheet piles emitted strong and dangerous vibrations.



99.     Defendant JMA hired subcontractor ASAP Installations, LLC ("ASAP") to perform the sheet pile installation work.

100.     ASAP performed vibratory sheet pile driving around the perimeter of the Eighty-Seven Park project from approximately February 24, 2016, through March 28, 2016.

101.     The sheet piles were driven into the ground only about 10 feet away from the CTS south foundation wall:



**Defendants Failed to Adequately Monitor Sheet Pile Driving**

102.    On February 13, 2016, JMA's Frank Wiza asked the Terra Defendants' Project

Manager, Curt Wyborny, whether the Terra Defendants wanted NV5 to monitor vibrations during

all sheet pile installations or only those that would be installed on the north side of the project:

> On Feb 13, 2016, at 9:40 AM, Frank Wiza <FWiza@jmaf.net> wrote:
>
> Curt did you say you wanted NV 5 to monitor vibration when we do the North side only or during all sheet
> pile install? We are planning to start next Wed. Please advise. Thank you

103.    Before receiving a response from Mr. Wyborny, Eric Stern, a Professional Engineer

for NV5, inquired how long the sheet pile installation would take. After learning it would take

approximately two weeks, Stern reached out to Geosonics, the subcontractor hired to perform

vibration monitoring. Stern informed Geosonics that there would be two weeks of sheet pile

installation at the Eighty-Seven Park project and that the plan was to "put[] a technician onsite full

time to move with the sheet pile operation" and monitor vibration levels for all sheet pile

installations:

From: "Eric J. Stern" <Eric.Stern@nv5.com>
To: Katie Daniel <kdaniel@geosonics.net>
Cc: Jeffrey Straw <jstraw@geosonics.com>, clyde.grey@nv5.com, Ilya Liberman <ilya.liberman@nv5.com>
Subject: 87 park
Date: Sat, 13 Feb 2016 10:33:46 -0500
Importance: Normal

Good morning Katie.  Our project at 8701 Collins will have two weeks of sheet pile vibration monitoring starting Wednesday.  We had discussed putting a technician onsite full time to move with the sheet pile operation.  We can talk more in Monday.

Eric J Stern, PE
NV5
305-666-3563 x225

104.     Eric Stern then informed the Terra Defendants and JMA that the "intent is to have a technician on site to monitor vibrations in real time as close to the adjacent property as possible."

From: "Eric J. Stern" <Eric.Stern@nv5.com>
To: "Frank Wiza" <FWiza@jmaf.net>
Cc: "Curt Wyborny" <wyborny@terragroup.com>, "Howard Rice" <HRice@jmaf.net>, "Kerry Lopez" <klopez@asapinstallations.net>, "Glenn Massinger" <Glenn.Massinger@nv5.com>, "Clyde Grey" <Clyde.Grey@nv5.com>
Subject: RE: Sheet Pile
Date: Sun, 14 Feb 2016 16:05:17 -0000
Importance: Normal

Thank you.

The intent is to have a technician on site to monitor vibrations in real time as close to the adjacent property as possible.

105.     The plan to monitor all sheet pile installations changed, however, when the Terra Defendants decided that instead of monitoring all sheet pile installations for dangerous vibrations, the installations would be selectively monitored—taking place on only some days and not continuously throughout those days.

106.    On February 16, 2016, Eric Stern asked JMA if the vibration monitoring was still needed the following day, when sheet pile installation was set to begin. In response, JMA informed Stern that the Terra Defendants' Curt Wyborny had decided that monitoring would occur only along the north line of the project.

> **From:** Frank Wiza <FWiza@jmaf.net>
> **To:** "Eric J. Stern" <Eric.Stern@nv5.com>
> **Cc:** Curt Wyborny <wyborny@terragroup.com>
> **Subject:** RE: Sheet Pile
> **Date:** Tue, 16 Feb 2016 19:30:01 +0000
> **Importance:** Normal
>
> ――――――――――――――――――――――――――――――
>
> Negative we have a few issues to resolve. Sounds like Curt just wants the North line monitored do you agree? We have a new start date of Friday.
>
> Sent from my Verizon Wireless 4G LTE smartphone
>
> -------- Original message --------
> From: "Eric J. Stern" <Eric.Stern@nv5.com>
> Date: 02/16/2016 2:21 PM (GMT-05:00)
> To: Frank Wiza <FWiza@jmaf.net>
> Cc: Howard Rice <HRice@jmaf.net>, Kerry Lopez <klopez@asapinstallations.net>, Glenn Massinger <Glenn.Massinger@nv5.com>, "Curt Wyborny (cwyborny@terragroup.com)" <cwyborny@terragroup.com>
> Subject: RE: Sheet Pile
>
> Frank…
>
> Do you still need us tomorrow?
>
> Eric J. Stern, P.E. |Vice President | NV5

107.    Instead of heeding the warnings from the April 17, 2015, NV5 Report concerning the dangers of unmonitored and uncontrolled vibrations caused by driving sheet piles with a vibratory hammer, the Terra Defendants, JMA, NV5, and DeSimone allowed the vast majority of sheet pile installation work to be completed with absolutely no vibration monitoring and no other measures in place to limit damaging vibrations, as monitoring took place on only some days and for only some parts of those days—even along the north wall of the project.

108.    In addition to sheet piles installed around the north, south, east, and west perimeters of the project site, sheet piles were also installed at interior locations on the project:



109.    The vibratory sheet pile driving installation work for the interior locations occurred on or about May 26, 2016.

110.    Not only did installing interior sheet piles with the vibratory hammer cause vibrations that damaged CTS but removing interior sheet piles with the same vibratory hammer subjected CTS to yet another round of the same damaging vibrations.

111.    The Terra Defendants, JMA, NV5, and DeSimone did not perform any vibration monitoring for sheet pile installations at the east, west, or south perimeters of the project or for the interior sheet pile installations or removals.

112.    Instead, NV5 hired Geosonics to perform vibration monitoring only for some (but not all) sheet piles installed along the north perimeter of the project.

113.    During portions of the north sheet pile installation, Geosonics installed two portable vibration monitors directly adjacent to the south CTS foundation wall on the Eighty-Seven Park project site.

114.    The vibration monitors installed and used were Safeguard Seismic Unit 3000EZ-plus:



115.    Geosonics monitored vibrations intermittently on March 3, 7, 8, 9, 10, 11, and 14, 2016.

116.    Even though, according to Geosonics, the Safeguard Seismic Unit 3000EZ-plus vibration monitor is capable of "continuous ground vibration and air overpressure monitor[ing]," the Terra Defendants JMA, NV5, and DeSimone only performed selective vibration monitoring for short periods of time on the above-referenced dates.

117.   NV5 explained in its March 28, 2016, Vibration Summary Report that, although vibration limits were never formally established for the Eighty-Seven Park project, industry standards dictated that vibrations of 0.5 inches per second can cause property damage. Thus, the Terra Defendants, JMA, NV5, and DeSimone established a vibration limit of 0.5 inches per second for the sheet pile installation. The goal was to ensure that vibrations produced during sheet pile installation did not exceed that threshold.

118.   The Terra Defendants, JMA, NV5, and DeSimone failed to ensure that the vibrations produced during the sheet pile installation along the south CTS foundation wall remained below the 0.5 inches per second threshold they set.

119.   The Geosonics data, subsequently incorporated into NV5's March 28, 2016, Vibration Summary Report, confirmed that during almost the entirety of the sheet pile installation along the south CTS foundation wall, the vibrations exceeded acceptable and safe levels. *A staggering 29 out of 36 vibration readings taken exceeded the allowable threshold of 0.5 inches per second*:

| Date | Time | Longitudinal @ Frequency | Transverse @ Frequency | Vertical @ Frequency | Percent of Limit | Location |
|------|------|------|------|------|------|------|
| 3/03/2016 | 2:53 p.m. – 4:08 p.m. | 0.660 in. /sec. @ 27.8 Hz | 0.400 in. /sec. @ 26.3 Hz | 0.725 in. /sec. @ 29.4 Hz | Exceeded | SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/03/2016 | 4:11 p.m. – 4:33 p.m. | 0.058 in. /sec. @ 27.8 Hz | 0.035 in. /sec. @ 29.4 Hz | 0.033 in. /sec. @ 18.5 Hz | 11.6% of 0.50 in. /sec. | SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/07/2016 | 2:27 p.m. – 3:27 p.m. | 0.558 in. /sec. @ 25.0 Hz | 0.408 in. /sec. @ 26.3 Hz | 0.583 in. /sec. @ 31.3 Hz | Exceeded | SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/03/2016 | 8:09 a.m. – 9:04 a.m. | 0.400 in. /sec. @ 26.3 Hz | 0.183 in. /sec. @ 38.5 Hz | 0.633 in. /sec. @ 38.5 Hz | Exceeded | 15 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/03/2016 | 9:00 a.m. – 9:45 a.m. | 0.365 in. /sec. @ 25.0 Hz | 0.283 in. /sec. @ 20.8 Hz | 0.778 in. /sec. @ 31.3 Hz | Exceeded | 30 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/08/2016 | 9:56 a.m. – 11:58 a.m. | 0.308 in. /sec. @ 23.8 Hz | 0.210 in. /sec. @ 29.4 Hz | 0.605 in. /sec. @ 38.5 Hz | Exceeded | 45 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |

| Date | Time | Longitudinal @ Frequency | Transverse @ Frequency | Vertical @ Frequency | Percent of Limit | Location |
|------|------|------|------|------|------|------|
| 3/08/2016 | 11:46 a.m. – 1:28 p.m. | 0.480 in. /sec. @ 29.4 Hz | 0.100 in. /sec. @ 26.3 Hz | 0.530 in. /sec. @ 33.3 Hz | Exceeded | 60 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/08/2016 | 3:24 p.m. – 4:49 p.m. | 0.505 in. /sec. @ 19.2 Hz | 0.353 in. /sec. @ 27.8 Hz | 0.613 in. /sec. @ 38.5 Hz | Exceeded | 75 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/09/2016 | 11:10 a.m. – 11:47 a.m. | 0.393 in. /sec. @ 31.3 Hz | 0.210 in. /sec. @ 33.3 Hz | 0.650 in. /sec. @ 38.5 Hz | Exceeded | 90 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/09/2016 | 12:41 p.m. – 1:28 p.m. | 0.498 in. /sec. @ 27.8 Hz | 0.385 in. /sec. @ 31.3 Hz | 0.835 in. /sec. @ 27.8 Hz | Exceeded | 90 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |

| Date | Time | Longitudinal @ Frequency | Transverse @ Frequency | Vertical @ Frequency | Percent of Limit | Location |
|---|---|---|---|---|---|---|
| 3/09/2016 | 3:35 p.m. – 3:53 p.m. | 0.253 in. /sec. @ 29.4 Hz | 0.325 in. /sec. @ 29.4 Hz | 0.355 in. /sec. @ 26.3 Hz | 71% of 0.50 in. /sec. | 90 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/09/2016 | 3:35 p.m. – 3:53 p.m. | 0.253 in. /sec. @ 29.4 Hz | 0.325 in. /sec. @ 29.4 Hz | 0.355 in. /sec. @ 26.3 Hz | 71% of 0.50 in. /sec. | 90 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/09/2016 | 11:46 p.m. – 1:36 p.m. | 0.628 in. /sec. @ 27.8 Hz | 0.393 in. /sec. @ 23.8 Hz | 0.975 in. /sec. @ 26.3 Hz | Exceeded | 105 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/10/2016 | 8:24 a.m. – 9:05 a.m. | 0.303 in. /sec. @ 27.8 Hz | 0.260 in. /sec. @ 41.7 Hz | 0.820 in. /sec. @ 38.5 Hz | Exceeded | 120 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/10/2016 | 8:30 a.m. – 9:33 a.m. | 0.520 in. /sec. @ 23.8 Hz | 0.273 in. /sec. @ 35.7 Hz | 0.553 in. /sec. @ 29.4 Hz | Exceeded | 135 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/10/2016 | 9:41 a.m. – 10:06 a.m. | 0.500 in. /sec. @ 20.8 Hz | 0.163 in. /sec. @ 33.3 Hz | 0.720 in. /sec. @ 38.5 Hz | Exceeded | 135 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/10/2016 | 9:38 p.m. – 10:32 p.m. | 0.318 in. /sec. @ 27.8 Hz | 0.178 in. /sec. @ 22.7 Hz | 0.530 in. /sec. @ 33.3 Hz | Exceeded | 150 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/10/2016 | 10:18 a.m. – 2:23 a.m. | 0.593 in. /sec. @ 31.3 Hz | 0.290 in. /sec. @ 25.0 Hz | 0.663 in. /sec. @ 27.8 Hz | Exceeded | 165 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/10/2016 | 1:48 p.m. – 3:10 p.m. | 0.448 in. /sec. @ 50.0 Hz | 0.248 in. /sec. @ 25.0 Hz | 0.863 in. /sec. @ 31.3 Hz | Exceeded | 180 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/10/2016 | 2:31 p.m. – 3:32 p.m. | 0.668 in. /sec. @ 19.2 Hz | 0.433 in. /sec. @ 27.8 Hz | 0.795 in. /sec. @ 33.3 Hz | Exceeded | 195 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/10/2016 | 3:24 p.m. – 3:54 p.m. | 0.290 in. /sec. @ 29.4 Hz | 0.213 in. /sec. @ 38.5 Hz | 0.343 in. /sec. @ 38.5 Hz | 68.6% of 0.50 in. /sec. | 210 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |

| Date | Time | Longitudinal @ Frequency | Transverse @ Frequency | Vertical @ Frequency | Percent of Limit | Location |
|---|---|---|---|---|---|---|
| 3/11/2016 | 9:35 a.m. – 10:05 a.m. | 0.448 in. /sec. @ 26.3 Hz | 0.238 in. /sec. @ 38.5 Hz | 0.520 in. /sec. @ 38.5 Hz | Exceeded | 195 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/11/2016 | 10:10 a.m. – 10:28 a.m. | 0.355 in. /sec. @ 29.4 Hz | 0.215 in. /sec. @ 45.5 Hz | 0.498 in. /sec. @ 35.7 Hz | 28.4% of 1.75 in. /sec. | 205 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/11/2016 | 10:32 a.m. – 10:32 a.m. | 0.013 in. /sec. @ 41.7 Hz | 0.010 in. /sec. @ 0.30 Hz | 0.010 in. /sec. @ 38.5 Hz | 2.6% of 0.50 in. /sec. | 205 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/11/2016 | 10:35 a.m. – 12:17 p.m. | 0.650 in. /sec. @ 22.7 Hz | 0.268 in. /sec. @ 25.0 Hz | 0.913 in. /sec. @ 35.7 Hz | Exceeded | 215 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/11/2016 | 12:22 p.m. – 12:42 p.m. | 0.618 in. /sec. @ 23.8 Hz | 0.248 in. /sec. @ 25.0 Hz | 0.828 in. /sec. @ 38.5 Hz | Exceeded | 225 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/14/2016 | 12:15 a.m. – 12:44 a.m. | 0.523 in. /sec. @ 21.7 Hz | 0.313 in. /sec. @ 23.8 Hz | 0.833 in. /sec. @ 38.5 Hz | Exceeded | 235 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/14/2016 | 12:51 p.m. – 1:18 p.m. | 0.500 in. /sec. @ 41.7 Hz | 0.190 in. /sec. @ 45.5 Hz | 0.510 in. /sec. @ 31.3 Hz | Exceeded | 245 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/14/2016 | 1:24 p.m. – 1:54 p.m. | 0.478 in. /sec. @ 45.5 Hz | 0.213 in. /sec. @ 35.7 Hz | 0.545 in. /sec. @ 33.3 Hz | Exceeded | 255 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/14/2016 | 1:59 p.m. – 2:19 p.m. | 0.430 in. /sec. @ 31.3 Hz | 0.235 in. /sec. @ 35.7 Hz | 0.585 in. /sec. @ 31.3 Hz | Exceeded | 255 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/14/2016 | 2:25 p.m. – 2:53 a.m. | 0.563 in. /sec. @ 33.3 Hz | 0.273 in. /sec. @ 33.3 Hz | 0.728 in. /sec. @ 29.4 Hz | Exceeded | 265 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/14/2016 | 2:58 p.m. – 3:29 p.m. | 0.605 in. /sec. @ 16.7 Hz | 0.265 in. /sec. @ 26.3 Hz | 0.778 in. /sec. @ 31.3 Hz | Exceeded | 275 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |

| Date | Time | Longitudinal @ Frequency | Transverse @ Frequency | Vertical @ Frequency | Percent of Limit | Location |
|------|------|--------------------------|------------------------|----------------------|------------------|----------|
| 3/14/2016 | 3:37 p.m. – 4:12 p.m. | 0.165 in. /sec. @ 41.7 Hz | 0.153 in. /sec. @ 29.4 Hz | 0.553 in. /sec. @ 35.7 Hz | Exceeded | 285 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/14/2016 | 4:17 p.m. – 4:32 p.m. | 1.358 in. /sec. @ 3.50 Hz | 0.970 in. /sec. @ 4.0 Hz | 0.603 in. /sec. @ 41.7 Hz | Exceeded | 295 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |
| 3/14/2016 | 4:26 p.m. – 4:41 p.m. | 0.433 in. /sec. @ 27.8 Hz | 0.355 in. /sec. @ 35.7 Hz | 0.570 in. /sec. @ 35.7 Hz | Exceeded | 295 feet West of the SE Corner of the perimeter wall of 8777 Champlain Towers |

120.    Even though more than 80% of the vibration readings taken confirmed that vibrations from driving the sheet piles exceeded safe and allowable limits, the Terra Defendants, JMA, NV5, and DeSimone continued their vibratory sheet pile installations.

121.    At a weekly project meeting between the Terra Defendants and JMA, it was noted that **"[d]ue to high vibration readings at the north side ASAP will begin pre drilling today."**

Owner | Architect | Contractor ("OAC") Meeting
Meeting # 22

Project:  87 PARK, 8701 Collins Avenue, Miami Beach, FL
Date:  March 7, 2016
Attendees:  Curt Wyborny, Alejandro Hoch, Howard Rice

Meeting # 22  began at 8:00 AM at Terra Group's Offices in Coconut Grove, FL
Approval of Previous Meeting Minutes:  February 29th Meeting Minutes accepted
Field Report:
- Schedule Update:  Sheet piling started on 24FEB16 and is ongoing.   Due to high vibration readings at the north side ASAP will begin pre drilling today.  Perimeter sheet piling is scheduled to finish up this week.

122.    Despite ASAP's attempts to pre-drill for the sheet pile installations and the confirmed knowledge of the Terra Defendants, JMA, NV5, and DeSimone that vibration readings along the south CTS foundation wall were exceeding safe and allowable limits, they allowed the vibratory sheet pile installation to continue producing vibrations at an unsafe level.

123.    Even after the March 7, 2016, meeting at which the Terra Defendants and JMA explicitly acknowledged the high vibration readings, 28 vibration readings exceeded the allowable limit. But they continued with vibratory pile driving anyway.

124.    At the next weekly project meeting, on March 14, 2016, the Terra Defendants and JMA noted that ASAP's pre-drilling, changes to the frequency setting on the power head, and changes to how the piles were driven "dropped the readings back to the 4 range." However, data from Geosonics confirmed that the vibrations continued to exceed the safe and allowable threshold. The March 14, 2016, meeting minutes also revealed that the sheet pile installation along the north end of the Eighty-Seven Park project could not be completed because the existing waterline had not yet been capped. ***The meeting minutes also reflected that the Terra Defendants and JMA received numerous complaints from CTS owners and residents regarding the construction activities***.

Owner | Architect | Contractor ("OAC") Meeting
Meeting # 23

Project: 87 PARK, 8701 Collins Avenue, Miami Beach, FL

Date: March 14, 2016

Attendees: Curt Wyborny, Alejandro Hoch, Bob Stout, Howard Rice

Meeting # 23 began at 8:00 AM at Terra Group's Offices in Coconut Grove, FL

Approval of Previous Meeting Minutes: March 7th Meeting Minutes accepted

Field Report:

- Schedule Update: The sheet piling at the north side was installed last week. We had to pre drill, change the frequency rate on the drive head and drive one half of the pairs of sheets to keep the vibrations readings down to acceptable levels at the north side. The existing waterline has not been capped by WASD and will prevent us from completing the sheet piling at the west end of the north row and the last few feet of the west side.

| SUN | MON | TUE | WED | THU | FRI | SAT |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
| MAR 20 | 21 – OAC 24 | 22 | 23 | 24 | 25 | 26 |
| MAR 27 | 28 – OAC 25 | 29 | 30 | 31 | 1 | 2 |
| APR 3 | 4 – OAC 26 | 5 | 6 | 7 | 8 | 9 |
| APR 10 | 11 – OAC 27 | 12 | 13 | 14 | 15 | 16 |

- Permits/Inspections: Permit is still at the DERM office. Curt W. says that they have not looked at it due to the number of residential applications and he expects it to take at least two weeks before we get the phased construction permit.

- Manpower/Safety: Nothing to discuss at this meeting.

- QA/QC: We were getting high vibration readings during the installation of the sheet piling at the north side. ASAP predrilled this area, change the frequency setting on the power head and are driving only one half of the pair of sheets at a time. This has dropped the readings back to the 4 range. No work starts before 8:00 AM even though our neighbors at Champlain Towers continue to complain.

125.    The last day that any vibration monitoring was performed for sheet pile installation at the Eighty-Seven Park project was March 14, 2016. Yet, the project meeting minutes confirmed that the sheet pile installation along the north end of the project, which was the southern CTS

foundation wall, would be completed after the waterline was capped. ***There was no vibration monitoring performed for the final sheet pile installations at the north end of the project***.

126.    The fact that sheet pile installation work continued after Geosonics took the final vibration reading on March 14 at 4:41 PM was confirmed through email communications between the Terra Defendants and JMA. At the end of the day on March 14, at 5:54 PM, the Terra Defendant Project Manager, Curt Wyborny, wrote to JMA and informed JMA that the sheet pile installers had not even reached the water line yet, that the sheet pile installers "have yet to finish the north side," and "[t]hey have sheets to install and 100 [linear feet] that must go ***deeper***."

| | |
|---|---|
| **Date:** | Monday, March 14 2016 05:54 PM |
| **Subject:** | Re: Sheet Pile work - 87 Park |
| **From:** | Curt Wyborny |
| **To:** | Howard Rice <HRice@jmaf.net>; |
| **CC:** | Frank Wiza <FWiza@jmaf.net>; |

Howard,

They are not stopped by the water line.

They have yet to finish the north side. They have sheets to install and 100 lf that must go deeper.

East side needs excavating and they can do from the corner to the water line.

They are planning to break down the drill rig tomorrow after they finish the sheets.

Curt

127.    By driving the sheet pilings deeper, the Eighty-Seven Park construction caused additional vibrations and further damage to CTS. As a result, the Terra Defendants, JMA, NV5, and DeSimone likely decided to cease monitoring the vibrations because it would be best not to have a record of the extreme vibrations that would inevitably occur.

128.    The Terra Defendants, JMA, NV5, and DeSimone did not perform any vibration monitoring for the remainder of the sheet pile installations along the north perimeter of the project and south CTS foundation wall despite their knowledge that vibrations were exceeding safe and

allowable limits and that the vibrations would foreseeably cause damage to CTS's foundational structure, disregarding the health and safety of CTS residents and occupants.

**Defendants Ignored CTS Warnings, Dismissed Residents' Fear for their Lives and Safety, and Continued Using Sheet Pile Driving**

129.   The Terra Defendants, JMA, NV5, and DeSimone also received notice directly from the Association and/or CTS owners, residents, and occupants that vibrations being emitted during the vibratory sheet pile driving were damaging CTS.

130.   On March 17, 2016, the Radulescu Family, residents of CTS who resided in Apartment 404, wrote a tragically prophetic email to one of the Terra Defendants' Project Managers, Francisco Canestri. The Radulescu Family stated that they, along with the other residents of CTS, *"are very concerned because of the daily TREMORS we encounter, in our apartments, sitting, standing, laying in bed."* The Radulescu Family informed Mr. Canestri that on March 17, 2016, *"standing on our balcony we found [] a crack on the wall near our balcony. It is not fair, you, Terra Group, are doing your job, our building will be damaged, and our residents['] lives will be in danger to have apartments walls demolished."* The Radulescu Family concluded the email notice and warning to the Terra Defendants by stating, *"We write this message, to inform you of what our residents encounter, daily, because you must be aware of what happens with your workers, and heavy machinery, and you must be concerned of what happens to us the residents and our building, Champlain Tower, South."*

**From:** maria popa <mariasuba2@gmail.com>
**Date:** March 17, 2016 at 10:37:14 PM EDT
**To:** <fcanestri@terragroup.com>
**Subject: Fwd: Concerns on all day long tremors, in our apartments, because of the Terra Group.**

To : Mr. Canestri, Construction Manager, Terra Group,
about the work on 87-th Terrace, Miami Beach.

First, we, the residents of our building, were glad to have a new condominium
built near us. But, now, we are very concerned because of the daily TREMORS
we encounter, in our apartments, sitting, standing, laying in bed.
For months, since the Terra Group started the work, these tremors are more
and last longer hours per day. Today, standing on our balcony we found out
a crack on the wall near our balcony. It is not fair, you, Terra Group, are doing
your job, our building will be damaged, and our residents lives will be in
danger to have apartments walls demolished. Our building lawyer talked
to the Terra Group lawyer about INSTALLING around our building VIBRATION
and NOISE SENSORS, and nothing was done. One day, oil from one crane
was spilled over the building fence on cars parked near the wall. Besides these
there are dust, traffic and noise from 7:00 am to 5:00 pm, every day, even on
Saturdays.

We write you this message, to inform you of what our residents encounter,
daily, because you must be aware of what happens with your workers,
and heavy machinery, and you must be concerned of what happens to us
the residents and our building, Champlain Tower, South. .

Thank you for listening to us and we are waiting an answer.

The Radulescu Family, ap. 404

131.    The Radulescu Family's March 17, 2016, email confirmed that the construction

activities on the Eighty-Seven Park project, including the vibratory sheet pile driving, were causing

noticeable damage to the CTS structure and that residents were afraid for their lives and property.

132.    Tragically, the worst fears of the Radulescu Family came true: Maria Popa and

Mihai Radulescu of the Radulescu Family perished in CTS when the building collapsed .

133.    The Terra Defendants, JMA, NV5, and De Simone should have taken proper

corrective measures and appropriately responded to the high vibration readings at the start of the

sheet pile driving along the north perimeter of the project.

134.    Instead, in response to the alarming email the Terra Defendants received from the

Radulescu Family, the Terra Defendants immediately retained lawyers and looped in their counsel.

That attorney informed the Terra Defendants and JMA that he had a meeting scheduled the following week at the site with CTS's counsel and that he needed to receive the vibration reports prior that meeting. In response, David Martin, then-chief operating officer for Terra, instructed JMA and his subordinate, Michael Piazza, to help Terra Defendants' counsel "be completely prepared."

---

**From:** David Martin <dmartin@terragroup.com>
**Date:** March 17, 2016 at 7:51:14 PM EDT
**To:** Victor Diaz <victor@diazpartners.com>, John Leete <jleete@jmaf.net>, Michael Piazza <mpiazza@terragroup.com>
**Cc:** Curt Wyborny <cwyborny@terragroup.com>, Michael Patrizio <mpatrizio@terragroup.com>
**Subject: Re: Concerns on all day long tremors, in our apartments, because of the Terra Group.**

John and Michael piazza please help victor be completely prepared. Get Howard involved Curt!!

On Mar 17, 2016, at 7:39 PM, Victor Diaz <victor@diazpartners.com> wrote:

All: I am having a meeting AT THESITE with Robert Zarco next week Wed or Thursday after 5 pm..

I NEED TO RECIVE VIBRATION REPORTS BEFORE THAT DATE!

---

I want to go in super well prepared!

Kind Regards,

Victor M. Diaz, Esq.

**VM Diaz & Partners, LLC.**

---

135.    The Terra Defendants' Curt Wyborny then reached out to NV5's Eric Stern and requested the vibration reports. Stern immediately contacted Geosonics and asked that the vibration reports be provided as soon as possible, noting, "The lawyers are now involved in this one. They want everything by Tuesday[.] We need the report as quick as possible."

From: "Eric J. Stern" <Eric.Stern@nv5.com>
  To: "'kdaniel@geosonics.com'" <kdaniel@geosonics.com>
  Cc: 'Jeffrey Straw' <jstraw@geosonics.com>, Clyde Grey <Clyde.Grey@nv5.com>
Subject: 87 Park
  Date: 2016-03-18 10:46:23 -0400
Importance: Normal

Katie...

The lawyers are now involved in this one. They want everything by Tuesday

We need the report as quick as possible.

Please send to me and Clyde.

I am out next week. Any chance that we will have these today?

Eric J. Stern, P.E. | Vice President | NV5

136.     Meeting minutes from the weekly March 21, 2016 project meeting also confirm that the Terra Defendants had scheduled a meeting with CTS "to address complaints by their residents."

Owner | Architect | Contractor ("OAC") Meeting
Meeting # 24

Project: 87 PARK, 8701 Collins Avenue, Miami Beach, FL

Date: March 21, 2016

Attendees: Curt Wyborny, Alejandro Hoch, Bob Stout, Howard Rice, Michael Piazza

Meeting # 24  began at 8:05 AM at Terra Group's Offices in Coconut Grove, FL

- QA/QC:  A meeting is scheduled with Champlain Towers and the Owner this week to address complaints by their residents.  JMA has been strictly observing the work hours of 8:00 Am to 5:oo PM.

137.     The vibration monitoring, which confirmed that vibrations were overwhelmingly exceeding the allowable and safe limit, immediately raised red flags for the Terra Defendants, JMA, NV5, and DeSimone and should have caused them to stop the sheet pile driving until they confirmed that vibrations could be reduced to safe levels. Instead, they did nothing but lawyer up

in response to the dangerous vibration levels, despite the danger that the Terra Defendants, JMA, NV5, and DeSimone knew the vibrations presented.

138.    When Defendants received the alarming March 17, 2016, email from the Radulescu Family, they failed to treat the vibrations as a critical safety issue putting people's lives at risk. Instead, the Terra Defendants, JMA, NV5, and DeSimone treated it as a claims matter and simply passed it along to their lawyers.

139.    While the Terra Defendants eagerly awaited the vibration report, which only confirmed what they knew as early as March 7—the vibrations caused by sheet pile driving exceeded safe and allowable limits—the Terra Defendants' Curt Wyborny asked NV5's Eric Stern to speak with attorneys for the Terra Defendants about the vibration report.

> **From:** Curt Wyborny <cwyborny@terragroup.com>
> **To:** "Eric J. Stern" <Eric.Stern@nv5.com>
> **Subject:** 8701
> **Date:** Wed, 23 Mar 2016 16:21:30 +0000
> **Importance:** Normal
>
> Can you take a call this afternoon from our attorney to discuss vibration report
> If so, what time?

140.    Shortly following the realization that the vibratory sheet pile driving had caused damage to CTS, which the Terra Defendants were warned was a foreseeable outcome if they did not undertake appropriate vibration monitoring and control, the Terra Defendants' attorneys were in discussions with CTS's attorneys to schedule inspections and estimates to "quantify the cost of some of the mitigation items[.]"

On Apr 29, 2016, at 9:15 AM, Victor Diaz <victor@diazpartners.com> wrote:

Himanshu: I received your message regarding a meeting with Robert.
I am at the doctor's all day today for my annual check-up.
As I understand it, we left it that we would schedule inspections and estimates to quantify the cost of some of the mitigation items under discussion before we next met.
I have been pushing those inspections which you wanted coordinated through your office – instead of directly with client – as was agreed at our last meeting.
I am happy to speak or meet with Robert (I can't today), but I need to get these inspections and estimates completed before our discussions can be substantive.

Kind Regards,

Victor M. Diaz, Esq.
**VM Diaz & Partners, LLC.**
119 Washington Avenue Suite 402
Miami Beach, FL 33139
victor@diazpartners.com
T: 305-704-3200
F: 305-538-4928

141.   Unfortunately, the Radulescu Family's report of daily tremors and structural damage to CTS was neither unique nor uncommon.

142.   In fact, CTS owners, residents, and occupants voiced numerous complaints regarding the impact the Eighty-Seven Park construction was having on CTS, including reports of breaking and falling concrete, excessive vibrations, daily tremors and shaking of the building, cracks in concrete, and structural problems and flooding in the garage. These reports elicited no meaningful safety-regarding response, other than for the Terra Defendants, JMA, NV5, and DeSimone to shift responsibility to their lawyers to handle the matter.

143.   Minutes from a March 10, 2016, CTS Board Meeting, which occurred in the middle of the vibratory sheet pile driving along the CTS south foundation wall, reflects that the Eighty-Seven Park construction was causing ***"Excessive vibrations*.*"

## Champlain Towers South Condominium Association, Inc.

8777 Collins Ave. Surfside, FL. 33154 tel. 305-865-4740  fax. 305-865-7800

### Minutes of the Board of Directors Meeting

Date:           **March 10, 2016**
Time:           **7:00 p.m.**
Description:    **Board Meeting**
Place:          **Recreational Room**

\*\*\*

**Transitions from the prior Board**
- Status of Sprint Tower Lease
- Terra Group 87 Park Construction
  - Prior Board retained Attorney Roberto Zarco
  - Excessive vibrations and oil spills
  - Residents encouraged to file violations with City officials

144.   Even though the Terra Defendants, JMA, NV5, and DeSimone knew that the Eighty-Seven Park construction site was emitting dangerously high vibrations during vibratory sheet pile driving, and even though they knew neighbors had complained about the daily tremors and structural damage being done, the Terra Defendants, JMA, NV5, and DeSimone never performed more than a cursory inspection of CTS following the vibratory sheet pile driving. The Terra Defendants, JMA, NV5, and DeSimone knew about the dangerously excessive vibrations and should have conducted a thorough inspection and analysis of damage the vibratory sheet pile driving had done to CTS but failed to conduct any such inspection or analysis.

145.   Damage caused to CTS during this vibratory sheet pile phase of the Eighty-Seven Park project became the subject of settlement discussions between the Association and the Terra Defendants.

146.   On May 7, 2019, after vibrations from the sheet pile driving had penetrated and damaged CTS and after numerous CTS residents had lodged complaints about that damage, the Terra Defendants sought a settlement agreement from the Association for "any alleged nuisance

or adverse impact claim." That settlement agreement would, in part, provide the Terra Defendants with a "broad form general release of all claims," including claims for damage that the construction activity on the Eighty-Seven Park project did to CTS's property, in exchange for $200,000.



147.    Rather than investigate the damage they caused and take steps to remediate the damage, the Terra Defendants attempted to buy their way out of liability.

148.    As settlement discussions stalled and as CTS owner and resident complaints regarding the construction activities at the Eighty-Seven Park project mounted, Terra's David Martin was determined not to let neighbors' complaints delay the project and cost the Terra Defendants money. Mr. Martin advised everyone to "[k]eep moving the job forward," to "not let any neighbor delay us," and to "just be nice!"

**From:** David Martin <david@terragroup.com>
**Sent:** Friday, March 22, 2019 8:32 AM
**To:** Jason Gilg <jgilg@terragroup.com>
**Cc:** Robert Nordling <rnordling@jmaf.net>; John Leete <JLeete@jmaf.net>; Fernando Vilela <FVilela@jmaf.net>; Michael Patrizio <mpatrizio@terragroup.com>; Michael Piazza <mpiazza@terragroup.com>; Andres Moncada <amoncada@terragroup.com>; Ryan Mahoney <RMahoney@jmaf.net>
**Subject:** Re: Champlain Tower | Neighbor Complaint + Call to City for Work After Hours

Keep moving the job forward. If there are any issues with city call my cell. The city will help us they want to us to finish. Do not let any neighbor delay us let just be nice!

Sent from my iPhone

149.     The Terra Defendants, JMA, NV5, and DeSimone focused on pushing their luxury condominium project forward, without any regard for the lives, well-being, and safety of CTS owners, residents, occupants, and guests. Money motivated the Terra Defendants to advance the Eighty-Seven Park project at all costs, and those costs included 98 lives and 136 homes.

150.     The NV5 Report informed the Terra Defendants, JMA, and DeSimone that vibratory sheet pile driving was not necessary in the first place, as there were other suitable, alternative methods of basement excavation support available.

151.     The Terra Defendants, JMA, NV5, and DeSimone chose to prioritize corporate profits over the safety of CTS's owners, residents, occupants, and guests by deciding to use driven sheet piles instead of the other available methods, knowing the risks driven sheet piles presented to the immediately adjacent CTS.

152.     Further, Defendants' informed decision to continue driving sheet piles with a vibratory hammer, despite knowing that vibration levels were exceeding safe and allowable limits, disregarded the health and safety of the residents and occupants of CTS.

### ***Soil Compaction Vibrations at Eighty-Seven Park Damaged CTS***

153.     Soil compaction at Eight-Seven Park also caused vibrations that damaged CTS.

154.    NV5's April 2015 report explicitly informed the Terra Defendants, JMA, and DeSimone that *"[t]he vibrations produced by the operation of the compactor should be monitored for potential adverse effect on adjacent existing structures, pavements, and utilities."*

155.    Despite knowing that preparatory site compaction procedures would produce vibrations that could adversely affect adjacent structures, including the extremely close CTS, the Terra Defendants, JMA, NV5, and DeSimone performed no vibration monitoring during site compaction procedures.

156.    The Terra Defendants, JMA, NV5, and DeSimone knew, or should have known, that a failure to monitor vibration levels appropriately and vigilantly to ensure safe preparatory site compaction procedures would expose the owners, residents, occupants, and guests of CTS to an unreasonable and unacceptable risk of severe injury, death, and property loss. Despite this knowledge, the Terra Defendants, JMA, NV5, and DeSimone failed to monitor vibrations produced during the preparatory site compaction procedures.

157.    In addition to preliminary site compaction procedures, the Terra Defendants, JMA, NV5, and DeSimone engaged in on-site vibratory compaction procedures related to installation of a "Silva Cell" system, or a modular suspended pavement system that uses soil volumes to support large tree growth, on the Eighty-Seven Park site.

158.    On April 26, 2019, during the installation procedures for the Silva Cell system, the manufacturer of the Silva Cell system requested that the Terra Defendants and JMA "make 2-3 passes with a vibratory plate" over the location where the Silva Cell system was being installed in order "to consolidate/lock the aggregate particles together."

**From:** Pat Greeley <Pat@deeproot.com>
**Sent:** Friday, April 26, 2019 1:15 PM
**To:** Moneiba Medina <MMedina@jmaf.net>
**Cc:** Fernando Vilela <FVilela@jmaf.net>; 'Chelsea Young' <cyoungtenor@bellsouth.net>; 'justperfectland@aol.com' <justperfectland@aol.com>; Robert Nordling <rnordling@jmaf.net>; 'Andres Moncada' <amoncada@terragroup.com>; Sam Collet <SCollet@jmaf.net>
**Subject:** Re: 87 Park - Silva Cell - Layer N Issues

Thank for reaching out regarding this. Given the material has no fine particles that can be compacted, in lieu of compaction testing we ask the installer make 2 - 3 passes with a vibratory plate over the #44 ballast rock to consolidate/lock the aggregate particles together.

Best regards,
Pat Greeley
Director of Technical Services
612 840 9004

159.    In response, a Project Manager for the Terra Defendants, Andres Moncada, forwarded the email to NV5's Eric Stern, who responded that NV5 "can visually observe the compaction process."

**From:** "Eric J. Stern" <Eric.Stern@nv5.com>
**To:** Andres Moncada <amoncada@terragroup.com>
**Cc:** Moneiba Hernandez Medina <mmedina@jmaf.net>, Michael Piazza <mpiazza@terragroup.com>, Jason Gilg <jgilg@terragroup.com>, Sam Collet <SCollet@jmaf.net>, Robert Nordling <rnordling@jmaf.net>, Fernando Vilela <fvilela@jmaf.net>, Ryan Mahoney <rmahoney@jmaf.net>, "Jeff Baldridge Lobby Superintendent" <jbaldridge@jmaf.net>, Glenn Massinger <Glenn.Massinger@nv5.com>
**Subject:** Re: 87 Park - Silva Cell - Layer N Issues
**Date:** 2019-04-28 13:34:33 -0400
**Importance:** Normal
**Attachments:** Archived

We can visually observe the compaction process.   We have been involved in projects with these materials before.

Please ensure Glenn in my office if ccd on scheduling requests to ensure we send out the right assignment

Eric J Stern, PE | NV5
D:305.901.2049
C:305.495.1436

160.    The Terra Defendants, JMA, NV5, and DeSimone did not monitor vibration levels during these compaction procedures related to installation of the Silva Cell system on the Eighty-Seven Park construction site.

161.    The Terra Defendants, JMA, NV5, and DeSimone knew that on the Eighty-Seven Park construction site had the potential to negatively impact CTS and that a failure to vigilantly monitor and control vibration levels during compaction activities would expose the residents and occupants of CTS to an unreasonable and unacceptable risk of severe injury, death, and property loss.

162.    Despite this knowledge, the Terra Defendants, JMA, NV5, and DeSimone failed to monitor or control vibration emissions and levels during compaction procedures related to the installation of the Silva Cell systems at the Eighty-Seven Park site.

163.    By 2019, the vibratory sheet pile driving on the Eighty-Seven Park construction project and other vibration and tremor-emitting activities, such as site compaction and excavation, had inflicted extensive damage on the CTS foundation structure. This damage caused or contributed to its ultimate collapse.

164.    The construction activities on the Eighty-Seven Park project site, namely, the vibratory sheet pile driving and vibration-producing compaction activities, decreased the structural stability and life expectancy of CTS and was a proximate cause of and contributor to CTS's collapse on June 24, 2021.

165.    The NV5 Report explicitly informed the Terra Defendants, JMA, and DeSimone that vibrations emitted during vibratory sheet pile driving and vibration-producing compaction activities could cause damage to adjacent buildings, including CTS, if the vibrations were not properly monitored and controlled.

### *Dewatering at Eighty-Seven Park Damaged CTS*

166.   Dewatering is the process of removing and controlling the presence of groundwater and stormwater during a construction project for purposes of facilitating deep excavation work and allowing the foundation construction to occur in dry soil rather than wet and unstable soil.

167.   Dewatering on a site carries with it the inherent risk of impacting the water table underlying adjacent properties by creating a differential, which causes stress and load re-distribution in the adjacent structure, and which may ultimately cause a catastrophic failure of the structure. Accordingly, special care must be taken to ensure that dewatering on a construction site does not dangerously impact adjacent structures.

168.   Asymmetrical drawdown of the water table underlying adjacent properties creates the potential for differential settlement, and the water table underlying the adjacent property must be adequately "recharged" such that no differential settlement occurs.

169.   Because of the known risks that dewatering in construction poses, the April 2015 NV5 Report explicitly warned the Terra Defendants, JMA, and DeSimone, that ***"[d]uring dewatering the adjacent properties must be monitored for adverse impacts from dewatering drawdown. The potential for adverse impacts from dewatering is especially heightened where the peaty layer exists."***

170.   Drawing down the water table beneath a heavy structure was a hazard that was known, or should have been known, to the Terra Defendants, JMA, NV5, and DeSimone. These Defendants should have ensured against and monitored adverse impacts on CTS and the underlying water table that dewatering activities on the Eighty-Seven Park project site caused.

171.   Given the proximity of the Eighty-Seven Park project to CTS, the Terra Defendants, JMA, NV5, and DeSimone should have undertaken measures to closely monitor the underlying water table and CTS during the dewatering process.

172.   Despite the proximity of CTS, the Terra Defendants, JMA, NV5, and DeSimone performed the site dewatering in a dangerous manner and failed to appropriately monitor and analyze the impact that dewatering was having on CTS.

173.   An October 2015 Proposed Dewatering Plan submitted to the Miami-Dade County Division of Environmental Resources Management by Florida Civil, Inc. on behalf of the Terra Defendants noted that "[d]ue to the depth of excavation into the water table and other concerns, the contractor proposes the installation of two (2) continuous sheet pile cofferdams for support of excavation."



FLORIDA CIVIL INC.
970 WEST McNAB ROAD, SUITE 210
FT. LAUDERDALE, FL 33309
PH:  754.222.9259
WWW.FLORIDA-CIVIL.COM
ENGINEERING@FLORIDA-CIVIL.COM

DEWATERING ENGINEERING &
ENVIRONMENTAL SERVICES

October 5, 2015

**Pollution Remediation Section**
Miami-Dade County
Division of Environmental Resources Management
701 NW 1st Court, 4th Floor
Miami, Florida 33136-3912

Subject:       **Proposed Dewatering Plan**
                   8701 Collins Avenue Proposed Multistory Structure
                   8701 Collins Avenue
                   Miami Beach, FL 33154
                   Florida Civil Project No. 15056

\*\*\*

### 1.0   PROPOSED DEWATERING PLAN

A summary of the proposed dewatering plan, attached in **Appendix A**, follows:

The proposed multistory structure requires groundwater dewatering for the construction of the foundation elements.  Due to the depth of excavation into the water table and other concerns, the contractor proposes the installation of two (2) continuous sheet pile cofferdams for support of excavation.

174.   According to the dewatering plan, a proposed point of discharge where a deep dewatering drainage well would be installed was at the north side of the Eighty-Seven Park project site and immediately adjacent to the southern CTS foundation wall.



175.   Despite the known risk of impacting the water table underlying CTS and despite the proximity of the point of discharge and deep dewatering drainage well to CTS, the Terra

Defendants, JMA, NV5, and DeSimone did not monitor and/or failed to monitor adequately the impact of dewatering procedures of the Eighty-Seven Park project on CTS.

176.    Industry standards required the Terra Defendants, JMA, NV5, and DeSimone to perform an analysis of the Radius of Influence of the Eighty-Seven Park dewatering activities by using the Sichardt's Equation. The Terra Defendants, JMA, NV5, and DeSimone failed to do any type of analysis regarding the Radius of Influence of Eighty-Seven Park's dewatering activities despite knowing of the risks that dewatering posed to CTS.

177.    On November 29, 2015, Terra Defendants' Curt Wyborny sent an email to JMA, among others, and laid out the step-by-step dewatering plan:

| Sent: | Sunday, November 29 2015 08:52 AM |
|---|---|
| Subject: | 8701 Dewatering Meeting |
| From: | Curt Wyborny |
| To: | Bob Stout <BStout@jmaf.net>; Clinton Glass <CGlass@jmaf.net>; jose delgado (jmd@hjfoundation.com) <jmd@hjfoundation.com>; Howard Rice <HRice@jmaf.net>; andres baquerizo (amb@hjfoundation.com) <amb@hjfoundation.com>; kevin stevens <kstevens@completepumps.com>; Michael Piazza <mpiazza@terragroup.com>; steve@rsiconcrete.com; |
| Location: | Terra Conference Room |
| Start Time: | Thursday, December 3 2015 01:30 PM |
| End Time: | Thursday, December 3 2015 03:00 PM |
| Duration: | 90 |
| Timezone: | (UTC-05:00) Eastern Time (US & Canada) |
| Attachments: | 2015-11-29 20151110_Basement Depth_Sketch01.pdf |

Please be prepared to discuss the following:

1. Reduction in depth of dewatering requirements as indicated on attached sheet.
2. Reduction in depth of dewatering as the 5PC will be reduced in depth by 20 inches.
3. Top of cap will now be top of slab.
4. Returning to the original dewatering plan;
   a. Sheet pile the entire interior low area (110PC, 3,4,5 PCs)
   b. Install well point system at this interior area.
   c. Draw down for 3 days.
   d. Foundation work
   e. Install complete exterior well point system.
   f. Draw down for 3 days.
   g. Remove interior sheet piles and interior well point system.
   h. Begin higher level foundation work.

178.    Noticeably absent in the dewatering plan was any discussion of measures taken to monitor the impact the dewatering and water table drawdown would have on CTS or any efforts to ensure that an asymmetrical drawdown was not occurring and/or that CTS was not subjected to any differential settlement.

179.    The dewatering activities of the Terra Defendants, JMA, NV5, and DeSimone on the Eighty-Seven Park construction site caused both an asymmetric drawdown of the water table underlying CTS and differential settlement, which resulted in excessive and dangerous structural stress and load re-distribution.

180.    The Terra Defendants, JMA, NV5, and DeSimone failed to "recharge" the water table underlying CTS and thus failed to correct the differential settlement and asymmetric drawdown of the water table.

181.    Photographs of damage occurring to the CTS south foundation wall from 2020 documented step cracking, a telltale sign that CTS suffered from differential settlement caused by Terra Defendants', JMA's, NV5's, and DeSimone's improper and unmonitored dewatering at Eighty-Seven Park:



182.    CTS's differential settlement caused by improper dewatering at Eighty-Seven Park damaged the CTS foundation and dramatically reduced its structural stability, contributing to the June 24, 2021, collapse.

183.    The failure of the Terra Defendants, JMA, NV5, and DeSimone to monitor the dewatering procedures appropriately and to ensure that the water table was not dangerously drawn down was inexcusable since the April 2015 NV5 Report warned them that their failure to adequately monitor dewatering would have disastrous effects on CTS.

### *Excavation and Water Diversion at 87th Terrace Damaged CTS*

184.    In addition to damaging CTS by excessive vibrations and improper dewatering, the Terra Defendants, JMA, NV5, and DeSimone excavated and built the 87th Terrace footpath in a manner that damaged CTS's south foundation wall in construction, then caused exponential damage over time as it diverted water away from Eighty-Seven Park and into CTS's adjacent structural components.

185.    In early 2019, the Terra Defendants, JMA, NV5, and DeSimone built the beach access walkway in place of the prior 87th Terrace and against the CTS south foundation wall.

186.    Pursuant to a November 24, 2014, Development Agreement with the City of Miami Beach, the Terra Defendants agreed to construct, enhance, and maintain the 87th Terrace beach access walkway and provide a permanent pedestrian access easement to give the public pedestrian access from Collins Avenue to the beach. As alleged above, the Terra Defendants agreed to expend funds and construct the beach access walkway and to pay the City of Miami Beach a "voluntary monetary contribution of $10,500,000" in exchange for the right to expand the Eighty-Seven Park project and to build upon the then-existing 87th Terrace.

E.    Pursuant to City Resolution No. 2014-28754 (the "Vacation Resolution"), the City approved the vacation of 87th Terrace, subject to and conditioned upon the terms and conditions contained in such Vacation Resolution, including, without limitation, (1) the grant by the Owner to the City of the 87th Terrace Easement; (2) the Owner and City entering into the maintenance agreement for 87th Street; (3) the Owner's commitment to expend funds and prepare the 87th Street Plans and the 87th Terrace Plans at the Owner's expense; (4) the Owner's commitment to expend funds and construct the 87th Street Improvements and the 87th Terrace Easement Improvements at the Owner's expense; and (5) the Owner's commitment to provide the City with a voluntary monetary contribution of $10,500,000 (the "Voluntary Contribution") to be allocated as described in Section 7 of this Agreement.

187.    In overtaking 87th Terrace, excavating and re-grading the site, and constructing the 87th Terrace beach access walkway the Terra Defendants, JMA, NV5, and DeSimone excavated against the CTS south foundation wall, causing it critical damage:



188.    Eighty-Seven Park's excavation against CTS's south foundation wall exposed and caused extensive damage to the base CTS's foundation wall.





189.    Post-collapse photographs show that Eighty-Seven Park's excavation for the 87th

Terrace footpath penetrated CTS's foundation wall, leaving gaps and holes where water intruded

and saturated CTS's structural elements in and beneath its pool deck:



190.    On January 23, 2019, Mara Chouela, a CTS resident and member of the Board

emailed Town of Surfside Building Official Rosendo Prieto and complained, "We are concerned

that the construction next to Surfside is too close. ***The terra project on Collins and 87 are digging***

***too close to our property and we have concerns regarding the structure of our building***."

| From: | Mara Chouela <mara.chouela@gmail.com> |
|---|---|
| Sent: | Wednesday, January 23, 2019 9:56 AM |
| To: | Rosendo Prieto; Margarita Brito |
| Subject: | Terra project |
| Attachments: | image2.jpeg; ATT00001.txt; image1.jpeg; ATT00002.txt |

Mr Pietro

Hope this email finds you well.

We are concerned that the construction next to Surfside is too close. The terra project on Collins and 87 are digging too close to our property and we have concerns regarding the structure of our building.

We just wanted to know if any of tour officials could come by and check.

See attached



191.    Due to the proximity of the north end of the Eighty-Seven Park construction project and the explicit warnings NV5 provided, the Terra Defendants, JMA, NV5, and DeSimone were obligated to ensure that excavating near and against CTS would not damage the building during construction and would not damage it in the long term by diverting water runoff away from Eighty-Seven Park and into CTS's structural members.

192.    However, the Terra Defendants, JMA, NV5, and DeSimone failed to ensure that excavations and construction along CTS's south foundation wall would not damage CTS's structural members.

193.    The damage that the Terra Defendants, JMA, NV5, and/or DeSimone caused along CTS's south foundation wall had catastrophic consequences.  Not only did the construction of the

87th Terrace beach access walkway damage the CTS south foundation wall, but it was also constructed so that the walkway cleared water away from Eighty-Seven Park by running it directly into CTS's foundational structure.

194.   CTS resident Jean Wodnicki confirmed the infiltration of water into the CTS foundational structure and basement parking garage because of the improper construction of the beach access walkway. Ms. Wodnicki noted in an email to CTS's attorneys that ***"every time it rains the water pours off the path, right into our (damaged) wall and then[] down to the garage, flooding it every time."***

---

**From:** JEAN WODNICKI
**Sent:** Monday, December 21, 2020 10:19 AM
**To:** Shir, Jeremy; Direktor, Kenneth; Champlain Tower South
**Subject:** RE: Terra

Well it is an ongoing problem, because every time it rains the water pours off the path, right into our (damaged) wall and thence down to the garage, flooding it every time.

Item #1 specifically mentions damage due to regrading work. We had specifically asked him to evaluate the wall. He may not have commented on anything off our property or not the wall per se. I will ask him to clarify.

j

---

195.   The improper construction of the beach access walkway directly damaged the CTS foundation structure by causing water to infiltrate CTS.

196.   After significant water leaks began occurring in the CTS basement parking garage during the Eighty-Seven Park construction, the Association retained Morabito to investigate whether the Eighty-Seven Park construction activities were causing and/or contributing to the water leaks.

197.   In its December 29, 2020, report, Morabito detailed how Eighty-Seven Park construction also sloped the 87th Terrace footpath toward the CTS foundation wall, diverting runoff away from Eight-Seven Park and into CTS's foundation wall, basement parking garage, and the critical structural members in them:

Per your request, on December 23, 2020 Morabito Consultants, Inc. (MC) performed an investigation of the existing beach access adjacent to the south perimeter wall of the building (see figures 1 and 2). It is our understanding that Champlain Towers suspects that the existing beach access walkway is pitched toward the south perimeter wall and therefore is contributing to leaks into the sub garage.



Figure 1: South Perimeter Wall (left) and beach access path (right)

***

According to a recent survey prepared by J. Bonfill & Associates, Inc. (JBA) dated August 7, 2020, the elevation of the beach access pavers are uniformly higher than the gravel between the wall and pavers suggesting that the beach access pavers are pitching toward the wall (see figure 3 below).



***

Based on the survey and field findings it is apparent that the beach access is pitching toward the south perimeter wall and flooding the CTS sub garage by infiltration through the 2 foot strip of gravel. This will need to be corrected by either incorporating a drainage system within the 2 foot strip of gravel or pitching the access walkway away from perimeter wall.

198.    The Terra Defendants', JMA's, NV5's, and/or DeSimone's improper construction of the beach access walkway caused water to infiltrate, flood, and saturate the CTS foundation wall, basement parking garage, and the critical structural foundation.

199.    As a result of the water infiltration the Terra Defendants', JMA's, NV5's, and DeSimone's excavation and construction of the beach access walkway caused and the damage done to the CTS south foundation wall, the pool deck slab was severely damaged at the point it connected to the CTS south foundation wall.

200.    The water damage the Terra Defendants, JMA, NV5, and DeSimone caused resulted in the pool deck slab separating from CTS's south foundation wall, which reduced the structural stability of the entire pool deck slab, as well as CTS's tower structure.

### The 2016 Pre-Construction Survey Confirmed That the Eighty-Seven Park Construction Project Damaged CTS

201.    Before any sheet pile driving, excavation, or dewatering activities at Eighty-Seven Park, the Terra Defendants enlisted NV5 to perform an extensive and thorough pre-construction survey of CTS.

202.    On January 6, 2016, the Terra Defendants' attorney contacted the Association's attorney and requested access to CTS to perform a "pre-existing conditions survey of CTS." This survey would set up a framework for potential future discussions regarding the Association's claims for damage the Eighty-Seven Park construction caused.

203.    After the Terra Defendants scheduled the pre-construction survey and informed NV5 that they are "getting permission to survey the adjacent building," they later followed-up and confirmed that they were "set for 8:00 am Thursday[, January 14, 2016] for access to [the] adjacent property" to conduct the survey.

204.    On January 14, 2016, NV5 conducted an extensive survey of CTS and meticulously documented every area of pre-existing damage, including the smallest of hairline stucco fractures. Indeed, the very purpose of the pre-construction survey was to document every observable defect or area of damage at CTS, so that if a claim were made during or following the Eighty-Seven Park construction that the project had inflicted damage on CTS, the Terra Defendants could determine whether the claim related to pre-existing damage.

205.    The NV5 pre-construction survey left no stone unturned, taking hundreds of photographs of the entire exterior of CTS and the basement parking garage. NV5 thoroughly documented every observable defect or area of damage that existed as of January 14, 2016 and presented the findings of the pre-construction survey in a report dated January 27, 2016 and addressed to the Terra Defendants' then-chief operating officer, David Martin.



206.    Although the January 27, 2016, NV5 Report stated that the survey "consisted of documenting the pre-existing defects observable on the exterior portion" of CTS, the photographs included in the survey confirmed that NV5 also extensively examined the CTS basement parking garage and inspected it for pre-existing damage.

207. The vast majority of the damage CTS owners, residents, occupants, and others documented during and after the construction of Eighty-Seven Park was not present in January 2016 when NV5 conducted its pre-construction survey.

208. A comparison of the conditions documented in the January 2016 pre-construction survey with the 2018 and 2020 photographs Morabito took as part of the CTS 40-year recertification inspection and analysis reveals the severe damage the Eighty-Seven Park construction project inflicted on CTS.

209. The following photographs Morabito took in 2018 and 2020 documented significant structural damage that NV5 did ***not*** document in 2016 and that could not have occurred from normal and expected wear and tear. The only reasonable explanation for the following extensive structural damage was that it was caused by Eighty-Seven Park construction activities:



Figure J1: Typical cracking and spalling at parking garage columns








210.    The extensive NV5 2016 pre-construction survey did not document any of the above-depicted damage that Morabito found in 2018 and 2020, thus, confirming that none of it existed in 2016 prior to the Eighty-Seven Park construction and operations.

211.    A video taken in the CTS garage in July 2020 showed additional damage not depicted in the pre-construction survey. Notably, the water damage to the garage ceiling was located on the side closer to Eighty-Seven Park, and there was no observable water damage on the side farther away from Eighty-Seven Park.



212.    The water damage to the structural concrete slab in the CTS garage was exponentially worse the closer it was to Eighty-Seven Park. This damage is demonstrated by orienting still images from the same July 2020 video using the below schematic of the CTS parking garage, which identifies each parking spot:



213.    The closer each portion of the CTS parking garage was to Eighty-Seven Park, the progressively worse the observable water damage to the concrete structural slab was.

214.    The Terra Defendants, JMA, NV5, and DeSimone's dangerous construction activities at Eighty-Seven Park inflicted much of the structural damage to CTS that Morabito documented in 2018 and 2020, including but not limited to, dangerous and sporadically monitored vibrations, improper and unmonitored dewatering, excavation work that damaged the CTS south foundation wall, and sloping 87th Terrace to divert runoff away from Eighty-Seven Park and into CTS's structural components. These causes all combined to trigger, contribute to, accelerate, and result in CTS's tragic collapse that killed 98 people and levelled 55 condominium units in seconds.

***The Association's Failure to Repair and the Association and Morabito's Failure to Warn About CTS's Dangerous Structural Problems***

215.   The Association operated CTS and was tasked with maintaining the building on behalf of its owners and residents and ensuring the building remained in a safe condition.

216.   The Association's governing documents imposed upon the Association the duty to maintain all parts of the building in a safe condition:

> Except to the extent (i) expressly provided to the contrary in this Declaration, or (ii) proceeds of the insurance are made available therefor, the Association shall be responsible, at Common Expense, for maintenance, repair and replacement of:
>
> (a) ***All Common Elements, Limited Common Elements and Association Property***, except as otherwise provided in this Declaration;
>
> (b) ***All portions of the Condominium*** (except interior wall surfaces of Units) ***contributing to the support of the Building***, which portions shall include, but not be limited to, the outside walls of the building, chasing and load bearing railings walls or columns, or boundary walls of Units;
>
> . . . .
>
> (d) ***All floor and ceiling slabs, including, but not limited to, the slabs of all terraces and balconies***, except for decorative surfaces installed by Unit Owners to the extent any such surfaces may be permitted, including, but not limited to, waterproofing balcony floors;
>
> . . . .
>
> (j) Exterior painting, ***structural maintenance of the Buildings, roofing, maintenance of roads sidewalks, parking areas, drives, streets, and driveways*** (except as otherwise provided herein to the contrary), ***and general exterior maintenance***, but shall not include maintenance, repair and replacement of sliding glass doors, hurricane shutters, nor any alteration or addition to the Condominium Property made by a Unit Owners or his or her predecessors in title, nor any portions of the Condominium Property exposed to the elements or any structural element for which this Declaration delegates responsibility to the Unit Owner;
>
> (j) ***All property owned by the Association and other property contemplated by and to the extend the same is consistent with the terms hereof*** . . . .

Amended and Restated Declaration of Condominium of Champlain Towers South Condominium, § 7.1, at D10-D11 (hereinafter, the "Declaration").[1]

217.     The Miami-Dade County Code of Ordinances imposed on the Association the duty to ensure that CTS "be maintained in a safe condition." Art. I, § 8-11(a), Miami-Dade Cnty. Code of Ordinances.

218.     Despite these duties and obligations under the law, the Association failed to maintain all parts of CTS in a safe condition.

219.     The Association knew or should have known that certain parts of the building had been damaged and were failing, resulting in damage to the structure itself and the interiors of the units.  In the years preceding the collapse, evidence of concrete damage, cracking, and spalling throughout the building were apparent and brought to the Association's attention several times by residents, by the maintenance manager, and in a building inspection conducted in 2018. The Association repeatedly neglected these warnings.

220.     Indeed, part of the Association's duty included obtaining the 40-year recertification required by section 8-11(f)(ii) of the Miami-Dade County Code of Ordinances. Section 8-11(f)(ii) required all buildings 40 years or older to undergo Building Official recertification every 10 years. CTS turned 40 years old in 2021.

221.     In anticipation of CTS's 40-year recertification, the Association hired Morabito in 2018 to conduct a structural engineering analysis of CTS that would include an evaluation of the building's safety, structural integrity, and need for repairs.

---

[1]     Section 7.1 of the Declaration includes two subsections labeled "(j)."

222.     At all material times, Morabito was hired as a professional consultant and/or engineer responsible for inspecting, repairing, certifying, and/or otherwise attesting to CTS's safety, security, and structural integrity.

223.     At all material times, Morabito held itself out to the public, including to the Association, as a professional structural engineer with the expertise, skills, and ability to perform a full safety, recertification, and structural integrity inspection of CTS.

224.     As part of its comprehensive analysis of CTS, Morabito purported to have performed a full inspection of the building and an analysis of its structural integrity.

225.     Morabito's inspection and testing revealed widespread damage to the concrete and structural components throughout the building, which included concrete spalling, exposed rebar, damaged balconies, compromised concrete slabs surrounding the pool deck area, and other failures.

226.     At the conclusion of its 2018 inspection and testing, Morabito prepared and issued a comprehensive report regarding the condition of CTS ("2018 Report").

227.     Morabito's 2018 Report detailed major structural damage throughout CTS. For example, the 2018 Report described "concrete spalling or cracking" on "the concrete slab edge of balconies" as "fairly typical" and recommended further investigation and repair in line with the International Concrete Repair Institute's requirements.

228.     The 2018 Report also described evidence of damage to nearly half of the building's balconies as "systemic" and recommended the removal of all balcony tiles to repair the damaged concrete slabs underneath that tile and "fix structural damage." The 2018 Report also found "[s]ignificant cracking in the stucco exterior façade."

229.    The 2018 Report documented "major structural damage to the concrete structural slab" beneath the pool deck and entry driveway. Morabito recommended that the "Entrance/Pool deck concrete slabs that are showing distress . . . be removed and replaced in their entirety," warning that, without immediate repair, the concrete damage would "expand exponentially."

230.    The 2018 Report catalogued significant structural damage in the garage, including "[a]bundant cracking and spalling of varying degrees . . . in the concrete columns, beams, and walls of the parking garage . . . ."

231.    Any one of the findings in the 2018 Report constituted a dangerous condition that rendered CTS an unsafe structure. Taken together, the collective structural problems Morabito identified posed an enormous risk to the health, life, and safety of the building's owners, residents, occupants, and guests.

232.    Morabito furnished the Association with the 2018 Report, which also included repair recommendations to make CTS structurally sound and an estimate for the considerable cost of those repairs.

233.    Upon completing its inspection and testing of CTS and preparing the 2018 Report, Morabito knew the building's damage and lack of structural integrity required immediate and urgent attention, including, but not limited to, evacuation of the building.

234.    In violation of its ethical duties as a structural engineer, Morabito failed to warn unsuspecting owners, residents, occupants, and guests that the building's condition, lack of structural integrity, and need for critical emergency repairs put the lives of owners, residents, occupants, and guests at grave risk.

235.    Alternatively, Morabito's negligent inspections and structural testing failed to uncover and adequately disclose the extent and severity of the structural damage to the building.

236.    Notwithstanding Morabito's 2018 Report and despite knowing about significant structural problems that posed a risk to the life, safety, and property of CTS unit owners, residents, occupants, and guests, the Association failed to take action to make the necessary repairs.

237.    Moreover, the Association failed to warn anyone about the risks these significant structural problems posed to the building's unit owners, residents, occupants, and guests.

238.    Tragically for Plaintiffs and members of the Classes, the Association never warned that CTS's known structural damage posed severe risks to lives, safety, and property. In fact, the Association did just the opposite by allowing the building to remain occupied and treating the critical structural damage as little more than a financial nuisance.

239.    In October 2020, the Association again hired Morabito to perform both additional inspections and remediation work. Morabito's 2020 inspections and testing found that CTS's structural problems and concrete damage had worsened exponentially since 2018. The additional damage to the building in only two years was so substantial that Morabito expressed concern that the necessary remediation efforts would negatively impact surrounding buildings.

240.    Following its 2020 inspections, Morabito again failed to warn unsuspecting owners, residents, occupants, and guests that the building's condition, lack of structural integrity, and need for critical emergency repairs put the lives of owners, residents, occupants, and guests at grave risk.

241.    From its on-site inspections on multiple occasions in both 2018 and 2020 and from the structural testing it performed, Morabito had actual knowledge that CTS had pervasive structural damage and was, therefore, an unsafe structure. Morabito also knew that CTS was at risk of further, exponential damage and had, in fact, suffered such further damage between 2018 and 2020 during the Eighty-Seven Park construction. Morabito also knew, based on its testing and

findings, that without necessary remediation and structural repairs, the building was at significant risk of collapse and, therefore, posed an imminent danger to the life, safety, well-being, and property of the building's owners, residents, occupants, and guests.

242.     Morabito failed to submit the required reports to building and regulatory officials for Miami-Dade County and the Town of Surfside; failed to warn unit owners, residents, occupants, and guests of the building's structural damage; and failed to emphasize the significance and seriousness of the structural damage.

243.     Morabito's failures fell below the standard of care for a professional structural engineer with the expertise, skills, and ability necessary to perform a full safety, recertification, and structural integrity inspection. Morabito's failures caused and/or contributed to the catastrophic injuries resulting from the building's collapse on June 24, 2021.

244.     The Association also failed to inform CTS's unit owners, residents, occupants, or guests that the building suffered from structural damage in need of repair until the Association issued its April 2021 form letter addressing those repairs and admitting its failures: "A lot of this work could have been done or planned in years gone by. But this is where we are now."

245.     Tragically, this effort to finally address the building's structural damage came too late. Only two months after the Association's April 2021 letter revealing the building's structural damage, CTS collapsed.

### *Becker's Callous, Reckless, and Conscious Disregard for the Lives, Safety, and Property of CTS Owners and Occupants*

246.     Becker had a relationship with the CTS Association to render legal services and advice for more than 25 years, going all the way back to February 25, 1993. Becker thus provided continuous legal services and counsel to the Association since at least 1993 and through and until after the CTS collapse.



Today's date:  February 28, 2005

___ CIF
___ CUP
___ DIST

**CLIENT INFORMATION FORM**

CLIENT #: C09862   MATTER #: 31785   ASSIGNED ATTY: Rosa M De La Camara Esq.

DATE RETAINED: 2/25/1993   Transition Date:
AD-HOC Group (Y/N): No  Registered Agent: Yes  Over 55:
ASSOCIATION TYPE: Condo  Master: Hourly:

HOW DID CLIENT HEAR ABOUT BECKER & POLIAKOFF, P.A.? _____

DATE COVENANTS/DECLARATION *INITIALLY* RECORDED:

08/19/1981 -

COMPLETE NAME: Champlain Towers South Condominium Association, Inc.

ASSOCIATION ADDRESS (OFFICE): *(Physical street address of OFFICE. NOT P.O. Box or Management Co.)*
8777 Collins Ave.
Surfside, FL  33154-3401

COUNTY: Dade

CONDO. OFFICE PHONE # *(NOT Mgmt Co.)*    (305) 865-4740

CONDO. OFFICE FAX # *(NOT Mgmt Co.)*    (305) 865-7800

ASSN INTERNET ADDRESS (E-MAIL):    champlaintowers@aol.com

ASSOCIATION NICKNAME(S):  Champlain Towers South Condominium Association, Inc.

ANNUAL MEETING DATE: February     # OF UNITS: 136

MASTER ASSOCIATION, if any:

CORRESPONDENCE ADDRESS:
Gail Shear, Manager
8777 Collins Ave.
Surfside, FL 33154

247.     Becker attorneys leveraged the firm's reputation as condominium and construction law experts, to market themselves to the condominium association boards around the state, like that of CTS.

248.     In fact, Becker grew out of its pioneering role creating the law *and* legislation, pertaining to the operation of common ownership housing, with many of the leading cases in the field bearing the firm's name. In keeping with their commitment to their clients and the industry, Becker attorneys provide over 200 educational classes per year for board members and managers, and also advocate on behalf of clients through the firm's lobbying arm, the Community Association Leadership Lobby ("CALL").

249.    Becker's attorneys are recognized as individual national leaders in the field of construction and condominium law, through published works, public service, legislative activities, and industry group leadership positions. Several attorneys are members of the prestigious College of Community Association Lawyers.

250.    Becker has more Board-Certified Attorneys in Condominium and Planned Development Law than any other law firm in the state of Florida. Board certification demands rigorous testing and is in recognition of having the highest standards of skill, specialty knowledge, proficiency, professionalism, and ethics in community association law.

251.    Moreover, with one of the largest, dedicated teams of Board-Certified Construction attorneys, Becker's Construction Law Practice Group is one of most well-known nationally, for its specific knowledge and experience in the construction industry and experience effectively protecting the interests of its clients. Practice Group Chair Steven Lesser is Past Chair of the American Bar Association's Forum on Construction Law, the largest organization of constructional lawyers with over 6,000 construction professionals around the world. He also previously served as Chair of the Florida Bar Construction Law Certification Committee that prepares and administers an examination, evaluates peer review to determine those construction lawyers to be Board Certified by the Florida Bar.

252.    Becker has handled some of the most complex and varied construction-related cases, many of which have involved complex delay issues with a multitude of defendants, and scores of construction defects. Becker states that its construction attorneys represent clients in both transactions and disputes ranging from single- and multi-family dwellings to large commercial buildings, planned unit developments, multi-use retail, and industrial and governmental projects.

253.    Becker's relationship with the CTS Association is admittedly both as legal advisor, and as general counsel for day-to-day affairs in running the CTS condominium.

**From:** JEAN WODNICKI <jeanwodnicki@att.net>
**Sent:** Friday, March 5, 2021 8:26:01 AM
**To:** Direktor, Kenneth <kdirektor@beckerlawyers.com>
**Subject:** Thanks again

**EXTERNAL EMAIL - This message originated from an External Source.**

I know some of things I ask you are more in the nature of counselor than attorney, but you are great at both and your advice is always appreciated. Your thoughts and your presence are always tremendously helpful in the lion's den◆◆◆◆
J
Sent from my iPhone

254.    As Becker has explained in its public-facing advertising materials, Becker brings decades of broad expertise to their community association clients. Their business philosophy is to first focus on being a highly responsive law firm, deeply attentive to each client's needs. They are prepared to help associations with the myriad of legal issues, both ordinary and extraordinary, that volunteer directors may encounter, from updating governing documents, collecting delinquent assessments, pursuing rights with regard to defect and insurance claims, or conducting online voting, to negotiating with the development going up next door.

255.    Becker has advised the CTS Association on issues ranging from foreclosing on unit owners and enforcing the condominium regulations and bylaws restricting owners from owning pets in the building; to negotiating contracts with contractors hired to perform work on the building, such as Morabito Consultants, to evaluate the condition of the building and the work to be performed in connection with the 40 year recertification; to negotiating and obtaining financing including a 15 million dollar loan to fund a special assessment to make repairs in connection with the 40-year recertification; to responding to inquiries from unit owners regarding day to day issues

at CTS; to responding to owners' and residents' concerns about the condition of the building, need for repairs, and ongoing construction of the Eighty-Seven property being developed by the Terra Group.

256.    Becker considers itself to be the CTS Board Director's "safety net" in fulfilling its fiduciary duty to the members.[2] Becker Shareholder Donna DiMaggio Berger, who organized and conducted numerous public relations interviews after the collapse, notes: "Serving on a community association board is tough enough—don't do it without the necessary legal backup support. Working with legal counsel can protect both the association and individual board members from liability."

257.    One challenge that Becker encounters in working with community associations is protecting boards from inaccurate or misleading information they may gather on their own. Even the decision as to whether legal advice is necessary requires some knowledge of the law. "We often assist communities who have learned the hard way that proper advice would have cost less in the long run," says Chair of Becker's Community Association practice group, Kenneth Direktor.

258.    There were a number of extremely well qualified attorneys at Becker who continuously billed and collected tens of thousands of dollars and advised CTS in the management and operation of CTS and the construction issues it faced in the years leading up to the CTS collapse.

---

[2]    At the same time, for "decades," Becker "has waged a successful lobbying campaign **against condominium safety measures**," Brittany Wallman et al., *Becker & Poliakoff law firm the 'nemesis' of condo safety reformers*, Sun Sentinel (Sept. 28, 2021) https://www.sun-sentinel.com/news/fl-ne-surfside-collapse-condo-becker-20210928-oa5xaboljrfcxaptqslzujfita-story.html.

**Kenneth Direktor**

259.     Kenneth Direktor is Chair of Becker's Community Association practice group which includes over forty attorneys. He personally represents communities from Miami to Vero Beach focusing on representation of condominium, homeowners, and cooperative associations, and country clubs. He is a regular speaker on the topics of insurance, hurricane recovery, fiscal management, document drafting and other issues for various civic and community associations for the Community Associations Institute and for Florida Bar Continuing Legal Education Seminars. Mr. Direktor is one of only 190 attorneys statewide who are Board Certified Specialists in Condominium and Planned Development Law.

260.     For the past seven years, Mr. Direktor has taught community association law at Nova Southeastern University College of Law as an Adjunct Professor. Recognized in his field, Mr. Direktor was designated by Florida Business Magazine as one of "Florida's Legal Elite" in Real Estate Law in 2016 and has been recognized by Florida Trend Legal Elite since 2017.

261.     Mr. Direktor regularly lectures for various management companies and management associations on community association legal, operational, and practical issues and has lectured for CAI's National Law Seminar in Tucson, the Advanced Judicial Studies Seminar, and the University of Miami School of Law's Annual Cluster Housing Institute. He has been interviewed on national and local television and quoted in national, statewide, and local publications.

262.     Mr. Direktor is a member of the prestigious College of Community Association Lawyers, a group of attorneys who have distinguished themselves through contributions to community association law and who have committed themselves to high standards of ethical conduct. Fewer than 150 lawyers are members of this exclusive group.

263.   Mr. Direktor is the shareholder at Becker & Poliakoff who was the main Becker representative handling the CTS account.

> Q. And are you in charge of the account? I mean, how did the hierarchy work of the CTS account? Were you the main representative of Becker & Poliakoff?

> A. Yes.

Transcript of Kenneth Direktor Deposition ("Direktor Dep. Tr.") 70:6–10 (Nov. 10, 2021)

**Steven B. Lesser**

264.   Steven B. Lesser chairs Becker's national Construction Law and Litigation practice group. Mr. Lesser is Board Certified in Construction Law by the Florida Bar and devotes his practice exclusively to construction law and litigation, including governmental construction claims and defense and hotel/condominium disputes. He is a Fellow of the American College of Construction Lawyers. He has received a number of distinguished awards from the Florida Bar and American Bar Associations relative to his work in the construction industry.

265.   Mr. Lesser is Past Chair of the American Bar Association's Forum on Construction Law, a nationally prestigious organization devoted entirely to members of the construction industry. The Forum is the largest construction lawyer group in the world and is known for its scholarly publications and programs focusing on developments and trends in construction law.

266.   Mr. Lesser is presently Chair of The Florida Bar Association's Board of Legal Specialization and Education ("BLSE") which administers the Bar's certification plan and provides oversight over all 27 certification committees that each focus upon a specific practice area. As part of its mission, the BLSE helps identify for the general public and the profession those attorneys who have substantial experience and have demonstrated special knowledge, skills, and proficiency in certified areas of practice and professionalism and ethics in the practice of law. He

has further served in the leadership of a variety of Florida Bar and American Bar Association Committees including Past Chair of the Florida Bar Construction Law Certification Committee.

267.    Over the years, Mr. Lesser has directly advised Defendant CTS in all manner of construction issues, including specifically negotiating Defendant CTS's contracts with Mr. Frank Morabito, obtaining bids from contractors in connection with the 40-year recertification process, and in addressing the issues plaguing the CTS building as a result of the Eighty-Seven Park construction on the lot adjacent to CTS.

**Donna DiMaggio Berger**

268.    Donna DiMaggio Berger is a Shareholder in Becker's Community Association Practice in Fort Lauderdale, Florida. She is a member of the College of Community Association Lawyers ("CCAL"), a prestigious national organization that acknowledges community association attorneys who have distinguished themselves through contributions to the evolution or practice of community association law and who have committed themselves to high standards of professional and ethical conduct in the practice of community association law. She is also one of only 190 attorneys statewide who is a Board-Certified Specialist in Condominium and Planned Development Law.

269.    As Founder and Executive Director of Becker's Community Association Leadership Lobby ("CALL"), Ms. Berger has led various community association advocacy initiatives, working with legislators and other public policymakers on behalf of those who live, serve, and work in common interest ownership communities. She has testified before the Florida Legislature regarding community association law and frequently appears on radio talk shows and in print media discussing these issues.

270.     Ms. Berger is the host of "Take It To The Board" with Donna DiMaggio Berger, a Becker-produced podcast that explores the reality of life in a condominium, cooperative, or homeowners' association, what is really involved in serving on its board, and how to maintain that ever-so-delicate balance of being legally compliant and community spirited. Take It To the Board listeners are guaranteed to learn more about every facet of the shared ownership lifestyle and are invited to tune in for candid discussions with a variety of association leaders, experts, and vendors about issues they are facing, have faced, or something that might be in their future.

271.     Ms. Berger also maintains a community association law blog, which contains practical information for community associations like the CTS Association, and advice on issues like selecting engineers to assist with the 40-year recertification process, noting that "[t]his certification process may be both confusing and troubling to volunteer boards and their managers," and explaining that it is crucial that "your association counsel guide you through" the process.

272.     In addition, Ms. Berger has given seminars and speeches around Florida detailing community association legislative lobbying efforts. She was also recently appointed to the Board of Directors of the American Lung Association in Florida. Ms. Berger received her J.D. and B.A. from the University of Miami. Ms. Berger represents all types and sizes of community associations throughout Florida.

273.     Immediately following the tragic collapse of CTS, Berger went on a media blitz, responding to media inquiries from the nation's largest news outlets, including CNN and Fox, appearing in interviews and making a number of public-facing statements.

274.     In these statements, Berger speculated as to the cause of the collapse to Kathleen Reuschle of FOX News, stating in a July 26, 2021 email, "I would like to know if Morabito ever did any subsurface testing and whether the demolition of the building next door and the vibrations

felt when pilings for the new building (87 Park) were being drilled may have destabilized the Champlain Towers South building and parking structure. **Several owners have told us that that construction created reverberations that shook their windows to the point that they thought their windows might crack."**

| | |
|---|---|
| From: | "Berger, Donna" <DBerger@beckerlawyers.com> |
| Sent: | 6/26/2021 10:38:29 PM -0400 |
| To: | "Reuschle, Kathleen" <kathleen.reuschle@FOX.COM> |
| Subject: | Re: Re: Fox News |

Kat,

It's certainly appropriate for them to put out a statement. They didn't mention that the Champlain Towers South association started the certification inspection 4 years before they were legally required to do so. The 2018 report was posted on the association's website on the owner's page for all to see as were the bids for the work that were coming in.

Morabito mentions that the roof replacement was underway (which it was) but doesn't mention that the roof had to be replaced before the exterior concrete repairs could be undertaken as the OSHA straps on the roof are using for staging some portions of those repairs.

I certainly understand the tremendous amount of pressure that Morabito is under as people rush to know if Morabito ever did any subsurface testing and whether the demolition of the building next door and the vibrations felt when the pilings for the new building (87 Park) were being drilled may have destabilized the Champlain Towers South building and parking structure. Several owners have told us that that construction created reverberations that shook their windows to the point that they thought their windows might crack.

Lastly, it is odd that everyone seems to have forgotten that the entirety of 2020 precluded any type of major construction projects in occupied communities due to the pandemic. We had communities that naturally shut down access to their buildings as part of their Covid safety protocols. They weren't allowing owners to undertake renovations inside their units and the associations were not allowing construction crews into their buildings either.

Best,
Donna

**Donna DiMaggi   Berger**
o
Shareholder
Board Certified Specialist, Condominium and Planned Development Law
Fellow, College of Community Association Lawyers
Executive Director of CALL

**Becker**

Becker & Poliakoff
1 East Broward Blvd., Suite 1800
Ft. Lauderdale, FL 3330
1

954.364.603
1

954.985.417
6

DBerger@beckerlawyers.co
m

275.   These public statements immediately following the CTS collapse stand in stark contrast to statements Kenneth Direktor made at his deposition on November 10, 2021, where he

disclaimed any prior knowledge of CTS residents complaining about vibrations to the CTS building during the construction of Eighty-Seven Park:

> Q. Right. So in 2017 when you took over this account and the building, you – to your knowledge nobody at Becker & Poliakoff ever went back and found out that, in fact, residents had been complaining about daily tremors to your understanding?
>
> A. To my understanding that would be a correct statement, and I do not recall being asked anything by the board with regard to 87 Park until the latter part of 2019 when we were asked to look at the term sheet.

Direktor Dep. Tr. 165:14–24.

276.    In fact, Becker had been informed on numerous occasions that there were serious issues with the CTS building and that they needed to be remedied.

277.    Morabito sent Becker its 2018 Report, which made all of the important and serious findings as described above, including that there was failed waterproofing allowing extensive water infiltration that was causing *major structural damage* to the concrete structural slab below the pool deck area of the building, that there was abundant cracking and spalling of varying degrees in the concrete columns, beams and walls, that the pool deck concrete slabs would need to be removed and replaced in their entirety, that there was exposed and deteriorating rebar throughout these areas of the building, and that "the concrete deterioration needs to be repaired in a timely fashion" and "in accordance with the recommendations of ICRI."

278.    On November 5, 2018, shortly after Morabito released its October 8, 2018 report, Susanna Rodriguez, a concerned unit-owner and resident of CTS, contacted Becker directly via certified mail, expressing her concerns for the building in a three-page letter that specifically attached Morabito's October 8, 2018 report.

279.    Rodriguez said that she was "extremely concerned about the Structural integrity and Concrete Deterioration of Champlain Towers South (CTS)." Citing Morabito's October 8,

2018 report, Rodriguez explained that although "[s]ome owners think we can wait 2 years to begin this project," that the report determines that CTS has "major structural damage" and "structural issues that require repair and/or remediation in the immediate and near future."

280.    Rodriguez was concerned that even though the "concrete deterioration is evident to the naked eye," that "many owners as well as members of the Board do not understand the importance of commencing this work as soon as possible" and that "[p]ostponing this work will only make the job more expensive to repair and compromise the structure of our building."

281.    Rodriguez concluded that "it would be in the building's best interest to repair the structural flaws since it has become ***life threatening and necessary***." She then went on to state that "I think it would be in the Associations [*sic*] best interest to ask for legal advice from our Attorney on how to proceed with these issues" and that "Structural Repairs should be addressed immediately." Specifically addressing Becker, Rodriguez requested that "I would like your feedback and legal opinion on these matters and to please advise the BOD," and that "The building needs to be repaired correctly and before any other aesthetics project."

November 5, 2018

Certified Mail Return Receipt Requested
Emailed also:  Rosa de la Camera and CTS Manager BOD

Becker and Poliakoff PA
Rosa de La Camara, Esquire
Alhambra Towers
121 Alhambra Towers
10th Floor
Coral Gables, Fl.  33134

Champlain Towers South Board of Directors and Manager
8777 Collins Avenue
Surfside, Fl.  33154

RE:  Champlain Towers South- Special Assessments need Unit Owner's vote and Concrete
Deterioration Issues need immediate attention

I have been an owner at Champlain Towers South since 1999.

I am extremely concerned about the Structural Integrity and Concrete Deterioration of
Champlain Towers South (CTS).  The building is  almost 38 years old and will require a 40 year
inspection in 2 years.  The Association has hired a Structural Engineer to begin this process. The
Engineer Morabito Consultants has determined that the building "has structural issues that
require repair and/or remediation in the immediate and near future" (Engineering Survey
Report Attached). The estimated costs of these repairs are estimated at over 9 million
Dollars.  Some owners think we can wait 2 years to begin this project.

The Engineering Report has determined that there is major structural damage in the balcony
slabs, concrete Spalling and cracking on concrete balcony edges, water infiltration caused by
sub-surface deterioration at the exterior soffits under the balcony railings. (Page 3). Soffit
damage that requires removing existing tile of all balconies, Soffit support framing is
deteriorated (Page 4) Balcony Windows and Doors are at the end of their functional lifespan.
Some units have replaced the doors and they have not been installed properly etc. to just name
a few items on the report.

The concrete deterioration is evident to the naked eye but many owners as well as members of
the Board do not understand the importance of commencing this work as soon as possible so
that it does not compromise the reinforced steel structure of our balconies . A piece of
concrete has fallen off one balcony on to another balcony recently and this deterioration has
become a life safety hazard. Postponing this work will only make the job more expensive to
repair and compromise the structure of our building. The parking garage has been leaking for

over 10 years. It was repaired incorrectly with epoxy injections at the garage level. The building pool deck needs to be correctly re-sloped and waterproofed. I park in space 105 and have had a storm panel covering the ceiling of my space for over 7 years. Pretty soon pieces of concrete will be falling on to the cars in the garage.

In the meantime the Board levied a special assessment 2 years ago with a 2 year interest free payment plan which included $500,000.00 to be designated for a Hallway Renovation. Now the Board wants to pass an additional special assessment for the Hallway Renovation because the price of completing this project has increased over the past 2 years due to inflation. Also part of this work scope requires new door coverings for Hallway unit doors since they claim the doors some doors are cracked. The doors are the responsibility of the unit owners as are the sliding glass doors. My hallway doors are not cracked and do not need maintenance. I believe the hallway project is more of an aesthetic improvement and not necessary maintenance as is the concrete restoration the building which needs to addressed immediately. The Board cannot go back after an assessment has been levied and increase it for the Hallways. Also this assessment should have been voted on by the unit owners per our amended by laws. (attached and executed by your firm)

Becker and Poliakoff executed in court an amendment to our Declaration of Condominiums, By Laws and Articles of Incorporation signed by our secretary at that time Mr. Arnold Notkin, Secretary October 14th, 1996 and recorded in court October 31, 1996 (attached). The Bylaws were amended to say "Special Assessments require approval of 50% plus One of all unit owners."

I am a little concerned and surprised that CTS has not involved our Attorney in any of our Special Assessment meetings. The board plans on adopting a budget and a special assessment on November 29th. The board has tried to adopt the special assessment on the 23rd of October and was not successful. This special assessment cannot pass since it needs owners approval and the owners are more concerned about the structural damage at this time.

I think it would be in the building's best interest to repair the structural flaws since it has become life threatening and necessary.

I think it would be in the Associations best interest to ask for legal advice from our Attorney on how to proceed with these issues.

I have asked the Manager to please place me on the construction committee since I want to help with any aspect of these projects. I also believe the building will have to request a loan a line of credit preferably to secure a contractor to begin this process. Structural Repairs should be addressed immediately since the cost of construction inflation will increase as well as interest rates if we have to secure a loan. This will put us in the same situation we are encountering with the additional money the Board wants to collect to complete the Hallway Renovation.

I would like your feedback and legal opinion on these matters and to please advise the BOD that per our amended By-Laws they are not authorized to levy an Assessment without Unit Owners vote.

The BOD have a fiduciary responsibility to maintain the structure of the building and needs to commence the concrete restoration and possibly use funds for this hallway project since it is necessary maintenance and an emergency at this point. The association has in the past always done band-aid approach repairs to the building to keep repair cost low and that now have put us in a costly repair situation. The building needs to repaired correctly and before any other aesthetics project.

Thank you

Susana Rodriguez
Owner 607
305-989-1730

3 Attachments

282.    Rather than provide the requested guidance to the CTS board or any legal opinions

regarding the necessity of the structural repairs, on December 3, 2018, almost a month after

receiving the letter, Becker forwarded Rodriguez's letter to the CTS Board, simply requesting

whether the Board would like assistance in drafting a substantive response.

Kenneth S. Direktor, Esq.
Shareholder
Board Certified Specialist, Condominium and
Planned Development Law
Phone: (954) 965-5050  Fax: (954) 241-4922
kdirektor@beckerlawyers.com



Becker & Poliakoff
1 East Broward Blvd., Suite 1800
Ft. Lauderdale, FL 33301

December 3, 2018

**ATTORNEY/CLIENT WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**

**SENT VIA EMAIL ONLY TO:** gatormaggie@aol.com;
manager@champlainsouth.com

Board of Directors
Champlain Towers South Condominium Association, Inc.

**Re:   Susana Rodriguez Written Inquiry**

Dear Members of the Board:

Attached please find a letter from unit owner, Susana Rodriguez, inquiring as to structural
issues and a special assessment.

Since the letter was sent via certified mail to us and directly to the Association, Ms.
Rodriguez is entitled to a substantive written response within thirty (30) days of receipt of
the letter (we received it on November 13, 2018, so a response would be due by
December 13, 2018). Please advise if you wish to respond directly or you wish for me to
respond.  A failure to respond has legal consequences, including the loss of the right to
recover legal fees if the matter is litigated and the Association prevails. You may respond
within the thirty (30) days by advising Ms. Rodriguez that you are referring the inquiry to
counsel for advice, in which case you will have an additional thirty (30) days to provide a
substantive response.

Please advise how you wish to proceed.

Very truly yours,

**KENNETH S. DIREKTOR**
For the Firm

KSD/dts
Attachment

ACTIVE: C09862/231785:11734735_1
www.beckerlawyers.com                                    Florida | New Jersey | New York | Washington, D.C.

283.   On December 4, 2018, Becker informed Ms. Rodriguez that the CTS board asked

Becker to provide a substantive response to her letter within 30 days.

Marilyn J. Perez-Martinez, Esq.
Attorney at Law
Phone: (305) 260-1053  Fax: (305) 442-2232
mperez-martinez@beckerlawyers.com

**Becker**

Becker & Poliakoff
121 Alhambra Plaza
10th Floor
Coral Gables, Florida  33134

December 4, 2018

**Via U.S. Mail**

Susana Rodriguez
8777 Collins Avenue, #607
Surfside, FL  33154

Re:   Champlain Towers South Condominium Association, Inc.

Dear Ms. Rodriguez:

The Association is in receipt of your correspondence dated November 5, 2018. The Association has asked this office, as its counsel, to assist with a substantive response to your inquiry.

The response will be provided pursuant to the time frame required by statute.

Very truly yours,

Marilyn J. Perez-Martinez

MJP/as

cc:   Board of Directors

ACTIVE: C09862/231785 11739444_1

284.    On December 13, 2018, Becker provided Ms. Rodriguez the "substantive response" letter, which explained that "Your letter sets forth various concerns related to concrete restoration but does not actually ask a question as to this issue," and that "no response can be provided when no question has been asked."

285.    Becker's response then simply concluded as follows:

> In terms of legal guidance and opinions you want to ensure the Association is getting from its counsel, please note that the Board and Association's counsel (i.e., this Firm) work together on various matters but that need not be in the presence of the membership as such, the membership will not be privy to those discussions. Additionally, which your letter seeks this Firm's 'feedback and legal opinion' on the matters set forth in the letter, the Firm is retained by the Association which is the corporation which operates the condominium. The Firm does not provide feedback or legal opinions to anyone other than the Association through its Board of Directors. As such, your request cannot be complied with."

286.    Ms. Rodriguez was certainly not the only CTS resident who brought her specific and detailed prophetic concerns about the safety of the CTS building to Becker, as evidenced by

Ms. Berger's admission that Becker had received numerous complaints from CTS residents of the building shaking and being damaged as a result of the Eighty-Seven Park construction next door. Still, Becker turned a blind eye to these concerns and instead took the position that their only obligation was to the CTS board.

287.    Becker also has had knowledge of complaints from residents regarding the building's condition for years before the collapse, such as when CTS resident Matilde Zaidenweber filed a lawsuit against the building in 2001 and then again in 2015, claiming damages for her loss caused by water entering her unit through the cracks in the outside wall of the building. *See Zaidenweber v. Champlain Towers S. Condo. Ass'n In*c., Case No. 01-26634 CA 22 (Fla. 11th Cir. Ct.); *Fainstein v. Champlain Towers S. Condo. Ass'n Inc.*, Case No. 13 2015 CA 022299000001 (Fla. 11th Cir. Ct.). The very existence of these actions demonstrates how Becker was in ignoring the many issues the building was facing.

288.    This total disregard of Ms. Rodriguez's and other CTS residents' concerns runs entirely counter to the views Becker espouses in its educational materials and other public statements made in regard to keeping condominium residents informed as to the operation and maintenance of their building.

289.    David Ramsey, a shareholder in the Morristown, New Jersey office of law firm Becker and Poliakoff, suggests a most practical reason why transparency is vital to the interests of those not serving on the board: "A regular method of communication provides residents with the comfort that they know what is going on with their homes, what potential 'disasters' the association may be facing in the future, and how the owners might best prepare."[3]

---

[3]      https://sofl.cooperatornews.com/article/board-transparency/full

290.   "The importance of board transparency," Direktor has said, "falls into three categories: legal, practical and political, though not necessarily in that order of importance. As an attorney, I need to advise my clients as to how to do things in accordance with applicable law and governing documents, which require a certain level of transparency in terms of notice required for meetings. In order to comply with the law, that notice also requires disclosure of what will be discussed, that the meeting be open, and that board members not truncate the meetings. Noncompliance can mean that later, the decisions taken can be attacked on procedural grounds."[4]

291.   "On the practical level," he continues, "the reality is that transparency eliminates or reduces the backlash that can result when a board does something unpopular. Levying an assessment is never popular. Having a proper reserve study done and attaching the study to your budget, or otherwise making it available to the owners so they know what's coming up, when, and for how much can eliminate at least some of the backlash."[5]

292.   "Politically, a board that is open, accessible and transparent is good politics. Real transparency makes it less likely that misinformation will make an impact. Misinformation can only survive in the absence of correct information."[6]

293.   Becker had clear knowledge of the Morabito reports, the condition of the building, the clear risk to life, safety, and welfare that that condition posed to CTS residents, as well as actual knowledge of the concerns of the building's residents, and thus had a responsibility and duty to warn about the imminent nature of the damage and the extreme risk to the residents and occupants of CTS posed by the structural damage.

294.   Becker now claims to have never read the Morabito report.

---

[4]     *Id.*
[5]     *Id.*
[6]     *Id.*

295.    For example, at his recent deposition, Mr. Direktor claimed to have *never read* Morabito's 2018 Report until *after* the CTS Collapse.

> Q. So your testimony is that in 2018, you, as Becker & Poliakoff, thought that the building was in, quote, good shape?
>
> A. No, I –
>
> Q. Okay.
>
> A. I — I thought that representations had been made to the association that the building was in good shape.
>
> Q. And what did you do to check on those allegations --
>
> MR. BLUMBERG: Object to the form.
>
> BY MR. MOSKOWITZ:
>
> Q. -- those representations?
>
> A. It is not my role as counsel to follow up on those recommendations, because they came from an engineer, and I would not second guess an engineer, and they came from a representative of the building department who stated unequivocally that he had reviewed the data compiled by the engineer.
>
> Q. Did you read the Morabito report in 2018?
>
> A. I did not.
>
> Q. You've never read the Morabito report in 2018?
>
> A. I have read it since.
>
> Q. Since what?
>
> A. I have read it since the building collapsed.

Direktor Dep. Tr. 31:25–33:3

296.    Similarly, Mr. Direktor claimed that he did not review Ms. Rodriguez's letter or Morabito's report, even though it was attached to the letter, because he did not believe he had any responsibility to do so:

Q. Okay. Who is Rosa de la Camara, if we go to the first page?

A. Rosa is one of my partners in the Community Association Practice Group who practices in our Coral Gables office.

Q. And in the Champlain Towers account, did she report to you?

A. Yes.

Q. So when she received this letter on or about November 5, 2018, how did she show it to you? Did she call you in her office, did she forward it to you, or how did you get a copy of it?

A. I do not recall.

Q. But you do recall seeing the letter?

A. I can't -- I can't answer with certainty. I do not recall whether I saw the letter or not.

Q. You heard about the letter?

A. That I did.

Direktor Dep. Tr. 73:24–74:18.

Q. Okay. So after you read or hear about Ms. Rodriguez saying, quote, "I think it would be in the building's best interest to repair the structural flaws since it has become life-threatening and necessary," you didn't think it was at all a good idea to maybe take a look at what the report says?

A. Ms. Rodriguez is not our client, and I -- my role is to forward her letter to the board and recommend that they take up the issues -- "they" being the board, take up the issues that Ms. Rodriguez has raised with their engineer, which is what we did.

Direktor Dep. Tr. 78:10–22.

297.    If true, then after receiving Ms. Rodriguez's letter, not only did Becker **_not_** even

read the Report or advise Defendant CTS to ascertain "what the engineer thought," on November

15, 2018, a Becker representative attended a CTS board meeting along with Ross Prieto, the

Building Official of the Town of Surfside, *that Frank Morabito was not invited to attend*.  In fact,

no one at Becker, nor from the Board, even bothered to contact Mr. Mirabito to discuss his Report

for almost two years. At this CTS board meeting, Becker stood idly by as, Prieto falsely represented to the CTS residents, that based specifically on the Mirabito Report, "it appears the building is in very good shape."

298.    At no point did Becker ever advise that the Morabito's 2018 Report definitely demonstrated that the CTS building was *not* in good shape. At no point did Becker ever provide Morabito with the letter from Ms. Rodriguez to confirm her assessment of the Morabito report. Becker never consulted with Morabito about the report's findings at all.

299.    Yet, Direktor has since acknowledged that if there was a safety issue raised in Morabito's report, that Becker should have worked with the CTS Board to bring in the building department and taken emergency steps to protect the residents from any "imminent danger of collapse."

> Q. So if there's an engineer, which you said Mr. Lesser sign up the contract, and he's retained to do an inspection of the building, and the report says I think -- and let's go with these hypothetical facts, I think the building is a disaster and is about to fall down, you, Becker & Poliakoff, in your role, you're saying you have no duty at all to, A, read the report, or, two, take any measures at all to at all benefit the tenants when the expert report says the building is about to fall down?
>
> MR. BLUMBERG: Wait, hold on, hold on. Objection to form, leading, assumes facts not in evidence.
>
> BY MR. MOSKOWITZ:
>
> Q. Okay.
>
> A. Based upon your hypothetical, if an engineer had told the board that the building was in imminent peril of collapse, then **there would have been an entirely different response**, because we would have -- we would have worked with the board -- **the firm would have worked with the board to <u>bring in the building department</u>, and if the engineer had said at any point that the building was in imminent danger of collapse, <u>then there would have been emergency steps taken</u>**.

Direktor Tr. 34:13–35:15.

> Q. How do you know? Would you have consulted them to do something differently?

A. If the report had said there were life safety issues and the board had contacted me with regard to next steps, **yes, we would have acted differently**. "We," meaning the firm, **would have advised the association differently in terms of the actions that were appropriate at that point**.

Direktor Tr. 92:4–17.

300.    Becker's reckless disregard for the lives and safety of the CTS residents was not confined to its flat-out refusal to address the issues raised in the Morabito report. Direktor and another Becker shareholder, Michael Góngora,[7] were brought into negotiations with the Terra Defendants to evaluate a proposed term sheet for a proposed settlement between the Terra Defendants and CTS. That proposed term sheet would have *released* the Terra Defendants from any liability for claims that either CTS *or the CTS residents* may have had against them in connection with the construction of Eighty-Seven Park for $400,000, a meager sum given the extent of the damages the construction actually caused, as described above. Rather than investigate the issues and seek to protect CTS and its residents, Becker limited its review of the proposed settlement to revising the confidentiality provision sought by the Terra Defendants.

301.    Moreover, despite receiving yet another engineering report from Morabito, this one demonstrating that the Terra Defendants' construction of the walkway on 87th Terrace was causing water to flow away from Eighty-Seven Park and was directly damaging the CTS foundation structure by causing water to infiltrate CTS, Becker turned a blind eye to the significance of this

---

[7]    Michael Góngora is the lead Community Association Litigator in Becker's Miami office. His experience representing community associations includes handling various contracts, association declarations, litigation and disputes that may arise from these and other issues. He is— and was, during the relevant periods—also a City Commissioner for the City of Miami Beach.

substantial water intrusion and focused on working to negotiate a settlement of $20,000–30,000 with the Terra Defendants.[8]

302.     Similarly, when CTS was offered a free assessment of the CTS building to identify damages that may be consistent with hurricane force winds so that CTS could potentially pursue a claim to secure additional recoveries to renovate and repair the CTS building, Direktor specifically advised CTS to decline that assessment, explaining that if CTS were to pursue it, they might be "opening a bigger can of worms," i.e., that the building might be too expensive to repair.

303.     Plaintiffs have retained an expert to review the management and operation of CTS, its collapse, the reports provided and the actions of the Board of Directors and Becker as advisors to the Board.

304.     After reviewing various materials regarding CTS and the collapse, including but not limited to the allegations in this complaint and the materials upon which they are based, the expert's preliminary assessment of Becker's involvement is that Becker, "[a]s the long-time advisor to the Association, which is made up of rotating directors that do not have the experience

---

[8]     The significance of this land grab, as more fully described above, however, was not lost on others. In a recent interview, Olmedillo said he was so surprised when developers put up a fence blocking off 87th Terrace that he sent Surfside code enforcers to the site. He said he also called the land-use attorneys and surveyors associated with the project, asking whether it had crossed the municipal boundary—they told him it had not. "It struck me as strange that they would close the street and sell it. . . . It brought things uncomfortably close," Olmedillo said. He added that he was offended at the time that Surfside officials were not notified beforehand about the closure of 87th Terrace, which had public parking for residents and served as one of the beach access points for town police. "It was like, 'Oops, sorry, we forgot about you,'" Olmedillo said. "When the fence came up, I saw it and said: 'What the hell? What's going on?'" . . . .From 2016 to 2019, Miami Beach officials received dozens of noise complaints from the construction at 8701 Collins Ave., city records show. The developers were also fined for excessive noise at least eight times. In April 2019, members of the Champlain Towers South condo association took pictures of plastic foam that had drifted from the construction site. *See* Rebecca Tan et al., *Developer of luxury condos offered next-door Surfside building $400,000 amid complaints over construction, documents show*, Wash. Post (July 2, 2021) https://www.washingtonpost.com/investigations/2021/07/02/87park-champlain-towers-collapse/.

in construction review and analysis that the law firm of Becker & Poliakoff has," Becker not only "fell below the standard of care and custom and practice of what would be expected of an association legal advisor," but  "their lack of direct action showed a reckless disregard for the life and safety of the residents" of Champlain Towers South by, among other things, "not stressing to the Board the significance of the Morabito report and advising the Board that immediate action needs to be taken" and "that the owners needed to be immediately advised of the contents of the report."

**CLASS REPRESENTATION ALLEGATIONS**

*Class Definitions*

305.    Plaintiffs bring this class action and seek to certify and maintain it as a class action under Fla. R. Civ. P 1.220(a), (b)(1) or (b)(3), (d)(1), and (d)(4) on behalf of a Liability Class, a Personal Injury and Wrongful Death Subclass ("Personal Injury Subclass"); a Non-Owner Personal Injury and Wrongful Death Subclass ("Non-Owner Personal Injury Subclass"); and an Economic Loss and Property Damage Subclass ("Economic Loss Subclass").

306.    Plaintiffs anticipate first certifying a Liability Class under Fla. R. Civ. P. 1.220(b)(1) or (b)(3), and (d)(4) limited to certification and a subsequent trial of a global issue— namely, Defendants' liability for the collapse of CTS on June 24, 2021. Following certification of a Liability Class, Plaintiffs may seek certification of a Personal Injury Subclass, Non-Owner Personal Injury Subclass, and an Economic Loss Subclass for damages determinations and allocations, if appropriate. *See, e.g.*, *Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246, 1267–71 (Fla. 2006); *Las Olas Co. v. Fla. Power & Light Co.*, 2020 WL 9874296 (Fla. 17th Cir. Ct. Dec. 14, 2020), *aff'd per curiam sub nom. Infratech Corp. v. Las Olas Co.*, 320 So. 3d 751 (Fla. 4th DCA 2021).

**The Liability Class**

307. Plaintiffs define and will seek certification of the following Liability Class:

> **All persons and entities located at, residing at, and/or owning units at the Champlain Towers South condominium building, located at 8777 Collins Avenue, Surfside, Florida 33154, at the time of Champlain Towers South's collapse on June 24, 2021.**

**The Personal Injury and Wrongful Death Subclass**

308. Plaintiffs define and will seek certification of the following Personal Injury and

Wrongful Death Subclass on behalf of:

> **All persons who suffered personal injuries as a result of the collapse of the Champlain Towers South condominium building, located at 8777 Collins Avenue, Surfside, Florida 33154, on June 24, 2021, and the personal representatives, survivors, and beneficiaries of the estates of all persons killed as a result of the collapse.**

**The Non-Owner Personal Injury and Wrongful Death Subclass**

309. Plaintiffs will define and will seek certification of the following Non-Owner

Personal Injury and Wrongful Death Subclass on behalf of:

> **All persons who suffered personal injuries as a result of the collapse of the Champlain Towers South condominium building, located at 8777 Collins Avenue, Surfside, Florida 33154, on June 24, 2021, and the personal representatives, survivors, and beneficiaries of the estates of all persons killed as a result of the collapse who held no legal ownership interest in any condominium located in the Champlain Towers South condominium building.**

**The Economic Loss and Property Damage Subclass**

310. Plaintiffs define and will seek certification of the following Economic Loss and

Property Damage Subclass on behalf of:

> **All persons and entities located at, residing at, and/or owning units at the Champlain Towers South condominium building, located at 8777 Collins Avenue, Surfside, Florida 33154, at the time of the Champlain Towers South's collapse on June 24, 2021, and that lost real property and/or personal property as a result of the damage to the structure or**

**units at Champlain Towers South and the resulting collapse on June 24, 2021.**

311.    The Liability Class, the Personal Injury Subclass, the Non-Owner Personal Injury Subclass, and the Economic Loss Subclass exclude the Defendants, Plaintiffs' counsel and their employees, and the judicial officers and their immediate family members and associated court staff assigned to this case.

312.    Plaintiffs reserve the right to modify, expand, or amend the definitions of the proposed Classes following class certification discovery and before the Court determines whether class certification is appropriate.

313.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

***Requirements of Rule 1.220(a)***

<u>**Numerosity**</u>

314.    This action satisfies the numerosity requirement of Fla. R. Civ. P. 1.220(a)(1). The exact size of the Liability Class is unknown, but includes at least the owners, residents, occupants, and guests of the 136 units destroyed in the collapse of CTS. Similarly, the precise size of the Personal Injury Subclass is unknown but includes all 98 victims who died in the collapse, as well as all of those who survived but suffered personal injuries caused by the collapse. The precise size of the Non-Owner Personal Injury Subclass is also unknown but includes all of the members of the Personal Injury Subclass but who also held no legal interest in any condominium. Finally, the exact size of the Economic Loss Subclass is unknown, but includes at least all owners, residents, occupants, and guests of the 136 units who lost real property, personal property, or both in the June 24, 2021 collapse. Accordingly, the sizes of the Classes make joinder of their individual members

impracticable.

### Commonality

315.    This action satisfies the commonality requirement of Fla. R. Civ. P. 1.220(a)(2). Plaintiffs' claims raise questions of law and fact common to the Classes. The common questions of law or fact include, but are not limited to, the following:

    a.    Whether the Defendants owed duties to Plaintiffs and the Class Members to conduct their operations in ways that would have prevented the damage to and collapse of CTS;

    b.    Whether the Defendants knew, or should have known, about the risk of the catastrophic structural failure of CTS;

    c.    Whether the Defendants took reasonable, adequate measures to conduct their operations to prevent the damage to and collapse of CTS;

    d.    Whether the Defendants directly and proximately caused or contributed to the damage to and collapse of CTS; and

    e.    Whether the Defendants' actions, inactions, and/or omissions injured Plaintiffs and the Class Members.

### Typicality

316.    This action satisfies the typicality requirement of Fla. R. Civ. P. 1.220(a)(3). The claims Plaintiffs assert are typical of the claims of the Liability Class and their respective subclasses. Plaintiffs, as proposed Liability Class Representatives, have suffered harm that stems from the Defendants' same course of conduct. That conduct gives rise to the Liability Class's claims, which are based on the same legal theories and interests and depend on resolution of the same defenses to liability. Plaintiffs Raquel Azevedo de Oliveira and Kevin Spiegel, as proposed

Personal Injury Subclass Representatives, are representing the Estates of decedents who have suffered personal injury or wrongful death, also from Defendants' same course of conduct, and the claims the Personal Injury Subclass Representatives bring are based on the same legal theories and interests. Plaintiff Kevin Fang, as a proposed Non-Owner Personal Injury Subclass Representative, is representing the Estate of a decedent who has suffered personal injury or wrongful death, also due to Defendants' same course of conduct, and the claims the Non-Owner Personal Injury Subclass Representative brings is based on the same legal theories and interests. Finally, Plaintiffs Raysa Rodriguez and Steve Rosenthal, as proposed Economic Loss Subclass Representatives, have suffered economic loss and/or property damage from the Defendants' same course of conduct. The claims the Economic Loss Subclass Representatives bring are based on the same legal theories and interests.

### Adequacy of Representation

317.    This action satisfies the adequacy of representation requirement of Fla. R. Civ. P. 1.220(a)(4). Plaintiffs will fairly and adequately represent the interests of the Liability Class, and they do not have any conflict with the interests of the other members of the Liability Class. Plaintiffs have the same interests as members of the Liability Class and will fairly and adequately look out for and protect the interests of absent Liability Class Members. The same is true for Plaintiffs Azevedo de Oliveira and Spiegel, who have no conflict with the interests or members of the Personal Injury Subclass. Rather, Plaintiffs Azevedo de Oliveira and Spiegel share the same interests as members of the Personal Injury Subclass and will carefully guard the interests of absent Personal Injury Subclass members. Plaintiff Kevin Fang also has no conflict with the interests or members of the Non-Owner Personal Injury Subclass and will fairly and adequately represent the Subclass. In fact, Plaintiff Kevin Fang as the same interests as other members of the Non-Owner

Personal Injury Subclass and will carefully look after the interests of absent Non-Owner Personal Injury Subclass members. Plaintiffs Rodriguez and Rosenthal also will make adequate subclass representatives for the Economic Loss Subclass. Plaintiffs Rodriguez and Rosenthal have interests coextensive with the Economic Loss Subclass members and have no conflict with any member of the Economic Loss Subclass or their interests. Plaintiffs Rodriguez and Rosenthal stand ready to carefully protect the interests of absent Economic Loss Subclass members.

318.    On July 16, 2021, the Court entered its Amended Order Appointing Plaintiffs' Counsel and Addressing Certain Case Management Issues. (D.E. 73). In that order, the Court appointed a leadership structure to manage Plaintiffs' claims in this litigation. Plaintiffs' leadership will propose adequate counsel to represent the Classes in the motion for class certification.

319.    Proposed class counsel for the Liability Class, Personal Injury Subclass, Non-Owner Personal Injury Subclass, and the Economic Loss Subclass will all be sufficiently experienced in complex litigation and class actions and have the qualifications and abilities necessary to adequately represent the interests of their respective class and subclasses.

***Requirements of Rule 1.220(b)(1)(B)***

320.    This action is appropriate for class treatment pursuant to Fla. R. Civ. P. 1.220(b)(1)(B). The prosecution of separate claims by individual members of the Classes would create a risk of adjudications concerning individual Class Members which would, as a practical matter, be dispositive of the interests of those Class Members who are not parties to the adjudications, or substantially impair or impede the ability of other Class Members who are not parties to the adjudications to protect their interests.

Case 1:22-cv-20040-JEM   Document 4-1   Entered on FLSD Docket 02/03/2022   Page 109 of 169

*Requirements of Rule 1.220(b)(3)*

**Predominance**

321.     This action is appropriate for class treatment pursuant to Fla. R. Civ. P. 1.220(b)(3). As set forth above, there are questions of law and fact common to Plaintiffs' claims and the claims of each member of the Liability Class, the Personal Injury Subclass, the Non-Owner Personal Injury Subclass, and the Economic Loss Subclass. Those common questions of law and fact predominate over any questions of law or fact affecting only individual members of the Liability Class, the Personal Injury Subclass, the Non-Owner Personal Injury Subclass, or the Economic Loss Subclass.

322.     The claims brought by Plaintiffs and the Classes arise out of the collapse of CTS. This singular mass disaster affected a large number of individuals within a discrete, geographically defined region of Miami-Dade County, and was caused by the Defendants' course of conduct.

323.     The Liability Class will present common proof as to Defendants' liability, including, but not limited to, the duties Defendants owed Plaintiffs and the Class Members to conduct their operations to prevent the CTS collapse and resulting damage; Defendants' knowledge about the risk of catastrophic, structural failure of CTS; Defendants' conduct that failed to prevent or contributed to the collapse of CTS; whether Defendants' actions, inactions, omissions, and/or other conduct injured Plaintiffs and the Class Members.

324.     Common questions of law and fact also predominate over individualized issues raised by the Personal Injury Subclass and the Non-Owner Personal Injury Subclass. The claims for personal injury and wrongful death arose from the same catastrophe and in the very same moment, which involves common claims, proof, and defenses. Finally, common questions of law and fact predominate over individualized issues for the Economic Loss Subclass. Ownership

interest in the units and common elements are ascertainable through interpretation of the Association's Declaration, using uniform appraisals, and condominium termination proceedings.

**Superiority**

325.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class certification in this matter would aid in case management and the efficient use of limited resources, as the Defendant's liability and the resulting damages to Plaintiffs and the Classes arise from the same, simultaneous disaster. Moreover, various insurance companies have tendered, or will soon tender, tens of millions of dollars in insurance proceeds. Certification of the class will provide a superior method for facilitating the fair management of the allocation and distribution of tendered insurance proceeds among all claimants. A class action would achieve substantial economies of time, effort, and expense, and would assure uniformity of decisions as to persons similarly situated without sacrificing procedural fairness.

***Issue Certification***

326.    This action is appropriate for issue certification pursuant to Fla. R. Civ. P. 1.220(d)(4)(A). Plaintiffs' proposed Liability Class seeks certification of a particular legal issue—namely, the Defendants' liability for the collapse of Champlain Towers South on June 24, 2021. The Liability Class is ideally suited for issue certification.

**COUNT I**
**NEGLIGENCE**
**(Against the Terra Defendants)**

327.    Plaintiffs incorporate by reference all foregoing paragraphs as if fully set forth herein.

328.    The Terra Defendants were the owners, developers, and managers of the Eighty-Seven Park construction/development project and had final supervisory authority over all decision-making related to the project.

329.    The Terra Defendants owed a duty to persons present in and occupying adjacent structures, including Plaintiffs and the Class Members, to ensure that its development and construction activities on the Eighty-Seven Park project did not negatively impact or harm adjacent structures or in any way compromise the stability of adjacent structures, including CTS.

330.    The Terra Defendants' aforementioned duty was heightened by the fact that the Terra Defendants were warned, explicitly notified, and made aware that certain activities on the Eighty-Seven Park project, including site compaction activities, pile driving, dewatering, and excavation activities had the potential to negatively impact the structural stability of adjacent structures, including CTS.

331.    Given the Terra Defendants' knowledge of the risks that certain construction activities posed to CTS and its residents, the Defendants had a duty and responsibility to vigilantly monitor and control those risks and ensure that their construction activities did not negatively impact the structural stability of CTS.

332.    Further, because of the inherently dangerous nature of the street demolition construction activities on the Eighty-Seven Park project, the Terra Defendants were under a non-delegable duty to exercise a heightened degree of care to prevent and avoid risk of harm associated with the compaction activities, pile driving, dewatering, and excavation activities they undertook. Given that this duty was nondelegable, the Terra Defendants are accountable and responsible for the negligent actions of their sub-contractors, employees and/or agents in the performance of these dangerous activities.

333.    The NV5 Report presented the Terra Defendants with several available and appropriate options for basement excavation support methods. Only one of those options would produce damaging vibrations that would have to be closely monitored and controlled, while the other identified methods were "practically vibration free" but slightly more expensive. The Defendants had a duty to consider the impact on adjacent properties, including CTS, when choosing basement excavation support methods. The Terra Defendants had an additional duty to ensure that a reasonably safe method of basement excavation support was chosen and implemented on the Eighty-Seven Park project site. The Terra Defendants failed to abide by their duties when they chose to prioritize profits over safety by selecting driven sheet piles.

334.    The Terra Defendants were also explicitly warned that dewatering activities, site compaction activities, and excavation activities had the potential to damage and negatively impact CTS if they were not vigilantly monitored and controlled and absent specific measures to ensure CTS was not being negatively impacted.

335.    As discussed, despite the risks about which NV5 warned the Terra Defendants, the Terra Defendants failed to appropriately monitor and control the risks associated with dewatering, site compaction, pile driving, and excavation procedures. The Terra Defendants also failed to undertake appropriate and necessary measures to analyze and ensure that the Eighty-Seven Park construction activities were not negatively impacting CTS.

336.    The Terra Defendants, acting by and through their agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos, both generally and in the following particular respects, breached the duties owed to Plaintiffs and the Class Members:

        a)      Placing the residents and occupants of CTS at grave and immediate risk of harm;

b)  Damaging CTS a by impacting its structural condition and stability through construction and street excavation site activities at the Eighty-Seven Park project and causing economic damages;

c)  Conducting activities on the Eighty-Seven Park construction site that produced dangerous and damaging vibrations, despite knowing that such vibrations would foreseeably cause damage to adjacent structures, including CTS;

d)  Choosing to utilize a vibratory hammer to drive sheet piles on the project site, despite knowing that said pile driving activities would emit dangerous and destructive vibrations that would foreseeably penetrate and damage CTS;

e)  Choosing to utilize driven sheet piles for basement excavation support, despite knowing that pile driving activities would cause damaging vibrations to impact CTS and despite knowing that available and suitable alternatives existed that were vibration free;

f)  Prioritizing corporate profits over the safety of the residents and occupants of CTS and trying to save money by choosing to use driven sheet piles rather than available alternative methods that were vibration free;

g)  Performing pile driving without monitoring vibration levels;

h)  Performing pile driving along and/or immediately adjacent to the CTS south foundation wall;

i)  Performing pile driving along and/or immediately adjacent to the CTS south foundation wall without monitoring vibration levels;

j)  Selectively monitoring vibration levels during pile driving activities;

k)  Continuing to use a vibratory hammer to drive sheet piles after being informed that vibrations were exceeding safe and allowable limits;

l)  Failing to take appropriate corrective action after being notified that vibrations caused by sheet pile driving were exceeding safe and allowable limits;

m)  Failing to stop the pile driving work after being notified that vibrations were exceeding safe and allowable limits;

n)  Failing to stop the pile driving work or take appropriate corrective action after being notified that vibrations were exceeding safe and allowable limits, despite knowing that vibrations from pile driving could and would foreseeably damage adjacent structures, including CTS;

o)  Failing to stop the pile driving work or take appropriate corrective action after being notified that vibrations were exceeding safe and allowable limits, despite knowing that vibrations from pile driving could and would foreseeably damage adjacent structures, including CTS, and despite knowing that allowing the emission of the vibrations at dangerous levels

would expose the residents and occupants of CTS to an unreasonable and unacceptable risk of severe injury and/or death;

p)      Failing to warn the Association and any CTS residents and/or occupants that vibrations in excess of safe and allowable limits were being emitted from the Eighty-Seven Park project site;

q)      Failing to conduct a proper and adequate post-construction survey to determine the existence and extent of damage the construction site activities at Eighty-Seven Park caused to CTS;

r)      Failing to inspect and analyze the structural condition and stability of CTS after they knew or should have known the construction activities emitted vibrations in excess of the safe and allowable limit during pile driving activities;

s)      Failing to inspect and analyze the structural condition and stability of CTS after they knew or should have known the construction activates emitted vibrations in excess of the safe and allowable limit during pile driving activities and after receiving a complaint from CTS residents regarding tremors felt and structural damage done to their property as a result of the Eighty-Seven Park construction activities;

t)      Ignoring the vibration monitoring results confirming that vibrations emitted during pile driving activities were exceeding safe and allowable limits;

u)      Concealing from the Association the results of vibration monitoring performed during pile driving activities;

v)      Performing numerous vibration-emitting construction activities without monitoring or controlling vibrations;

w)      Performing site compaction work without monitoring vibrations;

x)      Failing to appropriately control vibrations during site compaction procedures;

y)      Failing to monitor and appropriately control vibrations during compaction procedures required for the installation of Silva Cell systems;

z)      Failing to appropriately monitor and control vibrations emitted during site compaction procedures, despite knowing that such vibrations could and foreseeably would damage CTS and expose the residents and occupants to an unreasonable and unacceptable risk of severe injury and/or death;

aa)      Excavating dangerously close to the CTS south foundation wall;

bb)      Damaging the CTS south foundation wall during excavation work;

cc)      Damaging the CTS south foundation wall during construction of the beach access walkway;

dd)      Failing to take proper and necessary precautions for excavations performed immediately adjacent to the CTS south foundation wall;

ee)      Failing to properly perform dewatering work at the Eighty-Seven Park site;

114

ff) Performing dewatering work at the Eighty-Seven Park site in a manner that negatively impacted the structural stability of CTS;

gg) Dangerously drawing down the water table underlying CTS through dewatering procedures at the Eighty-Seven Park site;

hh) Failing to appropriately monitor and analyze the impact of dewatering activities at the Eighty-Seven Park site on CTS and CTS's structural stability;

ii) Failing to appropriately monitor and analyze the impact of drawing down the water table underlying CTS;

jj) Drawing down the water table underlying CTS asymmetrically;

kk) Failing to recharge the water table underlying CTS;

ll) Impacting the structural stability and condition of CTS through dewatering activities undertaken at Eighty-Seven Park;

mm) Failing to monitor and analyze the impact of dewatering activities on the Eighty-Seven Park project site on the structural stability and condition of CTS, despite knowing that such a failure would expose the residents and occupants of CTS to an unreasonable and unacceptable risk of severe injury and/or death;

nn) Causing and allowing water to infiltrate CTS and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project;

oo) Causing and allowing water to infiltrate CTS and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project, despite knowing that the water infiltration would damage CTS and impact its structural stability;

pp) Failing to warn the Association and CTS residents and occupants that dewatering activities at the Eighty-Seven Park site could and were impacting the structural stability of CTS;

qq) Excavating and constructing the beach access walkway immediately adjacent to the CTS south foundation wall in such a way that caused water to infiltrate the CTS foundation wall and seep into the basement parking garage;

rr) Excavating and constructing the beach access walkway immediately adjacent to the CTS south foundation wall in such a way that caused water to infiltrate the CTS foundation and damage its structural foundation;

ss) Constructing the beach access walkway so that it was pitched and angled toward the CTS south foundation wall;

tt) Causing water runoff to infiltrate the CTS south foundation wall and cause damage to the CTS foundation;

uu)     Damaging the CTS south foundation wall such that water runoff was able to infiltrate the CTS foundation;

vv)     Failing to abide by applicable Florida Building Code rules and regulations, including but not limited to those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

ww)    Failing to abide by applicable OSHA rules and regulations, including but not limited to those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

xx)     Prioritizing corporate profits over the safety of CTS residents and occupants.

337.    The Terra Defendants' conduct and failures, as described herein, demonstrated disregard for the safety and health of CTS residents and occupants, including Plaintiffs and the Class Members.

338.    The Terra Defendants' negligence caused one of the most devastating and deadly building collapses in United States history, and the Plaintiffs and the Class Members suffered the damages set forth herein.

339.    By conducting themselves as set forth herein, the Terra Defendants' acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm to Plaintiffs and the Class Members.

**COUNT II**
**STRICT LIABILITY**
**(Against the Terra Defendants)**

340.    Plaintiffs incorporate by reference all foregoing paragraphs as if fully set forth herein.

341.    As discussed, sheet pile driving was extensively performed on the Eighty-Seven Park project, and it was done at the direction of and under the supervision of the Terra Defendants.

342.     The following factors are pertinent to determine whether an activity is abnormally dangerous: (a) whether the activity involves a high degree of risk of some harm to the person, land, or chattels of others; (b) whether the harm which may result is likely to be great; (c) whether the risk cannot be eliminated by the exercise of reasonable care; (d) whether the activity is not a matter of common usage; (e) whether the activity is inappropriate to the place where it is carried on; and (f) the value of the activity to the community. *Great Lakes Dredging & Dock Co. v. Sea Gull Operating Corp.*, 460 So. 2d 510, 512–13 (Fla. 3d DCA 1984).

343.     Pile driving, including sheet pile driving, is an ultrahazardous and abnormally dangerous construction activity that meets all the factors set forth in *Great Lakes Dredging*. Pile driving, including sheet pile driving necessarily involves an extreme risk of serious harm to persons and property that cannot be eliminated by the exercise of the utmost care. Pile driving also is not a matter of common usage, especially in a setting and location like the Eighty-Seven Park project site.

344.     The ultrahazardous and abnormally dangerous construction activity of pile driving poses a physical danger to persons and property in the area and adjacent to the pile driving that is of a significant magnitude and nature.

345.     Pile driving on the Eighty-Seven Park project, carried out at the direction and under the supervision of the Terra Defendants, was inappropriate given the project's proximity to CTS, a highly populated condominium building.

346.     Pile driving at the Eighty-Seven Park project was of no value to the community, given that available and suitable alternative methods of basement excavation support could have been utilized—the only "value" provided by pile driving was to the Terra Defendants' wallets.

347.    The April 2015 NV5 Report warned of the danger that the ultrahazardous and abnormally dangerous pile driving activities carried out on the Eighty-Seven Park project posed to properties adjacent to the site, including CTS and its residents, occupants, and guests. The April 2015 NV5 Report specifically cautioned that vibrations caused by the ultrahazardous and abnormally dangerous pile driving activities could damage adjacent structures, including CTS, if not properly monitored and controlled.

348.    The pile driving that the Eighty-Seven Park project performed damaged CTS and negatively impacted its structural stability.

349.    Damage to CTS's structural foundation that the ultrahazardous and abnormally dangerous pile driving activity on the Eighty-Seven Park project caused was foreseeable and within the scope of risk pile driving presents.

350.    The ultrahazardous and abnormally dangerous pile driving activities carried out on the Eighty-Seven Park project caused significant structural damage to CTS and are a substantial factor in, a factual cause of, and/or resulted in an increased risk of harm to Plaintiffs and the Class Members and the structural damage to CTS, which ultimately led to the third deadliest building collapse in United States history.

351.    As a result of the Terra Defendants' ultrahazardous and abnormally dangerous pile driving activities and the damage that the pile driving did to CTS's structure, Defendants are strictly liable for the injuries and damages Plaintiffs and the Class Members suffered, as alleged herein.

**COUNT III**
**NEGLIGENCE**
**(Against JMA)**

352.    Plaintiffs incorporate by reference all foregoing paragraphs as if fully set forth herein.

353.    JMA was the general contractor and/or construction manager Terra Defendants retained for the Eighty-Seven Park project. Thus, JMA had extensive knowledge of all construction activities performed on the project and was intimately involved with the construction activities primarily discussed herein, including but not limited to pile driving, dewatering, excavation, and site compaction procedures.

354.    Each piece of information and every warning concerning pile driving, dewatering, excavation, and site compaction procedures that NV5 provided to the Terra Defendants was also relayed to JMA.

355.    As the general contractor and/or construction manager, JMA owed a duty to persons present in and occupying adjacent structures, including Plaintiffs and the Class Members, to ensure that its development and construction activities on the Eighty-Seven Park project did not negatively impact or harm adjacent structures or in any way compromise the stability of adjacent structures, including CTS.

356.    Defendant JMA's aforementioned duty was heightened by the fact that JMA was warned, explicitly notified, and made aware that certain activities on the Eighty-Seven Park project, including site compaction activities, pile driving, dewatering, and excavation activities had the potential to negatively impact the structural stability of adjacent structures, including CTS.

357.    Given JMA's knowledge of the risks that certain construction activities posed to CTS and its residents, JMA had a duty and responsibility to vigilantly monitor and control those

risks and ensure that their construction activities did not negatively impact the structural stability of CTS.

358.    As the general contractor and/or construction manager, JMA had a duty to ensure that all work on the Eighty-Seven Park project, including all pile driving, dewatering, site compaction, and excavation work, was carried out safely and in such a way that did not damage or otherwise negatively impact adjacent properties, namely, CTS.

359.    Further, because of the inherently dangerous nature of the construction activities on the Eighty-Seven Park project, JMA was under a non-delegable duty to exercise a heightened degree of care to prevent and avoid risk of harm associated with the compaction activities, pile driving, dewatering, and excavation activities it undertook. Given that this duty was nondelegable, JMA is accountable and responsible for the negligent actions of its sub-contractors, employees, and/or agents in the performance of these dangerous activities.

360.    The NV5 Report presented several available and appropriate options for basement excavation support methods. Only one of those options would produce damaging vibrations that would have to be closely monitored and controlled, while the other identified methods were "practically vibration free" but slightly more expensive. JMA had a duty to consider the impact on adjacent properties, including CTS, when choosing basement excavation support methods. JMA had a further duty to ensure that the safest method of basement excavation support was chosen and implemented on the Eighty-Seven Park project site.

361.    Defendant JMA failed these aforementioned duties when it permitted the most dangerous method of basement excavation support—driven sheet piles—to be chosen and implemented on the project, despite the known and foreseeable risks to CTS.

362.   Even after choosing and/or permitting the use of driven sheet piles on the project, JMA had a duty to ensure that vibrations emitted through the vibratory sheet pile driving activities were vigilantly monitored and that the work would not be permitted to proceed if vibration levels exceeded safe and allowable limits.

363.   NV5 also explicitly warned JMA that dewatering activities, site compaction activities, and excavation activities had the potential to damage and negatively impact CTS if those activities were not vigilantly monitored and controlled and absent specific measures to ensure that CTS was not being negatively impacted.

364.   As discussed, despite the risks about which NV5 warned JMA, JMA failed to appropriately monitor and control the risks associated with dewatering, site compaction, pile driving, and excavation procedures and failed to undertake appropriate and necessary measures to analyze and ensure that the Eighty-Seven Park construction activities were not negatively impacting CTS.

365.   JMA, acting by and through their agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos, both generally and in the following particular respects, breached the duties owed to Plaintiffs and the Class Members:

     a.     Placing the residents and occupants of CTS at grave and immediate risk of harm;

     b.     Damaging CTS by impacting its structural condition and stability through construction site activities at the Eighty-Seven Park project and causing economic damages;

     c.     Conducting activities on the Eighty-Seven Park construction site that produced dangerous and damaging vibrations, despite knowing that such vibrations would foreseeably cause damage to adjacent structures, including CTS;

     d.     Choosing to utilize a vibratory hammer to drive sheet piles on the project site, despite knowing that said pile driving activities would emit dangerous and destructive vibrations that would foreseeably penetrate and damage CTS;

e.      Choosing to utilize driven sheet piles for basement excavation support despite knowing that pile driving activities would cause damaging vibrations to impact CTS and despite knowing that available and suitable alternatives existed that were vibration free;

f.      Prioritizing corporate profits over the safety of the residents and occupants of CTS and trying to save money by choosing to use driven sheet piles rather than available alternative methods that were vibration free;

g.      Performing pile driving without monitoring vibration levels;

h.      Performing pile driving along and/or immediately adjacent to the CTS south foundation wall;

i.      Performing pile driving along and/or immediately adjacent to the CTS south foundation wall without monitoring vibration levels;

j.      Selectively monitoring vibration levels during pile driving activities;

k.      Continuing to use a vibratory hammer to drive sheet piles after being informed that vibrations were exceeding safe and allowable limits;

l.      Failing to take appropriate corrective action after being notified that vibrations caused by sheet pile driving were exceeding safe and allowable limits;

m.      Failing to stop the pile driving work after being notified that vibrations were exceeding safe and allowable limits;

n.      Failing to stop the pile driving work or take appropriate corrective action after being notified that vibrations were exceeding safe and allowable limits despite knowing that vibrations from pile driving could and would foreseeably damage adjacent structures, including CTS;

o.      Failing to stop the pile driving work or take appropriate corrective action after being notified that vibrations were exceeding safe and allowable limits despite knowing that vibrations from pile driving could and would foreseeably damage adjacent structures, including CTS and despite knowing that allowing the emission of the vibrations at dangerous levels would expose the residents and occupants of CTS to an unreasonable and unacceptable risk of severe injury and/or death;

p.      Failing to warn the Association and any of CTS residents and/or occupants that vibrations in excess of safe and allowable limits were being emitted from the Eighty-Seven Park project site;

q.      Failing to conduct a proper and adequate post-construction survey to determine the existence and extent of damage the construction site activities at Eighty-Seven Park caused CTS;

r.      Failing to inspect and analyze the structural condition and stability of CTS after they knew or should have known the construction activities emitted vibrations in excess of the safe and allowable limit during pile driving activities;

s.     Failing to inspect and analyze the structural condition and stability of CTS after they knew or should have known the construction activities emitted vibrations in excess of the safe and allowable limit during pile driving activities and after receiving a complaint from CTS residents regarding tremors felt and structural damage done to their property as a result of the Eighty-Seven Park construction activities;

t.     Ignoring the vibration monitoring results confirming that vibrations emitted during pile driving activities were exceeding safe and allowable limits;

u.     Concealing from the Association the results of vibration monitoring performed during pile driving activities;

v.     Performing numerous vibration-emitting construction activities without monitoring or controlling vibrations;

w.     Performing site compaction work without monitoring vibrations;

x.     Failing to appropriately control vibrations during site compaction procedures;

y.     Failing to monitor and appropriately control vibrations during compaction procedures required for the installation of Silva Cell systems;

z.     Failing to appropriately monitor and control vibrations emitted during site compaction procedures despite knowing that such vibrations could and foreseeably would damage CTS and expose the residents and occupants to an unreasonable and unacceptable risk of severe injury and/or death;

aa.    Excavating dangerously close to the CTS south foundation wall;

bb.    Damaging the CTS south foundation wall during excavation work;

cc.    Damaging the CTS south foundation wall during construction of the beach access walkway;

dd.    Failing to take proper and necessary precautions for excavations performed immediately adjacent to the CTS south foundation wall;

ee.    Failing to properly perform dewatering work at the Eighty-Seven Park site;

ff.    Performing dewatering work at the Eighty-Seven Park site in a manner that negatively impacted the structural stability of CTS;

gg.    Dangerously drawing down the water table underlying CTS through dewatering procedures at the Eighty-Seven Park site;

hh.    Failing to appropriately monitor and analyze the impact of dewatering activities at the Eighty-Seven Park site on CTS and its structural stability;

ii.    Failing to appropriately monitor and analyze the impact of drawing down the water table underlying CTS;

jj.    Drawing down the water table underlying CTS asymmetrically;

kk.    Failing to recharge the water table underlying CTS;

ll.    Impacting the structural stability and condition of CTS through dewatering activities undertaken at Eighty-Seven Park;

mm.    Failing to monitor and analyze the impact of dewatering activities on the Eighty-Seven Park project site on the structural stability and condition of CTS despite knowing that such a failure would expose the residents and occupants of CTS to an unreasonable and unacceptable risk of severe injury and/or death;

nn.    Causing and allowing water to infiltrate CTS and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project;

oo.    Causing and allowing water to infiltrate CTS and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project despite knowing that the water infiltration would damage CTS and impact its structural stability;

pp.    Failing to warn the Association and CTS residents and occupants that dewatering activities at the Eighty-Seven Park site could and were impacting the structural stability of CTS;

qq.    Excavating and constructing the beach access walkway immediately adjacent to the CTS south foundation wall in such a way that caused water to infiltrate the CTS foundation wall and seep into the basement parking garage;

rr.    Excavating and constructing the beach access walkway immediately adjacent to the CTS south foundation wall in such a way that caused water to infiltrate the CTS foundation and damage its structural foundation;

ss.    Constructing the beach access walkway so that it was pitched and angled toward the CTS south foundation wall;

tt.    Causing water runoff to infiltrate the CTS south foundation wall and cause damage to the CTS foundation;

uu.    Damaging the CTS south foundation wall such that water runoff was able to infiltrate the CTS foundation;

vv.    Failing to prevent excavation work from damaging the CTS south foundation wall and/or failing to recognize that such damage had been caused;

ww.    Failing to prevent construction work on the beach access walkway from damaging the CTS south foundation wall and/or failing to recognize that such damage had been caused;

xx.    Failing to abide by applicable Florida Building Code rules and regulations, including but not limited to those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

yy.   Failing to abide by applicable OSHA rules and regulations, including but not limited to those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

zz.   Prioritizing corporate profits over the safety of CTS residents and occupants.

366.   JMA's conduct and failures, as described herein, demonstrated disregard for the safety and health of CTS residents and occupants, including Plaintiffs and the Class Members.

367.   JMA's negligence caused one of the most devastating and deadly building collapses in United States history, and the Plaintiffs and the Class Members suffered the damages set forth herein.

368.   By conducting itself as set forth herein, Defendant JMA's acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm to Plaintiffs and the Class Members.

**COUNT IV**
**STRICT LIABILITY**
**(Against JMA)**

369.   Plaintiffs incorporate by reference all foregoing paragraphs as if fully set forth herein.

370.   As discussed, sheet pile driving was extensively performed on the Eighty-Seven Park project, and it was done at the direction of and under the supervision of JMA.

371.   As the general contractor and/or construction manager, Defendant JMA was intimately involved in the performance and progress of the pile driving activities on the project.

372.   The following factors are pertinent to determine whether an activity is abnormally dangerous: (a) whether the activity involves a high degree of risk of some harm to the person, land, or chattels of others; (b) whether the harm which may result is likely to be great; (c) whether the risk cannot be eliminated by the exercise of reasonable care; (d) whether the activity is not a matter

of common usage; (e) whether the activity is inappropriate to the place where it is carried on; and (f) the value of the activity to the community. *Great Lakes Dredging*, *supra*, 460 So. 2d at 512–13.

373.    Pile driving, including sheet pile driving, is an ultrahazardous and abnormally dangerous construction activity that meets all the factors set forth in *Great Lakes Dredging*. Pile driving, including sheet pile driving necessarily involves an extreme risk of serious harm to persons and property that cannot be eliminated by the exercise of the utmost care. Pile driving also is not a matter of common usage, especially in a setting and location like the Eighty-Seven Park project site.

374.    The ultrahazardous and abnormally dangerous construction activity of pile driving poses a physical danger to persons and property in the area and adjacent to the pile driving that is of a significant magnitude and nature.

375.    Pile driving on the Eighty-Seven Park project, carried out under the supervision of Defendant JMA, was inappropriate given the project's proximity to CTS, a highly populated condominium building.

376.    Pile driving at the Eighty-Seven Park project was of no value to the community given that available and suitable alternative methods of basement excavation support could have been utilized—the only "value" provided by pile driving was to Defendant JMA's wallet as it was the cheapest option for basement excavation support.

377.    The NV5 Report warned of the danger that the ultrahazardous and abnormally dangerous pile driving activities carried out on the Eighty-Seven Park project posed to properties adjacent to the site, including CTS and its residents and occupants. The NV5 Report specifically cautioned that vibrations caused by the ultrahazardous and abnormally dangerous pile driving

activities could damage adjacent structures, including CTS, if not properly monitored and controlled.

378.    The pile driving that the Eighty-Seven Park project performed damaged CTS and negatively impacted its structural stability.

379.    Damage to CTS's structural foundation that the ultrahazardous and abnormally dangerous pile driving activity on the Eighty-Seven Park project caused was foreseeable and within the scope of risk pile driving presents.

380.    The ultrahazardous and abnormally dangerous pile driving activities carried out by Defendants on the Eighty-Seven Park project caused significant structural damage to CTS and are a substantial factor in, a factual cause of, and/or resulted in an increased risk of harm to Plaintiffs and the Class Members and the structural damage to CTS, which ultimately led to one of the deadliest building collapse in United States history.

381.    As a result of Defendant's ultrahazardous and abnormally dangerous pile driving activities and the damage that the pile driving did to CTS's structure, JMA is strictly liable for the injuries and damages Plaintiffs and the Class Members suffered, as alleged herein.

**COUNT V**
**NEGLIGENCE**
**(Against NV5)**

382.    Plaintiffs incorporate by reference all foregoing paragraphs as if fully set forth herein.

383.    Defendant NV5 was the geotechnical engineer and construction inspector Terra Defendants hired to work on the Eighty-Seven Park project. Thus, NV5 had extensive knowledge of all construction activities performed on the project and was intimately involved with the

construction activities primarily discussed herein, including but not limited to pile driving, dewatering, excavation, and site compaction procedures.

384.     Indeed, NV5 issued many of the warnings to other Defendants regarding the danger that pile driving, site compaction, dewatering, and excavation work on the Eighty-Seven Park project posed to CTS. Unfortunately, NV5 ignored its own warnings and allowed dangerous work to proceed on the Eighty-Seven Park project, despite the harm it was inflicting on CTS.

385.     NV5 owed a duty to persons present in and occupying adjacent structures, including Plaintiffs and the Class Members, to ensure that the development and construction activities on the Eighty-Seven Park project did not negatively impact or harm adjacent structures or in any way compromise the stability of adjacent structures, including CTS.

386.     Defendant NV5's aforementioned duty was heightened by the fact that NV5 itself issued warnings regarding the danger that certain construction activities posed to CTS if performed improperly or were not appropriately monitored and controlled. These construction activities included site compaction activities, pile driving, dewatering, and excavation activities that NV5 explicitly warned had the potential to negatively impact the structural stability of adjacent structures, including CTS.

387.     Defendant NV5 was responsible for ensuring both that all of its warnings regarding construction activities on the Eighty-Seven Park project were heeded and that the work not be permitted to negatively impact or damage CTS in the very ways NV5 warned against.

388.     Given NV5's knowledge of the risks that certain construction activities posed to CTS and its residents, NV5 had a duty and responsibility to vigilantly monitor and control those risks and ensure that the identified risky and dangerous construction activities did not negatively impact the structural stability of CTS.

389.     NV5 had a duty to ensure that all work on the Eighty-Seven Park project, including all pile driving, dewatering, site compaction, and excavation work, was carried out safely and in a manner that did not damage or otherwise negatively impact adjacent properties, namely CTS.

390.     Defendant NV5's April 2015 Report presented several available and appropriate options for basement excavation support methods. Only one of those options would produce damaging vibrations that would have to be closely monitored and controlled, while the other identified methods were "practically vibration free" but slightly more expensive. NV5 had a duty to ensure that the Terra Defendants, JMA, and DeSimone appropriately considered the potentially devastating impact on adjacent properties, including CTS, when choosing basement excavation support methods. NV5 had a further duty to ensure that the safest method of basement excavation support was chosen and implemented on the Eighty-Seven Park project site.

391.     NV5 should have recommended only the safest methods of basement excavation support that were practically vibration free and that would not have had a negative structural impact on CTS.

392.     Further, because of the inherently dangerous nature of the construction activities on the Eighty-Seven Park project, NV5 was under a non-delegable duty to exercise a heightened degree of care to prevent and avoid risk of harm associated with the compaction activities, pile driving, dewatering, and excavation activities it undertook. Given that this duty was nondelegable, NV5 is accountable and responsible for the negligent actions of its sub-contractors, employees and/or agents in the performance of these dangerous activities.

393.     NV5 failed its duties when it initially proposed pile driving as a viable option for basement excavation support. NV5 further failed its duties when it permitted the most dangerous

method of basement excavation support—driven sheet piles—to be chosen and implemented on the project, despite the known and foreseeable risks to CTS.

394.    Even after proposing and allowing the use of driven sheet piles on the project, NV5 had a duty to ensure that vibrations emitted through the vibratory sheet pile driving activities were vigilantly monitored and that the work would not be permitted to proceed if vibration levels exceeded safe and allowable limits.

395.    NV5 was also unquestionably aware that dewatering activities, site compaction activities, and excavation activities had the potential to damage and negatively impact CTS if those activities were not vigilantly monitored and controlled and absent specific measures to ensure that CTS was not being negatively impacted.

396.    As discussed, despite the risks about which Defendant NV5 was aware and warned others, NV5 failed to appropriately monitor and control the risks associated with dewatering, site compaction, pile driving, and excavation procedures. NV5 also failed to undertake appropriate and necessary measures to analyze and ensure that the Eighty-Seven Park construction activities were not negatively impacting CTS.

397.    The National Society of Professional Engineers Code of Ethics for Engineers establishes the fundamental canon and rule of practice that professional engineers must "Hold paramount the safety, health, and welfare of the public."

398.    NV5 failed to abide by the fundamental canon of the Code of Ethics for Engineers to hold the safety, health, and welfare of the public, and specifically of CTS residents and occupants, of paramount importance by engaging in the acts and omissions discussed herein.

399.     JMA, acting by and through their agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos, both generally and in the following particular respects, breached the duties owed to Plaintiffs and the Class Members:

a.     Placing the residents and occupants of CTS at grave and immediate risk of harm;

b.     Permitting construction site activities at the Eighty-Seven Park project to impact CTS by damaging its structural condition and stability and causing economic damages;

c.     Permitting activities on the Eighty-Seven Park construction site that produced dangerous and damaging vibrations, despite knowing that such vibrations would foreseeably cause damage to adjacent structures, including CTS;

d.     Allowing a vibratory hammer to be used to drive sheet piles on the project site, despite knowing that the pile driving activities would emit dangerous and destructive vibrations that would foreseeably damage CTS;

e.     Proposing driven sheet piles as a viable option for basement excavation support for the Eighty-Seven Park project, despite the known risks;

f.     Permitting driven sheet piles to be utilized for basement excavation support, despite knowing that pile driving activities would cause damaging vibrations to impact CTS and despite knowing that available and suitable alternatives existed that were vibration free;

g.     Failing to appropriately and vigilantly monitor vibration levels for all pile driving performed on the project;

h.     Permitting pile driving to be performed along and/or immediately adjacent to the CTS south foundation wall;

i.     Permitting pile driving to be performed along and/or immediately adjacent to the CTS south foundation wall without monitoring vibration levels;

j.     Selectively monitoring vibration levels during pile driving activities;

k.     Continuing to allow the use of a vibratory hammer to drive sheet piles after learning that vibrations were exceeding safe and allowable limits;

l.     Failing to take appropriate corrective action after learning that vibrations caused by sheet pile driving were exceeding safe and allowable limits;

m.     Failing to stop pile driving work after learning that vibrations were exceeding safe and allowable limits;

n.     Failing to stop the pile driving work or take appropriate corrective action after learning that vibrations were exceeding safe and allowable limits despite knowing that vibrations from pile driving could and would foreseeably damage adjacent structures, including CTS;

131

o.    Failing to stop the pile driving work or take appropriate corrective action after learning that vibrations were exceeding safe and allowable limits, despite knowing that vibrations from pile driving could and would foreseeably damage adjacent structures, including CTS, and despite knowing that allowing the emission of the vibrations at dangerous levels would expose CTS residents and occupants to an unreasonable and unacceptable risk of severe injury and/or death;

p.    Failing to warn the Association and CTS residents and/or occupants that the Eighty-Seven Park project site was emitting vibrations in excess of safe and allowable limits;

q.    Failing to conduct a proper and adequate post-construction survey to determine the existence and extent of damage the construction site activities at Eighty-Seven Park caused CTS;

r.    Failing to inspect and analyze the structural condition and stability of CTS after they knew or should have known the construction activities emitted vibrations in excess of the safe and allowable limit during pile driving activities;

s.    Failing to inspect and analyze the structural condition and stability of CTS after they knew or should have known the construction activities emitted vibrations in excess of the safe and allowable limit during pile driving activities and after receiving a complaint from CTS residents regarding tremors they felt and structural damage done to their property as a result of the Eighty-Seven Park construction activities;

t.    Ignoring the vibration monitoring results confirming that vibrations emitted during pile driving activities were exceeding safe and allowable limits;

u.    Concealing from the Association the results of vibration monitoring performed during pile driving activities;

v.    Permitting numerous vibration-emitting construction activities to be performed without monitoring or controlling vibrations;

w.    Allowing site compaction work to be performed without monitoring vibrations;

x.    Failing to appropriately control vibrations during site compaction procedures;

y.    Failing to monitor and appropriately control vibrations during compaction procedures required for the installation of Silva Cell systems;

z.    Failing to appropriately monitor and control vibrations emitted during site compaction procedures, despite knowing that such vibrations both could and foreseeably would damage CTS and expose the residents and occupants to an unreasonable and unacceptable risk of severe injury and/or death;

aa.    Permitting and not appropriately monitoring and controlling excavation activities in proximity to the CTS south foundation wall;

bb.    Failing to take proper and necessary precautions for excavations performed immediately adjacent to the CTS south foundation wall;

cc.    Failing to ensure that dewatering work was properly performed at the Eighty-Seven Park site;

dd.    Permitting dewatering work at the Eighty-Seven Park site to be performed in a manner that negatively impacted the structural stability of CTS;

ee.    Failing to recognize and prevent the dangerous draw down of the water table underlying CTS through dewatering procedures at the Eighty-Seven Park site;

ff.    Failing to appropriately monitor and analyze the impact of dewatering activities at the Eighty-Seven Park site on CTS and its structural stability;

gg.    Failing to appropriately monitor and analyze the impact of drawing down the water table underlying CTS;

hh.    Drawing down the water table underlying CTS asymmetrically;

ii.    Failing to prevent the water table underlying CTS from being drawn down asymmetrically;

jj.    Failing to recharge the water table underlying CTS and/or otherwise failing to ensure that the water table underlying CTS was appropriately recharged;

kk.    Permitting and/or failing to recognize that the structural stability and condition of CTS was negatively impacted through dewatering activities undertaken at Eighty-Seven Park;

ll.    Failing to monitor and analyze the impact of the Eighty-Seven Park project site dewatering activities on the structural stability and condition of CTS, despite knowing that such a failure would expose CTS residents and occupants of to an unreasonable and unacceptable risk of severe injury and/or death;

mm.    Causing and allowing water to infiltrate CTS and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project;

nn.    Causing and allowing water to infiltrate CTS and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project, despite knowing that the water infiltration would damage CTS and impact its structural stability;

oo.    Failing to warn the Association and CTS residents and occupants that dewatering activities at the Eighty-Seven Park site could and were impacting the structural stability of CTS;

pp.    Failing to recognize that the beach access walkway immediately adjacent to the CTS south foundation wall was excavated and constructed in a manner that caused water to infiltrate the CTS foundation wall and seep into the basement parking garage;

qq.    Failing to insist that corrective measures be taken to address the improperly excavated and constructed beach access walkway, which was causing water to infiltrate the CTS foundation wall and seep into the basement parking garage;

rr.    Failing to recognize and/or prevent the beach access walkway immediately adjacent to the CTS south foundation wall from being excavated and constructed in a manner that caused water to infiltrate the CTS foundation and damage its structural foundation;

ss.    Failing to recognize and correct the beach access walkway which was excavated and constructed in such that it was pitched and angled toward the CTS south foundation wall;

tt.    Failing to recognize and permitting water runoff to infiltrate the CTS south foundation wall and to damage the CTS foundation;

uu.    Damaging the CTS south foundation wall such that water runoff was able to infiltrate the CTS foundation;

vv.    Failing to abide by applicable Florida Building Code rules and regulations, including but not limited to those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

ww.    Failing to abide by applicable OSHA rules and regulations, including but not limited to those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

xx.    Violating the Code of Ethics for Engineers;

yy.    Knowing or having had reason to know his conduct violated the Code of Ethics for Engineers;

zz.    Prioritizing corporate profits over the safety of CTS residents and occupants.

400.    NV5's conduct and failures, as described herein, demonstrated a disregard for the safety and health of the CTS residents and occupants, including Plaintiffs and the Class Members.

401.    NV5's negligence caused one of the most devastating and deadly building collapses in United States history, and the Plaintiffs and the Class Members suffered the damages set forth herein.

402.     By conducting itself as set forth herein, Defendant NV5's acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm to Plaintiffs and the Class Members.

## COUNT VI
## STRICT LIABILITY
### (Against NV5)

403.     Plaintiffs incorporate by reference all foregoing paragraphs as if fully set forth herein.

404.     As discussed, sheet pile driving was extensively performed on the Eighty-Seven Park project, and it was done at the suggestion of and under the supervision of NV5.

405.     NV5 was intimately involved in the performance and progress of the pile driving activities on the project and was responsible for closely monitoring the vibration levels during portions of the pile driving work.

406.     The following factors are pertinent to determine whether an activity is abnormally dangerous: (a) whether the activity involves a high degree of risk of some harm to the person, land, or chattels of others; (b) whether the harm which may result is likely to be great; (c) whether the risk cannot be eliminated by the exercise of reasonable care; (d) whether the activity is not a matter of common usage; (e) whether the activity is inappropriate to the place where it is carried on; and (f) the value of the activity to the community. *Great Lakes Dredging*, *supra*, 460 So. 2d at 512–13.

407.     Pile driving, including sheet pile driving, is an ultrahazardous and abnormally dangerous construction activity that meets all the factors set forth in *Great Lakes Dredging*. Pile driving, including sheet pile driving necessarily involves an extreme risk of serious harm to persons and property that cannot be eliminated by the exercise of the utmost care. Pile driving also

is not a matter of common usage, especially in a setting and location like the Eighty-Seven Park project site.

408.     The ultrahazardous and abnormally dangerous construction activity of pile driving poses a physical danger to persons and property in the area and adjacent to the pile driving that is of a significant magnitude and nature.

409.     Pile driving on the Eighty-Seven Park project, carried out under the supervision of NV5, was inappropriate given the project's proximity to CTS, a highly populated condominium building.

410.     Pile driving at the Eighty-Seven Park project was of no value to the community, given that available and suitable alternative methods of basement excavation support could have been utilized.

411.     Report warned of the danger that the ultrahazardous and abnormally dangerous pile driving activities carried out on the Eighty-Seven Park project posed to properties adjacent to the site, including CTS and its residents and occupants. The NV5 Report specifically cautioned that vibrations caused by the ultrahazardous and abnormally dangerous pile driving activities could damage adjacent structures, including CTS, if not properly monitored and controlled.

412.     The pile driving that the Eighty-Seven Park project performed damaged CTS and negatively impacted its structural stability.

413.     Damage to CTS's structural foundation that the ultrahazardous and abnormally dangerous pile driving activity on the Eighty-Seven Park project caused was foreseeable and within the scope of risk that pile driving presents.

414.     The ultrahazardous and abnormally dangerous pile driving activities carried out by Defendants on the Eighty-Seven Park project caused significant structural damage to CTS are

substantial factor in, a factual cause of, and/or resulted in an increased risk of harm to Plaintiffs and the Class Members and the structural damage to CTS, which ultimately led to one of the deadliest building collapse in United States history.

415.    As a result of Defendant's ultrahazardous and abnormally dangerous pile driving activities and the damage that the pile driving did to CTS's structure, NV5 is strictly liable for the injuries and damages Plaintiffs and the Class Members suffered, as alleged herein.

### COUNT VII
### NEGLIGENCE
### (Against DeSimone)

416.    Plaintiffs incorporate by reference all foregoing paragraphs as if fully set forth herein.

417.    DeSimone was the structural engineer on for the Eighty-Seven Park project. Thus, DeSimone had extensive knowledge of all construction activities performed on site and was intimately involved with the construction activities primarily discussed herein, including but not limited to pile driving, dewatering, excavation, and site compaction procedures.

418.    Each piece of information and every warning concerning pile driving, dewatering, excavation, and site compaction procedures that NV5 provided to the Terra Defendants was also relayed to DeSimone.

419.    As the structural engineer, DeSimone owed a duty to persons present in and occupying adjacent structures, including Plaintiffs and the Class Members. This duty included ensuring that the development the Eighty-Seven Park project and the related construction activities did not negatively impact or harm adjacent structures or in any way compromise the stability of adjacent structures, including CTS.

420.    DeSimone's aforementioned duty was heightened by the fact that DeSimone was warned, explicitly notified, and made aware that certain activities on the Eighty-Seven Park project, including site compaction activities, pile driving, dewatering, and excavation activities had the potential to negatively impact the structural stability of adjacent structures, including CTS.

421.    Given DeSimone's knowledge of the risks that certain construction activities posed to CTS and its residents and occupants, DeSimone had a duty and responsibility to vigilantly monitor and control those risks and ensure that they did not negatively impact the structural stability of CTS.

422.    As the structural engineer on the Eighty-Seven Park project, DeSimone had a duty to ensure that all work on the Eighty-Seven Park project, including all pile driving, dewatering, site compaction, and excavation work, was carried out safely and in a manner that did not damage or otherwise negatively impact the structural stability of adjacent properties, namely CTS.

423.    The NV5 Report presented several available and appropriate options for basement excavation support methods. Only one of these options would produce damaging vibrations that would have to be closely monitored and controlled, while the other identified methods were "practically vibration free" but slightly more expensive. DeSimone had a duty to consider the impact on the structural stability of adjacent properties, including CTS, when a basement excavation support method was chosen for the Eighty-Seven Park project. Defendant DeSimone had a further duty to ensure that the safest method of basement excavation support was chosen and implemented on the Eighty-Seven Park project site.

424.    DeSimone failed these aforementioned duties when it permitted the most dangerous method of basement excavation support—driven sheet piles—to be chosen and implemented on the project, despite the known and foreseeable risks to the structural stability of CTS.

425.     Even after the driven sheet piles was chosen for the Eighty-Seven Park project, DeSimone had a duty to ensure that the vibratory sheet pile driving work would not impact the structural stability of CTS.

426.     NV5 also explicitly warned DeSimone that dewatering activities, site compaction activities, and excavation activities had the potential to damage and negatively impact CTS if those activities were not vigilantly monitored and controlled and absent specific measures to ensure CTS was not being negatively impacted.

427.     As the structural engineer, DeSimone had a duty to actively monitor and report on the status of the water table underlying the Eighty-Seven Park site and CTS and to ensure that the water table was not drawn down in a dangerous manner to cause differential settlement at the CTS site. If the water table drawdown was not being performed properly or was occurring in an asymmetrical manner, DeSimone had an obligation to take corrective action.

428.     Further, because of the inherently dangerous nature of the construction activities on the Eighty-Seven Park project, DeSimone was under a non-delegable duty to exercise a heightened degree of care to prevent and avoid risk of harm associated with the compaction activities, pile driving, dewatering, and excavation activities it undertook. Given that this duty was nondelegable, DeSimone is accountable and responsible for the negligent actions of its sub-contractors, employees, and/or agents in the performance of these dangerous activities.

429.     As discussed, despite the risks about which NV5 warned DeSimone, DeSimone failed to appropriately monitor and control the risks associated with dewatering, site compaction, pile driving, and excavation procedures and failed to undertake appropriate and necessary measures to analyze and ensure that the Eighty-Seven Park construction activities were not negatively impacting CTS.

430. The National Society of Professional Engineers Code of Ethics for Engineers establishes the fundamental canon and rule of practice that professional engineers must "Hold paramount the safety, health, and welfare of the public."

431. DeSimone failed to abide by the fundamental canon of the Code of Ethics for Engineers to hold the safety, health, and welfare of the public, and, specifically, of CTS residents and occupants, of paramount importance by engaging in the acts and omissions discussed herein.

432. DeSimone, acting by and through its agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos, both generally and in the following particular respects, breached the duties owed to Plaintiffs and the Class Members:

    a.    Placing CTS residents and occupants at grave and immediate risk of harm;

    b.    Damaging CTS by impacting its structural condition and stability through construction site activities at the Eighty-Seven Park project and causing economic damages;

    c.    Conducting activities on the Eighty-Seven Park construction site that produced dangerous and damaging vibrations, despite knowing that such vibrations would foreseeably cause damage to adjacent structures, including CTS;

    d.    Choosing to utilize a vibratory hammer to drive sheet piles on the project site and/or permitting the use a vibratory hammer, despite knowing that the pile driving activities would emit dangerous and destructive vibrations that would foreseeably damage CTS;

    e.    Choosing to utilize driven sheet piles for basement excavation support and/or permitting the use of sheet piles, despite knowing that pile driving activities would cause damaging vibrations to impact CTS and despite knowing that available and suitable alternatives existed that were vibration free;

    f.    Prioritizing corporate profits over the safety of CTS residents and occupants and trying to save money by choosing to use driven sheet piles rather than available alternative methods that were vibration free and/or permitting the use of driven sheet piles;

    g.    Permitting pile driving to be performed without monitoring vibration levels;

    h.    Permitting pile driving to be performed along and/or immediately adjacent to the CTS south foundation wall;

i.      Permitting pile driving to be performed along and/or immediately adjacent to the CTS south foundation wall without monitoring vibration levels;

j.      Allowing the selective monitoring of vibration levels during pile driving activities;

k.      Permitting the continued use of a vibratory hammer to drive sheet piles after being informed that vibrations were exceeding safe and allowable limits;

l.      Failing to take appropriate corrective action after being notified that vibrations caused by sheet pile driving were exceeding safe and allowable limits;

m.      Failing to stop the pile driving work after being notified that vibrations were exceeding safe and allowable limits;

n.      Failing to stop the pile driving work or take appropriate corrective action after being notified that vibrations were exceeding safe and allowable limits, despite knowing that vibrations from pile driving could and would foreseeably damage adjacent structures, including CTS;

o.      Failing to stop the pile driving work or take appropriate corrective action after being notified that vibrations were exceeding safe and allowable limits, despite knowing that vibrations from pile driving could and would foreseeably damage adjacent structures, including CTS, and despite knowing that allowing the emission of vibrations at dangerous levels would expose the residents and occupants of CTS to an unreasonable and unacceptable risk of severe injury and/or death;

p.      Failing to warn the Association and CTS residents and/or occupants that vibrations in excess of safe and allowable limits were being emitted from the Eighty-Seven Park project site;

q.      Failing to conduct a proper and adequate post-construction survey to determine the existence and extent of damage the construction site activities at Eighty-Seven Park caused CTS;

r.      Failing to inspect and analyze the structural condition and stability of CTS after they knew or should have known the construction activities emitted vibrations in excess of the safe and allowable limit during pile driving activities;

s.      Failing to inspect and analyze the structural condition and stability of CTS after they knew or should have known the construction activities emitted vibrations in excess of the safe and allowable limit during pile driving activities and after receiving a complaint from CTS residents regarding tremors felt and structural damage done to their property as a result of the Eighty-Seven Park construction activities;

t.      Ignoring the vibration monitoring results confirming that vibrations emitted during pile driving activities were exceeding safe and allowable limits;

u.    Concealing the results of vibration monitoring performed during pile driving activities from CTS;

v.    Permitting numerous vibration-emitting construction activities to be performed without monitoring or controlling vibrations or otherwise considering and analyzing the impact of such vibrations on CTS;

w.    Permitting site compaction work to be performed without monitoring vibrations;

x.    Failing to appropriately control vibrations during site compaction procedures;

y.    Failing to monitor and appropriately control vibrations during compaction procedures required for the installation of Silva Cell systems;

z.    Failing to appropriately monitor and control vibrations emitted during site compaction procedures, despite knowing that such vibrations could and foreseeably would damage CTS and expose the residents and occupants to an unreasonable and unacceptable risk of severe injury and/or death;

aa.    Allowing excavation to occur dangerously close to the CTS south foundation wall;

bb.    Failing to take proper and necessary precautions for excavations performed immediately adjacent to the CTS south foundation wall;

cc.    Failing to prevent the excavation work from damaging the CTS south foundation wall and/or failing to recognize that such damage had occurred;

dd.    Failing to prevent the construction work for the beach access walkway from damaging the CTS south foundation wall and/or failing to recognize that such damage had occurred;

ee.    Failing to properly perform dewatering work at the Eighty-Seven Park site and/or otherwise ensure that dewatering work was properly performed;

ff.    Performing dewatering work at the Eighty-Seven Park site in a manner that negatively impacted the structural stability of CTS and/or permitting dewatering work to be performed in said manner;

gg.    Allowing the dangerous draw down of the water table underlying CTS through dewatering procedures at the Eighty-Seven Park site and/or failing to recognize the dangerous draw down of the water table;

hh.    Failing to appropriately monitor and analyze the impact of dewatering activities at the Eighty-Seven Park site on CTS and its structural stability;

ii.    Failing to appropriately monitor and analyze the impact of drawing down the water table underlying CTS;

jj.    Drawing down the water table underlying CTS asymmetrically;

kk.    Failing to recharge the water table underlying CTS;

ll.     Impacting the structural stability and condition of CTS through dewatering activities undertaken at Eighty-Seven Park;

mm.    Failing to monitor and analyze the impact of dewatering activities on the Eighty-Seven Park project site on the structural stability and condition of CTS, despite knowing that such a failure would expose CTS residents and occupants of to an unreasonable and unacceptable risk of severe injury and/or death;

nn.     Causing and allowing water to infiltrate CTS and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project;

oo.     Causing and allowing water to infiltrate CTS and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project, despite knowing that said water infiltration would damage CTS and impact its structural stability;

pp.     Failing to warn CTS and its residents and occupants that dewatering activities at the Eighty-Seven Park site could and were impacting the structural stability of CTS;

qq.     Excavating and constructing the beach access walkway immediately adjacent to the CTS south foundation wall in a manner that caused water to infiltrate the CTS foundation wall and seep into the basement parking garage;

rr.     Excavating and constructing the beach access walkway immediately adjacent to the CTS south foundation wall in a manner that caused water to infiltrate the CTS foundation and damage its structural foundation;

ss.     Constructing the beach access walkway so it was pitched and angled toward the CTS south foundation wall;

tt.     Causing water runoff to infiltrate the CTS south foundation wall and damage the CTS foundation;

uu.     Damaging the CTS south foundation wall so that water runoff was able to infiltrate the CTS foundation;

vv.     Failing to abide by applicable Florida Building Code rules and regulations, including but not limited to those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

ww.    Failing to abide by applicable OSHA rules and regulations, including but not limited to those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

xx.     Violating the Code of Ethics for Engineers;

yy.     Knowing or having had reason to know his conduct violated the Code of Ethics for Engineers;

zz.    Prioritizing corporate profits over the safety of CTS residents and occupants.

433.    DeSimone's conduct and failures, as described herein, demonstrated disregard for the safety and health of CTS residents and occupants, including Plaintiffs and the Class Members.

434.    DeSimone's negligence caused one of the most devastating and deadly building collapses in United States history, and the Plaintiffs and the Class Members suffered the damages set forth herein.

435.    By conducting itself as set forth herein, DeSimone's acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm to Plaintiffs and the Class Members.

**COUNT VIII**
**STRICT LIABILITY**
**(Against DeSimone)**

436.    Plaintiffs incorporate by reference all foregoing paragraphs as if fully set forth herein.

437.    As discussed hereinbefore, sheet pile driving was extensively performed on the Eighty-Seven Park project, and it was done at the direction and under the supervision of Defendant JMA.

438.    As the structural engineer on the Eighty-Seven Park project, Defendant DeSimone was intimately involved in the performance and progress of the pile driving activities on the project and was extremely knowledgeable regarding the pile driving activities on site.

439.    The following factors are pertinent to determine whether an activity is abnormally dangerous: (a) whether the activity involves a high degree of risk of some harm to the person, land, or chattels of others; (b) whether the harm which may result is likely to be great; (c) whether the risk cannot be eliminated by the exercise of reasonable care; (d) whether the activity is not a matter

of common usage; (e) whether the activity is inappropriate to the place where it is carried on; and (f) the value of the activity to the community. *Great Lakes Dredging*, *supra*, 460 So. 2d at 512–13.

440.    Pile driving, including sheet pile driving, is an ultrahazardous and abnormally dangerous construction activity that meets all the factors set forth in *Great Lakes Dredging*. Pile driving, including sheet pile driving necessarily involves an extreme risk of serious harm to persons and property that cannot be eliminated by the exercise of the utmost care. Pile driving also is not a matter of common usage, especially in a setting and location like the Eighty-Seven Park project site.

441.    The ultrahazardous and abnormally dangerous construction activity of pile driving poses a physical danger to persons and property in the area and adjacent to the pile driving that is of a significant magnitude and nature.

442.    Pile driving on the Eighty-Seven Park project, carried out under the supervision of DeSimone, was inappropriate given the project's proximity to CTS, a highly populated condominium building.

443.    Pile driving at the Eighty-Seven Park project was of no value to the community, given that available and suitable alternative methods of basement excavation support could have been utilized.

444.    The NV5 Report warned of the danger that the ultrahazardous and abnormally dangerous pile driving activities carried out on the Eighty-Seven Park project posed to properties adjacent to the site, including CTS and its residents and occupants. The NV5 Report specifically cautioned that vibrations caused by the ultrahazardous and abnormally dangerous pile driving

activities could damage adjacent structures, including CTS, if not properly monitored and controlled.

445.    The pile driving that the Eighty-Seven Park project performed damaged CTS and negatively impacted its structural stability.

446.    Damage to CTS's structural foundation that the ultrahazardous and abnormally dangerous pile driving activity on the Eighty-Seven Park project caused was foreseeable and within the scope of risk that pile driving presents.

447.    The ultrahazardous and abnormally dangerous pile driving activities carried out by Defendants on the Eighty-Seven Park project caused significant structural damage to CTS are a substantial factor in, a factual cause of, and/or resulted in an increased risk of harm to Plaintiffs and the Class Members and the structural damage to CTS which ultimately led to one of the deadliest building collapse in United States history.

448.    As a result of Defendant's ultrahazardous and abnormally dangerous pile driving activities and the damage that the pile driving did to CTS's structure, DeSimone is strictly liable for the injuries and damages Plaintiffs and the Class Members suffered, as alleged herein.

**COUNT IX**
**NEGLIGENCE**
**(Against the Association)**

449.    Plaintiffs incorporate by reference all foregoing paragraphs as if fully set forth herein.

450.    The Association owed Plaintiffs and the Classes a non-delegable duty under its governing documents, the Miami-Dade County Code of Ordinances, and the common law to maintain Champlain Towers South in a safe condition and to warn of unreasonable risks of harm.

451.    The Association is bound by the rights and obligations contained in its governing documents, including its Declaration and any subsequent amendments.

452.    Section 7.1 of the Declaration provides that "the Association shall be responsible, at Common Expense, for maintenance, repair and replacement of: . . . [a]ll Common Elements, Limited Common Elements and Association Property[;] . . . [a]ll portions of the Condominium (except interior wall surfaces of Units) contributing to the support of the Building[;] . . . [a]ll floor and ceiling slabs, including, but not limited to, the slabs of all terraces and balconies[;] . . . structural maintenance of the Buildings, roofing, maintenance of roads, sidewalks, parking areas, drives, streets, and driveways . . . , and general exterior maintenance . . . [; and a]ll property owned by the Association and other property . . . ." Amended and Restated Declaration of Condominium of Champlain Towers South Condominium, § 7.1, at D10-D11.

453.    In addition to the duties imposed by the Declaration, the Association also had a duty to maintain the Champlain Towers South condominium building in a safe condition pursuant to section 8-11(a) of the Miami-Dade County Code of Ordinances.

454.    The Association owed Plaintiffs and the Class Members a non-delegable duty to exercise reasonable care in its control, maintenance, and operations of Champlain Towers South's common elements and limited common elements.

455.    The Association also owed Plaintiffs and the Class Members duties to keep Champlain Towers South in a reasonably safe condition, to guard them against dangers of which the Association was cognizant or might have reasonably foreseen and to warn them about damage and resultant latent defects about which the Association knew or should have known, but that Plaintiffs and the Class Members did not.

456.    The Association knew or should have known that its actions, inactions, and omissions posed significant and foreseeable risks of unreasonable harm to Plaintiffs and the Class Members.

457.    Despite knowledge of these foreseeable risks, the Association failed to take reasonable steps to avoid damage and to protect Plaintiffs and the Class Members. As a result, the Association breached its duty of reasonable care in its control, maintenance, and operation of Champlain Towers South's common elements and limited common elements.

458.    The Association also breached its duties to keep Champlain Towers South in a reasonably safe condition, to guard against dangers of which the Association was cognizant or might have reasonably foreseen and to warn about damage and resultant latent defects about which the Association knew or should have known, but that Plaintiffs and the Class Members did not know.

459.    The Association's actions, inactions, and omissions materially breached the duties it owed to Plaintiffs and the Class Members. The Association's actions, inactions, and omissions also unreasonably increased the risk of harm to Plaintiffs and the Class Members.

460.    The Association's actions, inactions, and omissions proximately and directly caused, or were substantial factors in causing harm to Plaintiffs and the Class Members.

461.    Plaintiffs and the Class Members are entitled to a judgment that the Association is liable to Plaintiffs and the Class Members for damages suffered because of the Association's negligence. Plaintiffs and the Class Members should be compensated for damages in an amount to be determined by juries in a subsequent damages phase of this litigation, after certification of the Liability Class and a bifurcated trial on the issue of Defendant's liability and apportionment of fault.

462.    All Plaintiffs and the Class Members, including those serving on behalf of estates, as power of attorneys, or personal representatives for victims, the applicable estates, power of attorneys, and personal representatives, are entitled to judgments against and separate awards for their recoverable damages from the Association.

## COUNT X
## NEGLIGENCE
### (Against Morabito)

463.    Plaintiffs incorporate by reference all foregoing paragraphs as if fully set forth herein.

464.    Morabito was retained for purposes related to CTS's 40-year recertification process.

465.    Section 8-11(f) of the Miami-Dade County Code requires all buildings, including CTS, which are 40 years or older to be recertified by the Building Official and then every ten years thereafter.

466.    The fundamental purpose of the required inspection and recertification is to confirm that the building is structurally safe for continued occupancy.

467.    It is critical that the structural inspection performed in relation to the recertification process examine the effects of time with respect to deterioration of the structure and determine whether immediate action is necessary to ensure the structural stability of the building and the safety of the residents, occupants, and guests.

468.    The need for a thorough structural inspection and examination, including a quantitative analysis performed through sampling and testing, is especially necessary in the marine climate in which the CTS condominium building was located, where highly aggressive conditions exist year-round.

469.    At an absolute minimum, a proper structural inspection and analysis will examine the structure for the following: general alignment, including bulging, settlement, defections, expansion, and contraction; any portions showing distress such as beams, columns, structural walls, floors, or roofs; surface conditions of the structure which should be specifically examined for cracking, spalling, peeling, signs of moisture penetration, and stains; cracks throughout the structure; the general extent of deterioration such as cracking or spalling of concrete or masonry, oxidation of metals, and rot or borer attack in wood; previous patching or repairs and the condition of the patching and repairs; and the nature of the present loading conditions and their magnitude. This is explicitly spelled out by the **Minimum Inspection Procedural Guidelines for Building's Structural Recertification Form**:

| MINIMUM INSPECTION PROCEDURAL GUIDELINES FOR BUILDING'S STRUCTURAL RECERTIFICATION | | |
|---|---|---|
| **2. PRESENT CONDITION OF STRUCTURE** | | |
| a. | General alignment (not good, fair, poor, explain if significant) | |
| | 1. | Bulging: |
| | 2. | Settlement: |
| | 3. | Defections: |
| | 4. | Expansion: |
| | 5. | Contraction: |
| b. | Portion showing distress (Note, beams, columns, structural walls, floors, roofs, other): | |
| | | |
| c. | Surface conditions – describe general conditions of finishes, noting cracking, spalling, peeling, signs of moisture penetration & stains: | |
| | | |
| d. | Cracks – note location in significant members. Identify crack size as HAIRLINE if barely discernable; FINE if less than 1 mm in width; MEDIUM if between 1 and 2 mm in width; WIDE if over 2 mm.: | |
| | | |
| e. | General extent of deterioration – cracking or spalling of concrete or masonry; oxidation of metals; rot or borer attack in wood: | |
| | | |
| f. | Previous patching or repairs: | |
| g. | Nature of present loading indicate residential, commercial, or other; estimate magnitude: | |

470.    The Minimum Inspection Procedual Guidelines for Building's Structural Recertification outlines the detailed analysis that must be performed to ensure the structural

stability of the building, including thorough inspection requirements and the provision of supporting data.

471.   In 2018, the Association retained Morabito to perform a structural engineering analysis of the building and submit a report in anticipation of the upcoming 40-year recertification requirement.

472.   Morabito performed a Field Survey including inspection and analysis of the structural integrity of the Champlain Towers South condominium building and rendered a report dated October 8, 2018.

473.   The goal of Morabito's 2018 analysis "was to understand and document the extent of structural issues that require repair and/or remediation in the immediate and near future" in order to "provide a safe and functional infrastructure for the future."

474.   The conclusions reached and recommendations given in Morabito's 2018 report were alarming, required immediate remediation, and raised multiple red flags which Morabito ignored.

475.   Much of the significant structural damage Morabito observed and documented in 2018 was caused by the construction activities of the Eighty-Seven Park project, as discussed thoroughly above.

476.   The structural issues existing at CTS at the time of Morabito's 2018 inspection were obvious and pervasive.

477.   Morabito's investigation and analysis found that it was "typical that the concrete slab edges of the balconies were experiencing concrete spalling or cracking" and that they be "further investigated and repaired" in accordance with the requirements of the International Concrete Repair Institute ("ICRI").

 

478.     Morabito further found that nearly half of all balconies of CTS showed evidence of deterioration that Morabito classified as "a systemic issue" that can only be repaired by removing all of the balcony tile and repairing the damaged concrete surfaces at the top and bottom of the slab. Morabito advised that "[p]atrial/full depth concrete repairs in these areas shall be performed in accordance with the recommendations of ICRI."

479.     Morabito's 2018 inspection further documented "Significant cracking in the stucco exterior façade."

480.     Much of the "significant cracking in the stucco exterior façade" was not present and was not identified during the Eighty-Seven Park pre-construction survey and, thus, was caused by the Eighty-Seven Park construction activities.

481.     Morabito's inspection and analysis of the pool deck area of the building revealed an alarming failure of the waterproofing, which was allowing extensive water infiltration and "**major structural damage** *to the concrete structural slab below these areas.*"

482.     Morabito found that "*[f]ailure to replace the waterproofing in the near future will cause the extent of the concrete deterioration to expand exponentially.*"

483.   Morabito informed Defendant CTS that "installation of deck waterproofing on a flat structure is a systemic issue for this building structure."

484.   Despite Morabito's findings, Morabito never insisted and demanded that the waterproofing and major structural damage to the concrete structural slab below the pool deck be repaired, even though Morabito knew it would only get exponentially worse.

485.   Morabito's inspection and analysis of the building's parking garage revealed even more unacceptable signs of obvious and dangerous structural deterioration.

486.   In its 2018 inspection and Field Survey, Morabito found that there was *"[a]bundant cracking and spalling of varying degrees . . . in the concrete columns, beams, and walls."*

487.   Morabito's 2018 report further details that *"[s]everal sizeable spalls were noted in both the topside of the entrance drive ramp and underside of the pool/entrance drive/planter slabs, which included instances with exposed, deteriorating rebar."*

488.   Thus, Morabito found that not only were the structural concrete slabs underneath the pool deck experiencing dramatic and rapid deterioration due to dilapidated and ineffective waterproofing, but that the concrete on the underside of the pool had significant concrete spalling and "exposed, deteriorating rebar."

489.   Morabito advised that the "Entrance/Pool deck concrete slabs that are showing distress" must be *"removed and replaced in their entirety."*

490.   Morabito told the Association that "the concrete deterioration needs to be repaired in a timely fashion" and "in accordance with the recommendations of ICRI."

491.   Morabito's observations and findings during its 2018 inspection should have spurred Morabito to examine the structural stability of CTS further by inspecting the sub-surface foundation.

492.    Morabito never inspected the sub-surface foundation.

493.    Morabito's 2018 inspection "revealed that many of the previous garage concrete repairs are failing resulting in additional concrete cracking, spalling and leaching of calcium carbonate deposits." Alarmingly, at the "underside of Entrance/Pool deck where the slab had been epoxy-injected, new cracks were radiating from the originally repaired cracks."

494.    Morabito's findings rendered CTS an "unsafe" structure pursuant to section 8-5(b)(2)(ii) of the Miami-Dade County Building Code.

495.    Despite CTS being classified as an unsafe structure under the Miami-Dade County Building Code by virtue of Morabito's findings that there as major structural damage, Morabito took absolutely no action to notify the residents and occupants of the building or otherwise make the building safe.

496.    Again, the majority of the damage Morabito observed was caused by the Eighty-Seven Park construction activities. Regardless of the cause of the damage, Morabito had a responsibility and duty to warn about the imminent nature of the damage and the extreme risk to the residents and occupants of CTS the structural damage posed.

497.    Following Morabito's inspection and the rendering of its October 8, 2018 Report, Morabito was required to submit a written report to the Town of Surfside certifying that CTS was structurally safe in conformity with the aforementioned minimum inspection procedural guidelines, pursuant to section 8-11(f)(iv) of the Miami-Dade County Building Code.

498.    Morabito never submitted the required report mandated by section 8-11(f)(iv) of the Miami-Dade County Building Code prior to the collapse.

499.    Instead, in an apparent attempt to wash away its failures in the wake of this tragedy, Morabito submitted the report required by section 8-11(f)(iv) of the Miami-Dade County Building Code at 5:35 p.m. on June 24, 2021, approximately 16 hours after CTS collapsed.

500.    The section 8.11(f) report that Morabito submitted after the devastating collapse starkly and noticeably contrasts Morabito's October 8, 2018 Report.

501.    The unverified report Morabito submitted following the collapse mentions *none* of the alarming findings from Morabito's October 8, 2018 Report—there is no reference to the "major structural damage" that would "expand exponentially" if not repaired, nor is there reference to the "abundant cracking and spawling[.]"

502.    Although Morabito identified the significant structural issues in the 2018 inspection and report and advised that the issues should be repaired in a timely fashion, Morabito unacceptably failed to explain the significance of its findings with respect to the potential for an imminent structural collapse and failed to warn the residents and occupants of CTS.

503.    Morabito had a responsibility to explain that the structural issues identified presented an immediate and significant risk to the lives of the people in the building, but Morabito failed to meet this responsibility.

504.    Morabito knew or should have known that the issues identified in the 2018 inspection/analysis and reflected in the October 8, 2018 report rendered the Champlain Towers South condominium building structurally unstable and at risk of a devastating collapse at any moment.

505.    Morabito further should have recognized that the issues identified and observed in the 2018 inspection/analysis required a thorough examination of the building's foundation to examine whether it was structurally safe but failed to do so.

506.     Morabito knew or should have known that a failure to advise the Association that the building was at risk of an imminent collapse and that it should be evacuated until the necessary and life-saving repairs could be made would expose the occupants of the building to an unreasonable and unacceptable risk of harm.

507.     Despite this knowledge, Morabito failed to do what was right and chose not to advise that CTS was at risk of a collapse and further failed to advise that the Association evacuate the building until the necessary repairs could be made and the structural stability of the building ensured.

508.     Following Morabito's 2018 Field Survey, Morabito made numerous return trips to CTS to conduct additional inspections and investigations, which only further revealed the dangerous condition of CTS and should have caused Morabito to take action to protect the residents and occupants of CTS.

509.     Morabito had an ethical, legal, and professional obligation to warn and advise the residents and occupants of CTS of the danger of an imminent collapse and to take further investigative measures to determine the condition of CTS's subsurface structural condition.

510.     Morabito failed to take any life-saving measures whatsoever.

511.     Morabito had a duty to inspect CTS adequately and thoroughly for any and all signs of structural damage and deterioration.

512.     Morabito had a duty to determine whether CTS was structurally safe and sound and fit for continued occupancy.

513.     Morabito had a duty to ensure that the results of its structural inspection and analysis were adequately and clearly communicated to CTS.

514. Morabito had a duty to ensure that the implications and potential consequences of the findings of its inspection and analysis were thoroughly and adequately communicated to the Association.

515. Morabito had a duty to determine and analyze the risk of an imminent collapse and clearly communicate the results of such an analysis and determination to the Association.

516. Morabito had a duty to take action to ensure that appropriate corrective measures were put into place following any inspection and analysis that determined CTS was not structurally safe, for the safety of the residents and occupants in the building.

517. Upon being retained in 2020 and 2021 and observing that *none* of the major structural damage identified in its 2018 report had been addressed, Morabito had an unquestionable duty to notify the Association and CTS residents and occupants that the building was at an imminent risk of collapse and immediate action needed to be taken.

518. The National Society of Professional Engineers Code of Ethics for Engineers establishes the fundamental canon and rule of practice that professional engineers must "Hold paramount the safety, health, and welfare of the public."

519. Morabito failed to abide by the fundamental canon of the Code of Ethics for Engineers to hold the safety, health, and welfare of the public, and specifically of CTS residents and occupants, of paramount importance by engaging in the acts and omissions discussed herein

520. Morabito failed all of these aforementioned duties, and as a result, CTS collapsed on June 24, 2021.

521. Morabito, acting by and through his agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos, both generally and in the following particular respects breached the duties owed to Plaintiffs and the Class Members:

a.      Failing to conduct a thorough and adequate structural inspection of CTS;

b.      Failing to identify significant structural damage and deficiencies during inspection of CTS;

c.      Failing to take immediate action to reinforce the structural stability of CTS or otherwise make it safe for continued occupancy;

d.      Failing to determine or analyze whether CTS was structurally safe and fit for continued occupancy;

e.      Failing to determine or analyze whether CTS was structurally safe and fit for continued occupancy despite knowing that such a failure would expose the residents and occupants of the building to the unreasonable and unacceptable risk of severe harm;

f.      Failing to adequately analyze the risks and dangers presented by the significant structural damage and deterioration identified during its inspection;

g.      Failing to adequately communicate the risks and dangers presented by the significant structural damage and deterioration identified in its inspection to CTS;

h.      Failing to recognize that CTS was at an imminent risk of collapse;

i.      Failing to advise that CTS was at an imminent risk of collapse;

j.      Failing to inform the Association that the structural repairs had to be made immediately otherwise a collapse could occur;

k.      Failing to employ competent and sufficiently trained inspectors and engineers;

l.      Failing to adequately and thoroughly explain to CTS the consequences and ramifications of a failure or refusal to fix the significant structural damage and deficiencies identified in the inspection;

m.      Failing to advise and/or demand that the building be evacuated until such time that the significant structural damage was repaired and/or otherwise addressed;

n.      Failing to adequately warn CTS and the residents and occupants, including Plaintiffs and the Class Members, of the imminent threat posed by the significant structural damage observed;

o.      Failing to demand and/or otherwise ensure that the structural damage was appropriately addressed and/or repaired;

p.   Failing to conduct a proper structural engineering analysis of CTS;

q.   Failing to conduct a structural analysis of the foundation of CTS, despite knowing of the major structural damage that was clearly visible during its 2018 inspection;

r.   Failing to urgently inform the Association and CTS residents and occupants that immediate emergency action must be taken to protect the lives of the building's residents and occupants upon being retained again in 2020 and 2021 and learning that none of the major structural damage identified in 2018 had been fixed;

s.   Failing to recognize that CTS had been sinking since at least the 1990's and that this sinking potentially compromised the structural integrity of the building's foundation;

t.   Failing to insist that the major structural damage identified in 2018 be repaired immediately or otherwise evacuate the residents of the building;

u.   Violating the Miami-Dade County Building Code;

v.   Knowing or having had reason to know his conduct violated the Miami-Dade County Building Code;

522.   Morabito's conduct, as described above, demonstrated a disregard for the safety, health, and economic damages of the residents and occupants of CTS, including Plaintiffs and the Class Members.

523.   Due to Morabito's negligence, Plaintiffs and the Class Members sustained the damages and injuries alleged herein.

524.   By conducting itself as set forth above, Morabito's acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm to Plaintiffs and the Class Members.

**COUNT XI**
**GROSS NEGLIGENCE**
**(Against Becker)**

525.   Plaintiffs incorporate by reference all foregoing paragraphs as if fully set forth herein.

526.     Plaintiffs and the Class Members make this gross negligence claim as a direct claim against Becker, rather than as third-party beneficiaries of the Association's contractual relationship with Becker.

527.     Defendant Becker was retained by the CTS Board of Directors to counsel the board in all facets of managing the CTS condominium, including for purposes related to CTS's 40-year recertification process and ongoing conflicts with the Terra Defendants and their construction activities in the adjacent lot.

528.     To be clear, Plaintiffs and Class members do not bring this gross negligence claim against Becker as purported third party beneficiaries of Becker's contractual legal relationship with Defendant CTS. *Silver Dunes Condo. of Destin, Inc. v. Beggs & Lane*, 763 So. 2d 1274, 1276 (Fla. 1st DCA 2000). Rather, this cause of action is brought against Becker to hold it liable for its callous, reckless, and conscious disregard for the lives and safety of the CTS residents, given the knowledge Becker had as to the imminent risk of death or serious injury the condition of the CTS building posed to the residents, its expertise and ability to appreciate the significance of that risk, its knowledge and ability to properly advise the CTS Association how to respond to mitigate that risk, and Becker's complete and total failure to render that advice or to take any measures to ensure that the issues that ultimately lead to the collapse of CTS were addressed in any meaningful way.

529.     In 2018, the CTS Association retained Defendant Morabito to perform a structural engineering analysis of the building and submit a report in anticipation of the impending 40-year recertification requirement.

530.     Defendant Morabito performed a Field Survey including inspection and analysis of the structural integrity of the CTS condominium building and rendered a report dated October 8, 2018.

531.     The goal of Morabito's 2018 analysis "was to understand and document the extent of structural issues that require repair and/or remediation in the immediate and near future" in order to "provide a safe and functional infrastructure for the future."

532.     The conclusions reached and recommendations given in Morabito's 2018 report were alarming, required immediate remediation, and raised multiple red flags which went ignored by Becker.

533.     Much of the significant structural damage observed and documented by Morabito in 2018 was caused by the construction activities of the Eighty-Seven Park project, as discussed thoroughly above.

534.     The structural issues existing at CTS at the time of Morabito's 2018 inspection were obvious and pervasive.

535.     Becker, as a leading law firm in Florida—if not the country—with unique experience and expertise in community association and construction issues, possessed the skill, knowledge, and expertise to appreciate the issues raised in the Morabito reports and caused by the adjacent construction of Eighty-Seven Park. Becker knew or should have known the impact of these issues in relation to the CTS building and were uniquely situated to counsel the CTS Association on how to act to resolve these issues and to protect the life, safety, and welfare of the CTS residents.

536.     Moreover, the CTS residents repeatedly made Becker aware of the structural issues existing at CTS, including their concerns regarding the Eighty-Seven construction and of the findings in the Morabito reports.

537.     Becker's actions and inactions were callous, reckless, and in conscious disregard of the lives, safety, and property of CTS residents and occupants. Becker knew and understood

that (a) CTS occupant reports showed that CTS's structural damage posed extreme risks; (b) reports on damage from Eighty-Seven Park's construction and operations showed that CTS's structural damage posed extreme risks; (c) the 40-year recertification inspection reports showed that CTS's structural damage posed extreme risks; (d) the Morabito 2018 inspection report showed that CTS's structural damage posed extreme risks; and (e) the Morabito 2020 inspection report showed that CTS's structural damage posed extreme risks. Notwithstanding at least this knowledge and understanding, notwithstanding Becker's experience and expertise in mitigating condominium liability, and notwithstanding Becker's understanding that the Association deferred to Becker's advice and counsel on nearly all aspects of CTS management, Becker failed to advise, counsel, or cause the Association to timely or adequately address the extreme risks at CTS.

538.    Despite this knowledge, Becker failed to advise, counsel, or cause the Association to timely or adequately address the extreme risks at CTS, causing and contributing to the ongoing economic damages and catastrophic injuries suffered in CTS's collapse.

539.    Becker acknowledges that in the face of these serious risks to the life, safety, and welfare of the CTS residents, Becker could—and should—have specifically advised the CTS Association to take appropriate actions, to bring in the Surfside building department, and to take various emergency steps to protect the CTS residents from the risk of imminent collapse of the CTS building.

540.    But despite Becker's knowledge of these issues and their likely catastrophic impact, Becker did nothing.

541.    Defendant Becker knew or should have known that a failure to advise Defendant CTS that the building was at risk of an imminent collapse and that it should be evacuated until the

necessary and life-saving repairs could be made would expose the occupants of the building to an unreasonable and unacceptable risk of harm.

542.     Despite this aforementioned knowledge, Becker failed to do what was right and chose not to advise that the Champlain Towers South condominium building was at risk of a collapse and further failed to advise that the CTS Association evacuate the building until the necessary repairs could be made and the structural stability of the building ensured.

543.     Becker had an ethical, legal, and professional obligation to warn and advise the residents and occupants of CTS of the danger of an imminent collapse and to take further investigative measures to determine the condition of CTS's subsurface structural condition.

544.     Becker failed to take any life-saving measures whatsoever.

545.     At the time of the CTS collapse, there was a composite of circumstances which, together, constituted an imminent and present danger amounting to more than the normal and usual peril. Becker's conduct as described herein was so grossly negligent, reckless, and wanting in care that it constituted a conscious disregard and indifference to the life, safety, or rights of persons exposed to such conduct. In other words, Becker's conduct, as described above, demonstrated a willful and wanton disregard for the safety and health of the residents and occupants of CTS, including Plaintiffs and Class Members.

546.     By reason of the gross negligence, recklessness, outrageous, and willful and wanton conduct of Becker, as aforesaid, Plaintiffs and Class Members were caused to sustain the damages and injuries alleged herein.

547.     By conducting itself as set forth above, Becker's acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm to Plaintiffs and Class Members.

548.    Plaintiffs and the Class Members are entitled to a judgment that Becker is liable to Plaintiffs and Class Members for damages suffered because of the Becker's gross negligence. Plaintiffs and the Class Members should be compensated for damages in an amount to be determined in a subsequent damages phase of this litigation, after certification of the Liability Class and a bifurcated trial on the issue of Defendant's liability and apportionment of fault.

549.    Plaintiffs and the Class Members, including those serving on behalf of estates, as power of attorneys, or personal representatives for victims, the applicable estates, power of attorneys, and personal representatives, are entitled to judgments against and separate awards for their recoverable damages from Becker.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Liability Class, the Personal Injury and Wrongful Death Subclass, Non-Owner Personal Injury and Wrongful Death Subclass, and the Economic Loss and Property Damage Subclass, demand judgment against all Defendants for remedies including, but not limited to, the following:

a.    Declare this action to be a proper class action pursuant to Fla. R. Civ. P 1.220(a), (b)(1) or (b)(3), (d)(1), and (d)(4) on behalf of a Liability Class, a Personal Injury and Wrongful Death Subclass, Non-Owner Personal Injury and Wrongful Death Subclass, and an Economic Loss and Property Damage Subclass;

b.    Designate and appoint:

   i.    Liability Class Representatives and Liability Class Counsel;

   ii.    Personal Injury and Wrongful Death Subclass Representatives and Personal Injury and Wrongful Death Subclass Counsel;

   iii.    Non-Owner Personal Injury and Wrongful Death Subclass Representatives and

Non-Owner Personal Injury and Wrongful Death Subclass Counsel;

    iv.    Economic Loss and Property Damage Subclass Representatives and Economic Loss and Property Damage Subclass Counsel;

c.    Award Plaintiffs and the Class Members damages in an amount to be proven at trial;

d.    Award Plaintiffs and the Class Members their reasonable attorneys' fees and costs, as allowed by law;

e.    Award Plaintiffs and the Class Members pre-judgment and post-judgment interest, as provided by law; and

f.    Award Plaintiffs and the Class Members any further and different relief as this case may require or as determined by this Court to be just, equitable, and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Fla. R. Civ. P. 1.430(b), Plaintiffs, the Liability Class, the Personal Injury and Wrongful Death Subclass, Non-Owner Personal Injury and Wrongful Death Subclass, and the Economic Loss and Property Damage Subclass hereby demand a jury trial on all issues so triable.

Dated: November 16, 2021             Respectfully submitted,

                          */s/ Rachel W. Furst*
                          Rachel W. Furst (FBN 45155)
                          GROSSMAN ROTH YAFFA COHEN, P.A.
                          2525 Ponce de Leon Boulevard, Suite 1150
                          Coral Gables, FL 33134
                          Tel: (305) 442-8666
                          rwf@grossmanroth.com

                          *Plaintiffs' Co-Chair Lead Counsel*

*/s/ Harley S. Tropin*
Harley S. Tropin (FBN 241253)
Javier A. Lopez (FBN 16727)
Jorge L. Piedra (FBN 88315)
Tal J. Lifshitz (FBN 99519)
Eric S. Kay (FBN 1011803)
KOZYAK TROPIN &
THROCKMORTON LLP
2525 Ponce de Leon Boulevard, 9th Floor
Coral Gables, FL 33134
Tel: (305) 372-1800
hst@kttlaw.com

*Plaintiffs' Co-Chair Lead Counsel*

*/s/ Ricardo M. Martínez-Cid*
Aaron S. Podhurst (FBN 63606)
Ricardo M. Martínez-Cid (FBN 383988)
Lea P. Bucciero (FBN 84763)
PODHURST ORSECK, P.A.
1 SE 3rd Avenue, Suite 2300
Miami, FL 33131
Tel: (305) 358-2800
rmcid@podhurst.com

*Plaintiffs' Personal Injury and Wrongful
  Death Track Lead Counsel*

*/s/ Adam M. Moskowitz*
Adam M. Moskowitz (FBN 984280)
Howard M. Bushman (FBN 364403)
Adam A. Schwartzbaum (FBN 93014)
Joseph M. Kaye (FBN 117520)
THE MOSKOWITZ LAW FIRM, PLLC
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
Tel: (305) 740-1423
adam@moskowitz-law.com

*Plaintiffs' Economic Loss and Property
  Damage Track Co-Lead Counsel*

*/s/ Javier A. Lopez*
Javier A. Lopez (FBN 16727)
KOZYAK TROPIN &
THROCKMORTON LLP
2525 Ponce de Leon Boulevard, 9th Floor
Coral Gables, FL 33134
Tel: (305) 372-1800
jal@kttlaw.com

*Plaintiffs' Economic Loss and Property
  Damage Track Co-Lead Counsel*

*/s/ Curtis B. Miner*
Curtis B. Miner (FBN 885681)
COLSON HICKS EIDSON, P.A.
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Tel: (305) 476-7400
curt@colson.com

*Plaintiffs' Wrongful Death Charitable
  Liaison Counsel*

/s/ Stuart Z. Grossman
Stuart Z. Grossman (FBN 156113)
GROSSMAN ROTH YAFFA COHEN, P.A.
2525 Ponce de Leon Boulevard, Suite 1150
Coral Gables, FL 33134
Tel: (305) 442-8666
szg@grossmanroth.com

Plaintiffs' Wrongful Death Damage Claim
   Liaison Counsel

/s/ Robert J. Mongeluzzi
Robert J. Mongeluzzi (pro hac vice)
Jeffrey P. Goodman (pro hac vice)
SALTZ MONGELUZZI & BENDESKY
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Tel: (215) 496-8282
rmongeluzzi@smbb.com

Plaintiffs' Steering Committee

/s/ Gonzalo R. Dorta
Gonzalo R. Dorta (FBN 650269)
GONZALO R. DORTA, P.A.
334 Minorca Avenue
Coral Gables, FL 33134
Tel: (305) 441-2299
grd@dortalaw.com

Plaintiffs' Steering Committee

/s/ MaryBeth LippSmith
MaryBeth LippSmith (pro hac vice)
Graham LippSmith (pro hac vice)
LIPPSMITH LLP
555 S. Flower Street, Suite 4400
Los Angeles, CA 90071
Tel: (213) 344-1820
mb@lippsmith.com

Plaintiffs' Steering Committee

/s/ John Scarola
John Scarola (FBN 169440)
SEARCY DENNEY SCAROLA
BARNHART & SHIPLEY, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, FL 33409
Tel: (561) 686-6300
jsx@searcylaw.com

Plaintiffs' Steering Committee

/s/ Shannon del Prado
Shannon del Prado (FBN 127655)
PITA WEBER & DEL PRADO
9350 S. Dixie Highway, Suite 1200
Miami, FL 33156
Tel: (305) 670-2889
sdelprado@pwdlawfirm.com

Plaintiffs' Steering Committee

/s/ Willie E. Gary
Willie E. Gary (FBN 187843)
GARY WILLIAMS PARENTI
WATSON & GARY, PLLC
221 S.E. Osceola Street
Stuart, FL 34994
Tel: (772) 283-8260
weg@williegary.com

Plaintiffs' Steering Committee

/s/ Judd G. Rosen
Judd G. Rosen (FBN 458953)
GOLDBERG & ROSEN, P.A.
2 S. Biscayne Boulevard, Suite 3650
Miami, FL 33131
Tel: (305) 374-4200
jrosen@goldbergandrosen.com

Plaintiffs' Steering Committee

*/s/ John H. Ruiz*
John H. Ruiz (FBN 928150)
MSP RECOVERY LAW FIRM
2701 S. LeJuene Road, 10th Floor
Coral Gables, FL 33134
Tel: (305) 614-2222
jruiz@msprecoverylawfirm.com

*Plaintiffs' Steering Committee*

*/s/ Jorge E. Silva*
Jorge E. Silva (FBN 964476)
SILVA & SILVA, P.A.
236 Valencia Avenue
Coral Gables, FL 33134
Tel: (305) 445-0011
jsilva@silvasilva.com

*Plaintiffs' Steering Committee*

*/s/ Luis E. Suarez*
Luis E. Suarez (FBN 390021)
HEISE SUAREZ MELVILLE, P.A.
1600 Ponce de Leon Boulevard, Suite 1205
Coral Gables, FL 33134
Tel: (305) 800-4476
lsuarez@hsmpa.com

*Plaintiffs' Steering Committee*

*/s/ Bradford R. Sohn*
Bradford R. Sohn (FBN 98788)
THE BRAD SOHN LAW FIRM
1600 Ponce de Leon Boulevard, Suite 1205
Coral Gables, FL 33134
Tel: (786) 708-9750
brad@bradsohnlaw.com

*Plaintiffs' Steering Committee*

*William F. "Chip" Merlin, Jr.*
William F. "Chip" Merlin, Jr. (FBN 364721)
MERLIN LAW GROUP
777 S. Harbour Island Blvd., Suite 950
Tampa, FL 33602
Tel: (813) 229-1000
cmerlin@merlinlawgroup.com

*Plaintiffs' Insurance Coverage Liaison Counsel*

## <u>CERTIFICATE OF SERVICE</u>

We hereby certify that on November 16, 2021, we electronically filed the foregoing with the Clerk of the Court using the Court's electronic filing portal. We also certify that the foregoing is being electronically served this day on all counsel of record via transmission of Notices of Electronic Filing generated by the Court's electronic filing portal.

By: <u>*/s/ Harley S. Tropin*</u>
      Harley S. Tropin

By: <u>*/s/ Rachel W. Furst*</u>
      Rachel W. Furst

*Plaintiffs' Co-Chair Lead Counsel*